**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________

MOHAMMED JUNAEID HOSSAN PARBAS;
FRANCIS KAMUGISHA;
MD ABDUS SALAM;
MOHAMMED GIAS UDDIN; and
NABUULE GIFT ELIZABETH, *individually and on behalf of all others similarly situated,*

Plaintiffs,

v.

HUIONE GLOBAL, LTD.;
HUIONE PAY INC.;
HUIONE PAY PLC;
HUIONE CRYPTO;
HAOWANG GUARANTEE f/k/a HUIONE GUARANTEE;
HUIONE GROUP;
XINBI CO., LTD.;
XINBI GUARANTEE;
SEA DRAGON TRADING, LLC;
SEA DRAGON REMODEL, INC.;
HAILONG ZHU;
LU ZHANG;
JUSTIN WALKER;
JOSEPH WONG; and
DAREN LI,

Defendants.

---

**FILED UNDER SEAL**

**CLASS ACTION COMPLAINT**

---

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. PARTIES .......... 6

A. Plaintiffs .......... 6

B. Defendants .......... 8

1. The Huione Defendants .......... 8

2. The Xinbi Defendants .......... 10

3. The Sea Dragon Defendants .......... 11

III. NATURE OF THE PROCEEDING AND RELIEF SOUGHT .......... 13

IV. JURISDICTION AND VENUE .......... 14

V. DEFENDANTS' VENTURE TRAFFICKED PLAINTIFFS AND FORCED THEM INTO LABOR .......... 14

A. Background on the Southeast Asian Cyber Scam Industry .......... 14

B. Defendants Trafficked Plaintiffs and Coerced them Into Labor .......... 17

1. Plaintiff Ariyan .......... 18

2. Plaintiff Frank .......... 21

3. Plaintiff Salam .......... 24

4. Plaintiff Joton .......... 28

5. Plaintiff Elizabeth .......... 30

VI. DEFENDANTS KNOWINGLY PARTICIPATED IN AND BENEFITED FROM THE TRAFFICKING VENTURE .......... 33

A. Background on Cryptocurrencies .......... 34

B. Scam Proceeds from the Compound Wallet Are Linked to Huione, Xinbi, and Sea Dragon and their Money Laundering Network .......... 37

C. Huione's Additional Human Trafficking and Money Laundering Activities on Behalf of Defendants' Trafficking Venture .......... 44

1. Huione Laundered Funds for a Scam Compound that Trafficked Plaintiff Ariyan .......... 45

2. Huione Constructed and Operates a Scam Compound ..... 47

3. Huione Knowingly Participates in Human Trafficking ..... 49

4. Huione Knowingly Participates in Additional Investment Scam and Money Laundering Activities for the Venture ..... 53

5. Huione Has Continued Participating in and Benefiting from the Venture Despite Efforts to Stop It ..... 60

D. The Xinbi Defendants' Money Laundering and Scam Services for the Trafficking Venture ..... 67

E. The Sea Dragon Defendants' Investment Scam and Money Laundering Services for the Trafficking Venture ..... 71

VII. CLASS ACTION ALLEGATIONS ..... 79

VIII. CLAIMS FOR RELIEF ..... 81

COUNT I: TVPA Beneficiary Liability ..... 81

COUNT II: Colorado Organized Crime Control Act ..... 82

IX. PRAYER FOR RELIEF ..... 83

X. JURY DEMAND ..... 84

Plaintiffs Mohammed Junaeid Hossan Parbas ("Ariyan"), Francis Kamugisha ("Frank"), MD Abdus Salam ("Salam"), Mohammed Gias Uddin ("Joton"), and Nabuule Gift Elizabeth ("Elizabeth"), on behalf of themselves and those similarly situated (the "Class," as further defined below), bring this action pursuant to the Trafficking Victims Protection Act ("TVPA"), as codified at 18 U.S.C. §§ 1581 *et seq*., and the Colorado Organized Crime Control Act ("COCCA"), C.R.S. §§ 18-17-101 *et seq*., against: (1) the "Huione Defendants" or "Huione" (defined as Huione Group; Huione Global Ltd, f/k/a Huione LTD, f/k/a Lotcoin LTD; Huione Pay Inc.; Huione Pay PLC; Huione Crypto; and Haowang Guarantee, f/k/a Huione Guarantee); (2) the "Xinbi Defendants" or "Xinbi" (defined as Xinbi Co., Ltd. and Xinbi Guarantee); and (3) the "Sea Dragon Defendants" or "Sea Dragon" (defined as Sea Dragon Trading, LLC; Sea Dragon Remodel, Inc.; Hailong Zhu; Lu Zhang; Justin Walker; Joseph Wong; and Daren Li), and allege as follows:

## I. <u>INTRODUCTION</u>

1. This is an action to stop Defendants' further dissipation of over $500 million in ill-gotten gains from harming Plaintiffs, currently held as cryptocurrencies. Defendants obtained these funds illicitly, through a vast criminal venture that trafficked and enslaved Plaintiffs and the Class, and then forced them—through beatings, torture, and threats of violence—to assist Defendants' online investment scams and frauds targeting Americans.

2. Between 2021 and the present, Plaintiffs and a Class of human trafficking victims were lured under false pretenses to Southeast Asia where they were enslaved, tortured, and otherwise coerced into participating in their captors' online scamming activities.

3. After escaping from these "internet scam compounds" in Myanmar, Cambodia, and Laos in which they were enslaved, Plaintiffs worked with cryptocurrency tracing experts who were able to identify those responsible for their enslavement. Through that forensic analysis, Plaintiffs

also uncovered how Defendants laundered the ill-gotten gains of their criminal activities—including proceeds from investment scam victims, from marketplaces selling implements of torture and human trafficking, and from brokering the trafficking of humans, all while refusing to pay Plaintiffs for their labor—through a complex web of cryptocurrency accounts.

4. Defendants have laundered billions of dollars through this cryptocurrency network and continue to spend the ill-gotten gains remaining in their accounts. Fortunately, this Court still has jurisdiction over these funds and accounts, because they are controlled by certain cryptocurrency intermediary third parties that are incorporated or have a substantial presence in the United States and thus would be subject to and presumably abide by a Court order. However, should Defendants receive notice of this action before the assets are frozen, they will transfer them beyond the Court's reach and render any relief that may arise from this action meaningless.

5. Defendants knowingly operated, participated in, and benefited from a venture that, among other things, lures human victims and moves them across international borders, enslaves them, tortures them, and forcibly conscripts them into defrauding American victims through online scams, the proceeds of which Defendants then launder ("Trafficking Venture" or the "Venture").

6. Defendants' Trafficking Venture involves three key and interrelated components, each of which was required for it to succeed: (1) human trafficking, enslavement, and forced labor; (2) theft or conversion of assets from individuals in the United States through online scams; and (3) money laundering the proceeds from the United States.

7. Plaintiffs and the proposed Class are victims of Defendants' Trafficking Venture. Each Plaintiff was lured to Southeast Asia under false pretenses and promises of employment and, upon arrival, sold or forced into labor, transported to certain forced labor compounds (or "scam compounds") set forth herein, had their passports and/or phones confiscated, held under debt and

ransom demands, tortured and otherwise physically and/or emotionally assaulted and battered, and forcibly conscripted into locating individuals, including in the United States specifically, that Defendants could then defraud through online scams, all as part of the Trafficking Venture. By conservative estimates, the proposed Class is made up of at least 18,000 victims, the number of persons who have been trafficked to the compounds to which Plaintiffs were trafficked between 2021 (when the first Plaintiff was trafficked) and the present.

8. Miraculously, one of Defendants' victims, Plaintiff Mohammed Junaeid Hossan Parbas, who goes by "Ariyan," after being kidnapped, beaten, and forced into labor, escaped his captors with information about one of the cryptocurrency accounts under the control of his captors.

9. Upon his escape, Plaintiff Ariyan provided this information to a digital analytics firm that then traced funds received by and laundered through this account into a vast network of other accounts belonging to or controlled by Defendants. This network of accounts has received over $5.7 billion of proceeds from Defendants' Trafficking Venture, though it appears that only approximately $550,000,000 currently remains in the accounts. Among other relief, Plaintiffs seek to preserve the status quo by temporarily freezing these funds—cryptocurrencies that by design are subject to dissipation at any moment including by being moved instantly with just the stroke of a few keys.

10. Plaintiffs' forensic tracing analysis corroborates evidence set forth in criminal and forfeiture proceedings—brought by United States authorities including against various of the Defendants in this case—that document Defendants' involvement in the Trafficking Venture.

11. Each Defendant knowingly benefited from participation in Defendants' Trafficking Venture in various capacities, including selling or facilitating the implements needed to restrain and subject to torture the human trafficking victims, operating certain compounds where the

human trafficking and enslavement victims are held, directly receiving the stolen assets, and receiving fees and commissions for laundering those assets. Each Defendant knew or should have known that Defendants' Trafficking Venture involves human trafficking.

12. At the center of Defendants' Trafficking Venture are the Huione Defendants and related entities, a global network of persons and entities that United States authorities have identified as "of primary money laundering concern." Specifically, U.S. authorities have concluded that the Huione Defendants have laundered at least $4 billion in illicit proceeds, including from scam operators using human trafficking, between August 2021 and January 2025.

13. The Huione Defendants involved in the Trafficking Venture include, upon information and belief: (1) two Colorado-incorporated Huione Group affiliated entities that have received and laundered scam proceeds; (2) an online marketplace advertising money laundering services and physical tools for human traffickers such as restraint and torture devices; (3) an operator and/or service provider for a scam compound; and (4) other payment and exchange services and intermediaries facilitating receipt, conversion, and laundering of scam proceeds.

14. The Huione Defendants helped construct at least one scam compound in Southeast Asia and laundered funds for scammers operating out of a compound in which Plaintiff Ariyan was held captive.

15. The Huione Defendants coordinated a broader criminal services ecosystem—Huione Guarantee's marketplace, Huione Pay's exchange services, and Huione Crypto's cryptocurrencies—that served as a one-stop shop for the Trafficking Venture.

16. Huione Guarantee and similar Chinese-language Telegram marketplaces, including Defendant Xinbi Guarantee, operate on a "guarantee" model: the marketplace permits third-party vendors to offer services on its platform by requiring a deposit from them and then stands behind

the transactions between those vendors and their customers. Andy Greenberg, *An $8.4 Billion Chinese Hub for Crypto Crime Is Incorporated in Colorado*, Wired (May 13, 2025), https://www.wired.com/story/xinbi-guarantee-crypto-scam-hub/. This model allows the marketplaces to host and profit from criminal vendors while assuring scammers and traffickers that the illicit services they purchase will be delivered.

17. Defendant Huione Guarantee advertised and sold detention implements—such as electronic shackles and electric batons—via "extreme product" groups that Defendant Huione Guarantee administered on online platforms. In these groups, Defendant Huione Guarantee also listed the sale of trafficking victims, marketed money laundering services, and offered tools for carrying out cyber scams and for "unfreezing" accounts of scammers flagged by authorities.

18. Defendant Huione Pay PLC operated branches in high-risk hubs and inside scam compounds to convert cryptocurrency to fiat currency, and provided runner, document-processing, and armed-escort services to the Trafficking Venture.

19. Defendant Huione Crypto ran cryptocurrency exchange platforms that enabled money laundering via crypto trading, provided an "unfreezable" cryptocurrency to frustrate law enforcement, and provided access to the U.S. financial system through money services businesses registered in Colorado.

20. The Xinbi Defendants operate a Telegram-based guarantee marketplace through which merchants sold the Venture money-laundering services, scam tooling, and the recruitment of trafficking victims for scam compounds, with Xinbi holding buyers' funds in escrow and earning fees and commissions on each transaction. Defendant Xinbi Guarantee operates in substantially the same manner as Defendant Huione Guarantee and absorbed the criminal vendors from Huione Guarantee after Telegram banned Huione Guarantee's public channel in May 2025.

21. The Xinbi Defendants also advertised a physical storefront inside a scam compound in Myanmar.

22. The Sea Dragon Defendants operated United States shell companies and bank accounts and participated with certain Huione Defendants in investment scams, receiving funds, and laundering stolen assets. Forensic account tracing shows that certain United States companies affiliated with these Defendants and their transactions are traceable to both Huione Defendants-associated accounts and other accounts used by scam compounds and their forced laborers. In other words, the Sea Dragon Defendants received funds from United States scam targets and laundered those funds overseas for the benefit of the Trafficking Venture.

23. As with the Huione Defendants, certain of the Sea Dragon Defendants' and of the Xinbi Defendants' accounts are connected through multiple intermediaries and transactions to the account provided to Plaintiff Ariyan by his traffickers.

24. As described in detail below, the three key components of the Trafficking Venture—human trafficking, scams perpetrated on U.S. targets, and money laundering—were done with the common purpose of profiting by enslaving members of the Class.

25. Unless temporarily, preliminarily, and permanently enjoined and the assets traceable to their crimes frozen, Defendants will continue to engage in the illegal conduct described herein and Plaintiffs and the Class will be left with no adequate remedy for the egregious suffering Defendants and their associates subjected them to.

## II. <u>PARTIES</u>

### B. Plaintiffs

26. Plaintiff Ariyan is a citizen of Bangladesh. Starting in August 2024, Ariyan was trafficked to and between two scam compounds in western Myanmar, where his passport was

confiscated and he was forced at gunpoint to sign a contract to work in Defendants' Trafficking Venture. Ariyan was subjected to beatings, burned with frying pans, electrocuted, and locked in a cupboard. Ariyan was able to escape with the information about a cryptocurrency wallet used by the operators of one of the scam compounds he was held in, called the "Tai Chang Compound."

27. Plaintiff Frank is a citizen of Uganda. Between August 2021 and February 2022, Frank was trafficked to a compound in Ton Pheung, Laos, and then to compounds in Tachileik, Myanmar, where he was forced to participate in Defendants' Trafficking Venture. Frank was lured to Laos under the false pretense of a data manager job, where his travel documents were confiscated and he was forced to work under debt bondage. He was subjected to beatings, electric shocks, and food and sleep deprivation.

28. Plaintiff Salam is a citizen of Bangladesh. Between April and September 2022, Plaintiff Salam was trafficked to and between three scam compounds in Cambodia, where his documents were taken and he was forced to participate in Defendants' Trafficking Venture under threat of violence. During this time, he witnessed other victims being beaten and electrocuted.

29. Plaintiff Joton is a citizen of Bangladesh. After applying for a data entry job in Thailand in August 2023, Joton was trafficked to the V9 International Hotel Compound in Krong Poi Pet, Cambodia, where he was forced to recruit scam targets for Defendants' Trafficking Venture. During this time, Joton was subjected to mandatory overtime and beatings for minor infractions.

30. Plaintiff Elizabeth is a citizen of Uganda. Between November 2022 and an uncertain date in 2023, Elizabeth was trafficked to and between at least three compounds in the Golden Triangle Special Economic Zone, Laos, where she was held in debt bondage, her passport

was confiscated, and she was forced to work 16-hour days for Defendants' Venture. During this time, Elizabeth was sold repeatedly, raped, and locked in a room without food for five days.

31. The Class is defined to include all individuals trafficked to the compounds to which Ariyan, Salam, Frank, Joton, and Elizabeth were known to have been trafficked—namely, the Tai Chang Scam Compound; the V9 International Hotel; Long Bay; Thaiyang Chheng Casino (f/k/a Helory Estate); #8 Park; the Golden Casino (f/k/a White Sands 2); and the as-yet-unnamed compounds to which Elizabeth and Frank were trafficked in the Golden Triangle Special Economic Zone, Laos, and to which Frank was trafficked in Tachileik, Myanmar (the "Class Compounds"). Conservative estimates based on reports by transnational organizations suggest that the Class consists of at least 18,000 victims.

32. Based on the compensation offered to Plaintiffs, which ranged between $1,000 and $1,500 per month, conservative estimates suggest that the Class has suffered lost wages of roughly $584.3 million to $876.5 million. Alternatively, measured by Defendants' gains from exploiting Plaintiffs' and the Class's labor, the Class's damages far exceed $1 billion, based on the gains from cryptocurrency scams directed at U.S. victims from 2021 through 2025 alone. Plaintiffs' counsel is continuing to investigate the harms suffered by the Class and may identify additional compensable damages as the litigation progresses.

## C. Defendants

### 1. The Huione Defendants

33. The Huione Defendants are a Phnom Penh, Cambodia–based global conglomerate that coordinates a one-stop shop for illicit services, including human trafficking, and moves scam proceeds for Defendants' Trafficking Venture. Huione operated at least one of the Class Compounds—the one known as #8 Park or Huione Park. Moreover, through its app-based

marketplace, Huione advertised and sold detention equipment, such as shackles and electric prods, to traffickers; listed human trafficking victims for sale and resale between compounds; and provided web development, payment, and money-laundering services for the Trafficking Venture. The Financial Crimes Enforcement Network ("FinCEN") of the U.S. Treasury issued 31 C.F.R. § 1010.664 ("FinCEN 2025 Huione Rule") on October 16, 2025, which imposes a special measure on Huione Group, which controls Defendants (i) Haowang Guarantee f/k/a Huione Guarantee; (ii) Huione Pay Cambodia; and (iii) Huione Crypto, under Section 311 of the USA PATRIOT Act and prohibits financial institutions covered by the Rule from opening or maintaining a correspondent account for, or on behalf of, Huione and its entities. FinCEN directly linked Huione to cryptocurrency investment scams perpetrated by human traffickers.

34. Defendant Huione Global Ltd, f/k/a Huione LTD, f/k/a Lotcoin LTD ("Huione Global") is a Colorado domestic corporation, registered at 1312 17th Street, Suite 600, Denver, with Giovanni Sugian Bacalso listed as its registered agent and incorporator.

35. Defendant Huione Pay Inc. ("Huione Pay U.S.") is a Colorado domestic corporation, registered at 1312 17th Street, Suite 1402, Denver, with Hao Li listed as its registered agent and incorporator.

36. Defendant Huione Pay PLC ("Huione Pay Cambodia") is a Cambodian private liability company that offers crypto-to-fiat exchange services including "Huione International Payments," and ancillary "runner" and document services.

37. Defendant Huione Crypto ("Huione Crypto") is a Poland-registered, Cambodia-operated entity that operates as a virtual asset service provider offering peer-to-peer and centralized trading platforms for cryptocurrencies. Huione Crypto has issued USDH—Huione's proprietary

stablecoin, which Huione advertised as "unfreezable" and "not restricted by traditional regulatory agencies."

38. Defendant Haowang Guarantee, f/k/a Huione Guarantee ("Huione Guarantee," sometimes "Haowang Guarantee") is an unincorporated association that operates an online global marketplace facilitating the procurement of contraband and illicit services, including money-laundering and human trafficking services, equipment used by human traffickers and criminal organizations to torture and detain people, and provides technology and infrastructure for cyber scams as set forth herein.

39. Defendant Huione Group ("Huione Group") is a Phnom Penh, Cambodia–headquartered conglomerate and the ultimate corporate parent of Defendants Huione Global, Huione Pay U.S., Huione Pay Cambodia, Huione Crypto, and Huione Guarantee.

**2. The Xinbi Defendants**

40. The Xinbi Defendants operate an illicit online marketplace that provides money laundering and scam-enabling services for the Trafficking Venture.

41. Defendant Xinbi Co., Ltd., a Colorado corporation, was incorporated and advertised on Xinbi's website to project legitimacy and facilitate the Venture's scams. On September 9, 2026, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Xinbi a significant transnational criminal organization.

42. Defendant Xinbi Guarantee ("Xinbi Guarantee") is an unincorporated association that operates a Chinese-language, Telegram-based online marketplace—substantially similar to that of Huione Guarantee—through which vendors advertise and sell money laundering services, scam-tooling, stolen personal data, fraudulent-website development, AI face-swapping tools, and

trafficking-related services, including the solicitation of trafficking victims to work in scam compounds in Southeast Asia.

43. Vendors register with Xinbi Guarantee and post collateral, after which Xinbi Guarantee permits them to advertise their services on its Telegram channels, holds buyers' funds in escrow, and releases those funds once the service is performed.

44. Xinbi Guarantee is affiliated with XinbiPay Trading Co., Ltd., a Cambodia-registered entity, and the XinbiPay payment application through which Xinbi has built proprietary financial infrastructure.

45. Defendant Xinbi Co., Ltd. ("Xinbi Co.") was a Colorado corporation formed on August 29, 2022, bearing Colorado Secretary of State entity identification number 20221849161. Xinbi Co. listed its principal office address and registered agent address as 2851 South Parker Road, Aurora, Colorado 80014, and identified an individual named Mohd Shahrulnizam Bin Abd Manap as its registered agent and incorporator. It appears to have dissolved in August 2026.

46. Xinbi Co. was a subsidiary of, or is otherwise affiliated with, Xinbi Guarantee. Xinbi advertised Xinbi Co.'s Colorado registration on its website, www.xinbi[.]com, at least as late as February 16, 2025. On May 20, 2026, the Colorado Attorney General sued to dissolve Xinbi Co. as a "fraudulently formed and operated business entity," alleging that Xinbi "is a global, billion-dollar crypto fraud business focusing on money laundering services and is a self-described 'intermediary guarantee company of Telegram.'" Compl. ¶¶ 1–2, *Weiser v. Xinbi Co., Ltd.*, No. 2026CV31373 (Colo. Dist. Ct. Arapahoe Cnty. May 20, 2026) ("Colo. AG Xinbi Compl.").

### 3. The Sea Dragon Defendants

47. The Sea Dragon Defendants operated a United States money laundering cell for the Trafficking Venture.

48. Defendant Sea Dragon Trading, LLC ("Sea Dragon Trading") is a California limited liability company registered at 1140 S El Molino Street, Alhambra, California 91801.

49. Defendant Sea Dragon Remodel, Inc. ("Sea Dragon Remodel") is a California corporation registered at 4661 District Boulevard, Vernon, California 90058.

50. Sea Dragon Trading and Sea Dragon Remodel are pass-through companies and not legitimate businesses, according to public filings by the U.S. Department of Justice.

51. Defendant Hailong Zhu ("Zhu") is a citizen of China with known residences and activity in Los Angeles, California, and Illinois, and Sea Dragon Trading's and Sea Dragon Remodel's sole registered agent and Chief Executive Officer. In December 2023, a grand jury in the Central District of California indicted Zhu with co-defendants for a money laundering conspiracy involving at least 284 transactions and more than $80 million in victim losses from cryptocurrency investment scams, including more than $2.2 million deposited into accounts associated with the Sea Dragon Entities. Zhu has not appeared in that case and remains a fugitive as of October 2026.

52. Defendant Lu Zhang ("Zhang") is a citizen of China who resided in multiple locations in the United States, and who had access to and control over Sea Dragon bank accounts used to launder funds on behalf of the Trafficking Venture. In December 2023, a grand jury in the Central District of California indicted Zhang for his role in a money laundering conspiracy. Zhang pleaded guilty.

53. Defendant Justin Walker ("Walker") is a United States citizen who resided in Los Angeles, California, and who had access to and control over Sea Dragon bank accounts used to launder funds on behalf of the Trafficking Venture. In December 2023, a grand jury in the Central District of California indicted Walker for his role in a money laundering conspiracy

54. Defendant Joseph Wong ("Wong") is a United States citizen who resided in Los Angeles, California, and who had access to and control over Sea Dragon bank accounts used to launder funds on behalf of the Trafficking Venture. In December 2023, a grand jury in the Central District of California indicted Wong for his role in a money laundering conspiracy. Wong pleaded guilty.

55. Defendant Daren Li ("Li") is a Cambodia-based individual who directed Defendants Zhang, Walker, Wong, and Zhu as part of a larger money laundering network operating on behalf of the Trafficking Venture. In November 2024, Li pleaded guilty to conspiracy to launder at least $73.6 million in scam proceeds through certain Sea Dragon pass-through companies. Before he could be sentenced, Li cut off his court-ordered ankle monitor and fled the United States, and he remains a fugitive as of October 2026.

## III. NATURE OF THE PROCEEDING AND RELIEF SOUGHT

56. This Complaint asserts claims under the provisions of the Trafficking Victims Protection Act of 2000 ("TVPA"), as amended, codified at 18 U.S.C. §§ 1581 *et seq.*, and the Colorado Organized Crime Control Act ("COCCA"), Colo. Rev. Stat. §§ 18-17-101 *et seq*.

57. Plaintiffs seek, as immediate relief: (a) an order temporarily and preliminarily freezing the cryptocurrency accounts transacting through and belonging to the Trafficking Venture, which are set forth in Exhibits 3, 4, and 20 to the Declaration of Jason Trager submitted herewith ("Trager Decl."); and (b) an order permitting Plaintiffs to effect service via alternative means and conduct expedited discovery.

58. Plaintiffs also seek a final judgment: (a) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; (b) awarding restitution, a constructive trust, damages, and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1593, 1595(a),

2259; 29 U.S.C. § 201 *et seq.*; and C.R.S. §§ 18-17-106(1), (6), and (7); (c) permanently enjoining Defendants from additional COCCA violations, pursuant to §§ 18-17-106(1), (6), and (7); and (d) granting all other and further relief the Court may deem just and proper.

## IV. JURISDICTION AND VENUE

59. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1367, and 18 U.S.C. §§ 1581, 1583, 1584, 1589, 1590, 1591, 1593, 1595, and 1596.

60. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (c)(3), because certain acts giving rise to the violations complained of in this action occurred in this District, including the use of Colorado-incorporated entities to launder proceeds on behalf of the Trafficking Venture and the targeting of Colorado residents by the Trafficking Venture, because Defendants are subject to personal jurisdiction in this District, because certain Defendants reside in this District, or because certain Defendants are not United States residents.

## V. DEFENDANTS' VENTURE TRAFFICKED PLAINTIFFS AND FORCED THEM INTO LABOR

### A. Background on the Southeast Asian Cyber Scam Industry

61. Defendants are part of and help run a complex, vertically integrated venture—Defendants' Trafficking Venture—which operates in three coordinated steps as illustrated in Figure 1, below: (1) trafficking and restraining or kidnapping victims; (2) coercing the human trafficking victims to scam Americans; and (3) laundering proceeds of the scams through intermediaries, pass-through companies, and cryptocurrency exchanges domiciled in the United States and abroad.

62. After COVID-19 shutdowns in 2020 forced gray market casinos in Southeast Asia to find new revenue, transnational criminal organizations converted these sites into compounds,

lured human trafficking victims into them, and forced these victims to participate in online investment scams. Compound operators force victims to make contact—using stock photos, translation software, and AI face-swapping tools—with scam targets around the world, increasingly and disproportionately in the United States. Once contact is made, scam targets are convinced to "invest" cryptocurrencies in ventures that are secretly controlled by the traffickers.

63. Across Cambodia, Laos, Myanmar, Thailand, and the Philippines, scam compounds are estimated to hold between 220,000 and 500,000 persons indentured into criminality. The Tai Chang compound in Myanmar, for example, where Plaintiff Ariyan was trafficked and which launders funds through the Huione Defendants, has been reported as holding upwards of 3,000 foreign nationals.




*Figure 1: Defendants' Human Trafficking Venture*

64. Victims included United States citizens like Hsieh Yueh-Peng, who was lured to Bangkok by a job offer, then abducted and trafficked to a compound in Myawaddy, Myanmar.

65. Transnational criminal organizations recruit the workforce for these compounds through deceptive job offers promising attractive salaries. Once victims arrive in the destination country, they are trafficked to compounds, their passports and/or phones are seized, and they are forced to participate in online scams under threats (and inflictions) of violence and torture.

66. The compounds are enforced by prisonlike security in crowded and surveilled settings and torture implements like cattle prods and electric batons used against those who resist, underperform, or attempt escape. Victims are treated as property, and traffickers sell detainees between compounds for thousands of dollars per person. Exit, if offered, often requires large "buy-out" payments, and families can face ransom demands of between $5,000 and $100,000.

67. The Venture's ability to monetize this forced labor depends entirely on a money-laundering ecosystem. Launderers typically convert proceeds into cryptocurrency and layer them through multiple accounts, currencies, platforms, and jurisdictions, severing the traceability between the stolen funds and their ultimate destination and making detection and recovery exceedingly difficult.

68. At the heart of this money-laundering ecosystem are intermediary platforms also known as "gateway companies." Defendant Huione Pay, for example, is a "gateway company" that brokered transactions between cyber-scam operators and money-laundering "motorcades," which moved funds across accounts and jurisdictions. On April 1, 2025, the Head of Cyber Threat Intelligence for a major cryptocurrency tracing platform testified to the House Financial Services Committee that "[w]e see many of our scams are using Huione as a common denominator, the common place to launder cashout funds."

69. Other Defendants also acted as "gateways" and "motorcades" for the Trafficking Venture. The Xinbi Defendants, like the Huione Defendants, served as a gateway, operating an online marketplace that connected scam center operators with merchants offering money-laundering services, including receiving funds directly from fraud victims and laundering scam proceeds into "clean" funds.

70. The Sea Dragon Defendants laundered $20 million out of the United States through approximately 25 pass-through companies, directed by Defendant Daren Li. Li moved over $73 million through a larger money laundering motorcade and, according to public reports, earned a roughly 9% commission through Defendant Huione. As DOJ sentencing memoranda explain, money laundering conspiracies "like the one involv[ing the Sea Dragon Defendants] are the lifeline for international cryptocurrency investment frauds. The funds transferred overseas and converted to cryptocurrency give criminal syndicates the means to traffic humans and run scam compounds."

71. Global revenues from investment fraud schemes were estimated at about $63.9 billion in 2023, and scam operations in Cambodia, Laos, and Myanmar alone produced an estimated $43 billion in 2023. The U.S. State Department estimates that Americans lost $18.2 billion in 2025 to scam centers operating from Southeast Asia.

**B. Defendants Trafficked Plaintiffs and Coerced them Into Labor**

72. Between August 2021 and the present, Defendants' Venture trafficked Plaintiffs and the Class to the following Class Compounds defined and described in further detail below: (i) the Tai Chang Scam Compound; (ii) the V9 International Hotel; (iii) Long Bay; (iv) Thaiyang Chheng; (v) #8 Park; (vi) the Golden Casino (f/k/a White Sands 2); and (vii) the as-yet-unnamed compounds to which Elizabeth and Frank were trafficked in the Golden Triangle Special Economic Zone, Laos, and to which Frank was trafficked in Tachileik, Myanmar.

73. While at those compounds, Defendants' Venture coerced Plaintiffs and the Class to scam targets, including United States victims.

**1. Plaintiff Ariyan**

74. Plaintiff Ariyan, a citizen of Bangladesh, was trafficked to and held in the Tai Chang Scam Compound, which is connected to Defendant Huione.

75. In August 2024, while Ariyan was living and working in Dubai, he learned of a company seeking "computer operators" in Thailand and was put in contact with a recruiter named Noman on Telegram. Ariyan then interviewed with a Chinese recruiter over Telegram. Noman told Ariyan that a tourist visa would suffice for his work. Ariyan accepted an offer for an information technology job in Thailand paying USD $1,200–$1,500 a month.

76. On or about August 11, 2024, Ariyan traveled to Bangkok, Thailand, and was then driven approximately six hours to the Myanmar–Thailand border, where a group of men armed with automatic rifles forced him to cross the Moei River into Myanmar by boat. After crossing the border, Ariyan was taken to a scam compound in Kyaukhat, Myanmar, known as "Tai Chang" and also "Ko Sai" or "Kyauk Khat Casino" (the "Tai Chang Scam Compound"), and later referred to as Tai Chang 1. Upon entry, guards confiscated his passport and mobile phone.

77. At the Tai Chang Scam Compound, Ariyan was told he was required to sign a contract obligating him to generate $200,000 for Defendants' Venture, and that failure to do so would result in extra hours, electric shocks, and denial of food. When Ariyan stated that he did not want to work there and wished to return to Thailand, a man he later came to know as one of the bosses gave him an electric shock for approximately ten seconds. Ariyan was then forced to sign the contract at gunpoint.

78. Ariyan was forced to work 14- to 17-hour days collecting roughly 80 WhatsApp contacts daily and building AI-assisted fake personas to defraud American and European victims with weekly revenue targets of $5,000.

79. Ariyan's "supervisor" instructed Ariyan to never accept "no" as an answer and to "convince, convince, convince." Ariyan reached out to hundreds of people daily through fake social media profiles and told targets that he worked with online shopping platforms like Amazon and Shopee and earned more than $500 per day. If targets wanted to learn more, Ariyan directed them to fake applications and e-commerce platforms set up by the Venture. Ariyan was also instructed to have targets send funds using cryptocurrency, primarily directing them to cryptocurrency exchanges like Binance and OKX. If a target began investing larger sums, Ariyan was required to hand the target off to his supervisor, who then convinced the target to invest thousands of dollars in fake investment schemes. One individual Ariyan handed off to a supervisor invested $35,000.

80. Investment scams operating out of Tai Chang target Americans including residents of Colorado.

81. After approximately two weeks at Tai Chang 1, Ariyan was transferred to a larger, more isolated compound near Kyaukhat, which held thousands of workers and was heavily guarded by the Democratic Karen Buddhist Army ("DKBA")—the militia group overseeing the region in Myanmar where many prominent scam compounds operate. Ariyan later learned that this compound was called Tai Chang 2 and that Tai Chang 1 served as a training center for Tai Chang 2 and other compounds controlled by Defendants' Venture.

82. At Tai Chang 2, Plaintiff Ariyan's revenue target was increased from $5,000 to $10,000 per week and continued to increase by $5,000 thereafter. As described by Ariyan, "[i]f

we did not meet these goals, we were brutally punished." Ariyan was beaten, electrocuted, burned with frying pans, and locked in a cupboard, or a dark, windowless room, for hours. Other victims were forced to stand for hours with heavy water drums on their shoulders. These punishments were a daily occurrence.

83. Ariyan was forced to target Americans, including by searching American celebrities' social media accounts for potential targets. Ariyan learned from one of the supervisors at Tai Chang 2 that the compound had several groups dedicated to targeting people from various regions, including the United States, Europe, and China. Workers were assigned regions based on language skills. If a worker's English was deemed sufficiently proficient, he would be assigned to a group targeting Americans and Canadians.

84. On October 18, 2024, while escorting a colleague to a nearby clinic, Ariyan escaped by swimming across a nearby river into Thailand. After hours of travel, Ariyan encountered someone who connected him with Thai police, who took him to a hospital to treat his injuries. Ariyan was then sent to the Mae Sot human trafficking victim support center, where he identified himself as a trafficking victim. Ariyan was repatriated to Bangladesh on November 17, 2024.

85. During his captivity, Ariyan obtained the address of one of the Venture's cryptocurrency accounts (known as a "wallet") controlled by his traffickers, by convincing a supervisor to allow him to send $100 to his family. After his escape, Ariyan provided this address to Inca Digital ("Inca"), a blockchain analytics firm, after being connected to Inca by co-Plaintiff Salam.

86. Forensic analysis of the Venture's cryptocurrency wallet from the Tai Chang Scam Compound (the "Compound Wallet") identified money laundering networks moving billions of dollars through a series of interconnected cryptocurrency wallets. These flows between these

wallets and intermediaries match known indicia for money laundering—including rapid movement of funds, reuse of known laundering hubs, and eventual contact with cryptocurrency exchange endpoints where cryptocurrencies can be converted back to fiat currencies.

87. The identified cryptocurrency addresses (numerical representations of a "location" where the cryptocurrency is held) of the Huione, Xinbi, and Sea Dragon Defendants are each connected, through multiple intermediaries, to the Compound Wallet; each set of Defendants sent funds into the same network of wallets that received funds from the Compound Wallet.

**2. Plaintiff Frank**

88. Between August 2021 and February 2022, Plaintiff Frank was trafficked to a compound in the Golden Triangle Special Economic Zone in Ton Pheung, Laos, and then to compounds in Myanmar, where his travel documents were confiscated, and he was forced to participate in Defendants' Trafficking Venture. During this time, Frank was transferred among multiple compounds and subjected to beatings, electric shocks, and food deprivation.

89. Plaintiff Frank is a citizen of Uganda who was living in Dubai in August 2021.

90. In August 2021, a woman using the alias "Mikki" offered Frank a six-month "data manager" role for a Chinese company in Laos paying $1,500 per month plus commissions and allowances. Mikki later met Frank in person and assured him the company would pay for his visa, travel insurance and ticket.

91. Frank then traveled from Dubai to Laos on or around August 10, 2021. Upon arrival, Frank was taken to a compound in the Golden Triangle Special Economic Zone on the border of Laos, Myanmar, and Thailand. The compound was a sprawling complex of approximately ten multi-story buildings inside a fenced-in perimeter patrolled by armed guards carrying military-style automatic weapons.

92. Once inside the compound, Frank's passport and phone were confiscated.

93. Approximately two weeks later, Frank was presented with a contract for a position different from what he had been promised. Frank was also told he would need to pay approximately RMB 16,000 (roughly USD $2,300 to $3,000) to refund the company for his travel expenses. When Frank declined to sign, he was told that if he could not pay, he would have to work off the debt. He was also told he would only be given meals if he worked for his captors.

94. Frank spent approximately two months at this compound in Laos and was never allowed to leave. Frank was forced to work 15 hours a day under constant surveillance.

95. Frank was forced to create fake social media and dating profiles, pretending to be attractive young women to lure men into sending money and using scripts provided by compound supervisors. Frank was instructed to build strong psychological bonds with targets through daily communication, which Frank and others did via Facebook, TikTok, WhatsApp, Instagram, Snapchat, and LinkedIn, as well as dating applications such as Facebook Dating, Sweet Meet, Skout, and Badoo.

96. Frank was assigned by compound supervisors to target people in the United States, Europe, and Canada because of his English proficiency. Frank was specifically encouraged to target Americans because of their perceived wealth and access to retirement accounts, including 401(k) accounts. Once a target sent some money, supervisors took over direct communication with the target.

97. Frank directed targets to fake cryptocurrency investment platforms, including websites such as btmexlx[.]com, CentreWallet[.]com, and Sendovip[.]com, websites created and controlled by the Venture that were clones of legitimate websites. Frank was told to direct targets to transfer cryptocurrency to designated wallet addresses controlled by his captors.

98. In approximately October 2021, Frank was transferred to a compound in Tachileik, Myanmar. Frank was made to cross the border between Laos and Myanmar by boat without going through any customs. Frank was told his new role would be the IT work he was originally promised but soon realized he had been moved to another scam compound.

99. At the Myanmar compound, conditions worsened. Frank worked even longer hours than in Laos and was beaten with batons, tasered, and denied food when he failed to meet targets. Frank was sometimes tasered awake after only four to five hours of sleep. Frank was also forced to record videos stating he was being treated well. According to Frank, "[t]his brutality became a part of daily life."

100. In Myanmar, Frank was moved between three compounds over a period of about eight months. Frank was not paid during this entire period because the scam compound operators claimed they "owned" him.

101. Throughout his captivity, Frank made persistent efforts to escape, sending messages to Interpol, NGOs, and the nearest Ugandan embassy whenever a guard was distracted, and immediately deleting these messages to avoid detection. In February 2022, the compounds' operators confronted Frank about his communications. Frank was taken to a nearby military barracks, where military personnel questioned him about entering the country illegally. An unidentified person intervened and convinced the officers not to arrest Frank, after which Frank escaped together with a South African national.

102. After crossing back into Laos, Frank spent approximately three months attempting to reacquire his documents. Anti-trafficking police in Laos intervened and moved Frank to a government shelter. On July 10, 2022, Plaintiff Frank was finally able to return to Uganda.

Following his return, Frank was connected with Inca by Mina Chiang, the founder of the Humanity Research Consultancy.

103. Plaintiff Frank has since made it his mission to help other survivors of human trafficking and assisted in the repatriation of 23 Ugandans trafficked in similar circumstances.

### 3. Plaintiff Salam

104. Between March and September 2022, Plaintiff Salam was trafficked to and between three scam compounds in Cambodia, where his passport was confiscated and he was forced under threat of violence to participate in Defendants' Trafficking Venture. During this time, Plaintiff Salam witnessed other victims being beaten and electrocuted.

105. In late 2021, Plaintiff Salam, a citizen and resident of Bangladesh, was approached by an acquaintance for an information technology job in Cambodia for an online casino promising USD $800–$1,000 per month plus bonuses, for which his family mortgaged their land to pay $3,000 in recruitment fees.

106. In February 2022, Plaintiff Salam received a 30-day tourist visa and a round-trip airline ticket to Phnom Penh.

107. On March 31, 2022, Salam flew from Dhaka, Bangladesh, to Cambodia. After arriving in Cambodia, Plaintiff Salam's passport was confiscated under the pretense that the company needed it to secure a work permit. Plaintiff Salam was driven approximately nine hours to the Long Bay compound in Dara Sakor ("Long Bay"), which housed around two thousand people. The entrance gates to the compound were monitored by armed security guards, and the perimeter was secured by an electrified fence.

108. Plaintiff Salam was assigned to a team working a 14-hour overnight schedule and was given a computer, several iPhones, and approximately ten SIM cards. Plaintiff Salam was

instructed by a supervisor referred to as "Teacher Boss" to create fake social media profiles, particularly on Twitter, and to contact hundreds of people daily to identify targets for investment scams.

109. Plaintiff Salam and others on his team were assigned to target specific regions, with Americans as their primary target. Plaintiff Salam and others with strong English-language skills were specifically assigned to target Europeans and Americans, using strategies such as changing their locations on social media to appear to be based in the targeted country. Plaintiff Salam was told that the ideal target was a divorced American man between 25 and 40 years old, because Americans were perceived as rich and having an investment mindset.

110. Workers at Long Bay were subjected to physical punishment for failing to meet daily quotas.

111. After approximately 37 days at Long Bay, Plaintiff Salam was sold and transferred to a compound called Helory Estate—now known as Thaiyang Chheng Casino compound ("Thaiyang Chheng")—in Sihanoukville, a city in southwestern Cambodia that is known for hosting numerous large-scale scam compounds (*see* Figure 2, below). Salam received only $200 in cash as payment for his 37 days of work at Long Bay before the transfer.

112. Security was significantly heightened at Thaiyang Chheng. The dormitories and offices were nested within a series of gates. The outer perimeter was patrolled by armed guards dressed in black, who Plaintiff Salam later learned were former soldiers. Additional guards were posted at the inner gates and on each floor of the dormitory.

113. Plaintiff Salam was required to work 18 hours a day at Thaiyang Chheng and was instructed by his captors to target Americans, Canadians, and Europeans using Facebook, Instagram, Twitter, and dating applications such as Tinder and OkCupid. Plaintiff Salam and other

trafficking victims were told to build relationships with targets to gain their trust and gradually introduce them to cryptocurrency. Plaintiff Salam and other trafficking victims were instructed to tell targets to purchase a cryptocurrency called "Tether" from cryptocurrency exchanges and transfer those funds to a fake cryptocurrency trading application developed by his captors.

114. The operators at Thaiyang Chheng routinely used physical punishment for infractions as minor as arriving to work a minute late.

115. During this period, Plaintiff Salam and other trafficking victims attempted to seek help by contacting friends and family in Bangladesh, urging them to reach out to Cambodian police. After approximately one month at Thaiyang Chheng, Salam received a message from a Cambodian police officer requesting the names of trafficking victims, which Salam provided. However, Cambodian police then alerted Plaintiff Salam's captors about his attempts to escape.

116. Plaintiff Salam's captors then retaliated against Salam. Plaintiff Salam's team leader interrogated Plaintiff Salam about an attempted escape and within days Salam was sold to a third compound, the Golden Casino (f/k/a White Sands 2) compound in Sihanoukville.

117. At White Sands 2, Salam's phone was confiscated and his communication was restricted to calls with family on phones monitored by his captors. Salam was prohibited from sharing his location or disclosing details of his situation.

118. At White Sands 2, Plaintiff Salam was instructed to use new techniques to target Americans. Supervisors set up Google Voice accounts with American phone numbers for each trafficking victim and provided approximately 500 numbers to message per day. Salam learned through internet searches that these were American and Canadian numbers. On one occasion, each trafficking victim was provided with thousands of numbers, all of which had Oklahoma area codes.

119. Salam and other victims were instructed to direct American targets to create wallets with the U.S.-based cryptocurrency exchange Coinbase and to transfer their cryptocurrency to fake investment portfolio websites controlled by Plaintiff Salam's captors. Some of these websites were clones of popular cryptocurrency trading platforms.

120. Plaintiff Salam was eventually rescued from White Sands 2 with the assistance of the Global Anti-Scam Organization ("GASO"), which contacted the compound's supervisors directly and threatened to bring media and police to the compound during a period when Cambodian authorities were conducting crackdowns on scam compounds in early September 2022. Following his release, Plaintiff Salam was connected with the Humanity Research Consultancy, which arranged his return to Bangladesh.



***Figure 1: Photo taken by Plaintiff Salam within Thaiyang Chheng Casino compound in Sihanoukville***

121. Over more than five months and across three compounds, Plaintiff Salam earned only USD $200 total for his forced labor.

**4. Plaintiff Joton**

122. Beginning in or around August 2023, Plaintiff Joton was trafficked to the V9 International Hotel Compound in Krong Poi Pet, Cambodia ("V9 International Hotel"), where he was held under armed guard and forced to recruit scam targets.

123. In August 2023, while living in Dhaka, Bangladesh, Joton responded to a Facebook advertisement for a data entry job in Bangkok, Thailand, offering $1,000–$1,500 per month and was contacted via Telegram by a woman using the name Bella who claimed to be Russian. After

telling him that a Thai visa would be difficult to obtain, Bella offered Joton a similar position in Cambodia and connected him with an individual known as "Big Chicken," who arranged his travel.

124. Joton traveled from Dhaka to Ho Chi Minh City, Vietnam, where he stayed approximately three days before receiving a Cambodian visa and a plane ticket. He then flew to Phnom Penh, Cambodia, and traveled approximately twelve hours by car to Krong Poi Pet, along the Cambodia-Thailand border, where he was confined at the V9 International Hotel and his passport was confiscated.

125. There, Joton was trained to identify and message potential targets and was forced to reach out to hundreds of people daily over TikTok, WhatsApp, and dating applications.

126. Joton's captors imposed harsh rules, such as arbitrary fines and mandatory overtime dictated by supervisors.

127. Joton was slapped, kicked, and fined for minor infractions, such as taking longer than the five or ten minutes permitted to use the restroom or failing to convince enough targets during a shift. Joton and other trafficking victims were sometimes forced to work beyond their 18-hour days as punishment for failing to meet a goal or breaking a rule.

128. The compound used an assembly-line approach to its scams. Joton was forced to initiate contact with targets by promising small returns on small investments; once a target agreed to send money, a second team member took over to develop the relationship and request increasing amounts; and when the target was deemed sufficiently "hooked," a third person—known at the compound as "the killer"—took over and convinced the target to send thousands of dollars through a cryptocurrency exchange.

129. Although Joton's team was assigned to target people in Argentina and India, the syndicate targeted victims around the world, including Americans. Joton was often scheduled

alongside a group targeting Americans using romance-based scripts written specifically to reach middle-aged, divorced American men, based on a common understanding in the compound that Americans would send large sums. On one shift, Joton witnessed one of that team's "killers" convince an American to send $50,000 in cryptocurrency.

130. Joton's promised $1,500 monthly pay was reduced by $800 to reimburse the syndicate for his travel expenses, and his captors told him that fines left him owing the syndicate money. Over his time at the compound, Joton was paid a total of only $200 for his forced labor.

131. Despite the risk of punishment, Joton emailed and messaged NGOs seeking help and was eventually contacted by GASO. After more than a month of planning, Joton escaped the compound with GASO's assistance, leaving with no phone or passport. With the help of Cambodian immigration authorities and the Bangladesh Embassy, he secured an exit visa and travel documents and left Cambodia nine days later. After returning to Bangladesh, Joton was connected through GASO and other survivors to Inca, with whom he shared his experience.

**5. Plaintiff Elizabeth**

132. Between November 2022 and an uncertain date in 2023, Plaintiff Elizabeth was trafficked to and between at least three compounds in the Golden Triangle, Laos, where her passport was confiscated, and she was forced to work 16-hour days. During this time, Elizabeth was sold repeatedly, raped, and locked in a room without food for five days.

133. In October 2022, while living in Dubai, Elizabeth was recruited by a woman named Vivian, who promised her $1,200 a month for a purported social media marketing job.

134. Elizabeth traveled from Dubai to Laos via Bangladesh and Thailand in November 2022. Upon arrival in the Golden Triangle, Elizabeth was placed in a large, walled compound containing multi-story buildings and her passport was confiscated.

135. Elizabeth's traffickers provided her with four mobile phones, a computer, and data credit. Elizabeth was seated among other trafficking victims of various nationalities—including Ugandan, Pakistani, Indian, and Chinese nationals—who trained her to create fake online personas. Elizabeth was forced to create fake online identities and promote purported cryptocurrency investment opportunities in chats on Facebook and Instagram, building romantic relationships with targets to solicit funds. Her traffickers set goals for her to contact at least four potential targets and maintain at least ten active chat conversations each day.

136. Elizabeth was instructed to introduce the word "cryptocurrency" into her conversations with targets and to convince targets to enter into a joint business venture with Elizabeth's fake persona. Once a target agreed to invest, Elizabeth was instructed to hand that target off to a "team leader," who then dealt directly with the target to solicit funds purportedly for investment on a trading platform. Elizabeth never received or handled client funds directly.

137. When Elizabeth and other victims refused to continue working, their captors demanded repayment of $10,000 for the cost of their visas and airline tickets. When Elizabeth was unable to pay, her captors told her that she and the other victims would be sold to another company willing to pay off the debt.

138. Elizabeth was then sold and transferred to a second compound run by a boss known as "King."

139. At the second compound, Elizabeth and other victims worked and slept in separate buildings, each guarded by security personnel who restricted their movement and apprehended anyone who attempted to leave without permission. Their boss King informed them that within one week, each worker was required to produce a "promising client" and to work sixteen-hour

days. Elizabeth was instructed to target Americans specifically, using a persona claiming to be based in America.

140. If workers failed to secure a client within their shift, they were denied food.

141. King also confiscated Elizabeth's and other victims' phones.

142. After approximately ten days, Elizabeth and other victims collectively refused to continue working. King told them they would either have to repay the money he claimed to have invested in them or continue working for him. In retaliation for their refusal, King cut off their access to food and locked them in a room for five days, during which men were brought in who raped and beat Plaintiff Elizabeth and others. One of the men, himself a worker at the compound, told Elizabeth he was being forced to assault her and would be killed if he refused.

143. Elizabeth's confinement ended only when King sold her and other victims to another compound. Elizabeth was again transferred without receiving any pay.

144. At the third compound, Elizabeth was subjected to similar working conditions and told explicitly to target Americans, Canadians, and other Westerners. She worked twelve-hour days, which were often extended to fourteen hours if she failed to secure a client. Elizabeth worked at this compound for approximately two months without receiving any pay. During this period, Elizabeth discovered she was pregnant as a result of the rapes she endured at King's compound, but she concealed her pregnancy out of fear of reprisal.

145. After approximately two months, the boss at the third compound determined that the workers were not generating sufficient profit. He drove Elizabeth and other victims outside the Golden Triangle zone, returned their passports, and abandoned them on the side of the road. Elizabeth later went to a hospital, where she gave birth to a boy.

146. A few months after being abandoned, while in a hospital, Elizabeth contacted a Laotian former coworker, who connected her to Plaintiff Frank. Plaintiff Frank in turn connected her to Plaintiff Salam, who was affiliated with an organization called the Human Rescue Counsel ("HRC"). HRC paid Elizabeth's hospital bills, and after she was discharged, Elizabeth stayed with a Laotian friend while HRC arranged safe housing, and police then took her and her son to a shelter. They later returned to Uganda.

## VI. DEFENDANTS KNOWINGLY PARTICIPATED IN AND BENEFITED FROM THE TRAFFICKING VENTURE

147. After the Venture trafficked Plaintiffs and the Class and coerced them into labor as described above, the Venture laundered the funds from those scams through a sophisticated money laundering ecosystem.

148. Defendants knowingly participated in and benefited from the Venture, in various ways. Specifically, Huione and Xinbi are directly associated with or are operating at least two of the Class Compounds. In addition, Defendants' goods and services collectively enabled every stage of the Venture's operations—from procurement of human trafficking victims, to escrow of funds, to cross-asset conversion and off-ramp liquidity—thereby sustaining the Venture's profitability.

149. The Huione Defendants and Xinbi Defendants also provide marketplaces for these goods and services, as well as human trafficking victims themselves, and collect commissions and fees on these marketplace transactions.

150. All Defendants sent and received money through the Venture's money laundering network and otherwise facilitated the laundering of, and did launder, the Venture's scam-derived funds, further increasing the Venture's capacity to recruit, coerce, and retain trafficked workers by increasing its revenue and profits. Defendants further monetized Plaintiffs' forced labor and

trafficking by collecting commissions on laundering transactions for the Venture and by obtaining proceeds from investment scams.

**A. Background on Cryptocurrencies**

151. "Blockchains" are digital ledgers or databases distributed across a network of computers, each of which maintains a record of transactions done using that blockchain. The ledger records information about transactions in unchangeable data packages, referred to as "blocks." Each "block" typically contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain.

152. "Crypto asset," "digital asset," "cryptocurrency," or "token" generally are representations of value that can function as a medium of exchange and whose ownership is represented (recorded) on blockchains. Some cryptocurrencies may be "native" to a blockchain—meaning that they are the original cryptocurrency represented on a particular blockchain. For example, "bitcoin" is the "native token"—the original cryptocurrency—of the bitcoin blockchain. Another well-known example is "Ether," the native cryptocurrency of the Ethereum blockchain.

153. The "TRON blockchain" is a type of blockchain. Its native cryptocurrency is known as the "Tron," "Tronix," or "TRX" coin.

154. A "stablecoin" is a type of cryptocurrency that is supposed to have a stable value pegged to another asset, such as to the U.S. Dollar. One example of a "stablecoin" is "Tether," which trades with the symbol "USDT." Tether can be represented on various blockchains, including the "TRON blockchain."

155. To transfer cryptocurrencies from one address on a blockchain to another (and, hence, potentially from one owner to another owner), the person who controls a particular cryptocurrency needs a "public key" and a "private key."

156. The public key is colloquially known as the user's blockchain "address" and typically consists of a long sequence of letters and numbers. Anyone that knows a cryptocurrency "address" can see its transaction history and current balance—but the addresses do not disclose the owner's identity. Blockchain addresses are, therefore, considered to be "pseudonymous."

157. The private key is analogous to a password and confers the ability to transfer a cryptocurrency. Whoever controls the private key controls the cryptocurrency associated with that key and can almost instantly transfer the cryptocurrency associated with that key to another address on the blockchain, or to another blockchain altogether under certain circumstances. Only the holder of the "private key" associated with the asset can transfer cryptocurrency—multiple people can know the "private key" associated with the asset, but whoever knows the "private key" essentially can control the assets and is considered to be its owner.

158. Widely and publicly available search engines permit viewing and analyzing public data on a particular blockchain. For example, the free and publicly available search engine available at "tronscan.org" permits users to observe transactions on the TRON blockchain, including the cryptocurrency balances of any address on the TRON blockchain, and the activity associated with that address such as transfers, receipts, and other information. Again, however, none of this information, alone, reveals *who* owns any cryptocurrency represented on the TRON blockchain. The search engines only show *what* addresses engaged in *what* transactions with which other addresses for what amounts and *how much* cryptocurrency they currently hold.

159. Cryptocurrency owners typically store the keys providing them control over their crypto assets on "crypto wallets." Crypto wallets are software that store and manage critical information about crypto assets, primarily the "public key" and the "private key" associated with a crypto asset so that the user can make transactions on the associated blockchain.

160. "Crypto asset trading platform" or "cryptocurrency exchanges" are marketplaces that generally offer a variety of services relating to crypto assets, including allowing their customers to purchase and sell crypto assets for fiat currency or for other crypto assets.

161. When a user provides the information needed to transfer their cryptocurrencies to a third-party like a cryptocurrency exchange, their wallet is "hosted" by the exchange. If a user retains this information, the wallet is "unhosted."

162. A "cryptocurrency mixer" is a service that combines and scrambles crypto assets from multiple sources and redistributes equivalent amounts back randomly to new blockchain addresses to obscure the connections between the various addresses. According to DOJ, mixers have been used as "safe havens for laundering criminally derived funds, including the proceeds of ransomware and wire fraud."

163. "Cross-chain bridges" or "bridgers" refer to services that enable transfers of digital assets across different blockchains—i.e., to transfer the representation of a particular digital asset (for example Tether) from one blockchain (say, the bitcoin blockchain) to another blockchain (say, the TRON blockchain).

164. As used herein, the term "hop" refers to a single step or transfer between one blockchain address and another. For example, if a crypto asset is transferred from its original address to another address, then to another address, it traveled two "hops" on the blockchain.

165. Some blockchains, including the TRON blockchain, charge "fees," typically in the blockchain's native cryptocurrency, in order to effect transfers. These "fees," sometimes called "gas fees," represent a small percentage of the amount proposed to be transferred and are charged to inhibit a malicious actor from slowing down the blockchain from recording transactions by attempting to make an infinite number of transactions (also known as "spamming the network").

### B. Scam Proceeds from the Compound Wallet Are Linked to Huione, Xinbi, and Sea Dragon and their Money Laundering Network

166. During his captivity and as described above, Plaintiff Ariyan obtained a public address on the TRON blockchain that starts with the characters "TFtG1" (the "Compound Wallet"), which Defendants used to collect funds from investment scam victims.

167. Forensic analysis of transactions to and from the Compound Wallet identified money laundering networks moving billions of dollars through a series of interconnected cryptocurrency wallets. The flows between these wallets and intermediaries show known indicia for money laundering: rapid multi-hop movement, immediate bridging to the TRON blockchain, repeated routing of funds from different victims through the same intermediary addresses and known Huione-attributed wallets, and eventual contact with exchange endpoints.

168. The Compound Wallet belongs to an interconnected network of cryptocurrency addresses used to launder the proceeds of online investment scams and other illicit activity (the "Network," as further defined below, *see infra* ¶ 175).

169. Analyzing the transaction activity of the Compound Wallet together with the transaction activity of certain other cryptocurrency addresses provided to victims of online investment scams as the addresses to which they should send funds (the "Victim Wallets," together with the Compound Wallet, the "Reference Wallets"), results in a set of sixty-nine (69) addresses on the TRON blockchain (the "Core Intermediary Addresses").

170. Specifically, these sixty-nine (69) Core Intermediary Addresses on the TRON blockchain (i) sent or received funds at least one time to one of the Reference Wallets; (ii) sent or received funds at least once to another Reference Wallet through no more than one "hop" or intermediary; (iii) transacted with other potential intermediary addresses more than once; and (iv) transacted more than once with more than one address that transacted directly with the Compound

Wallet. As such, the 69 Core Intermediary Addresses on the TRON blockchain act as the "core intermediaries" of the Network to which the Compound Wallet belongs and its money-laundering activities.

171. Further tracing the transactions of the 69 Core Intermediary Addresses identifies the money-laundering Network—which consists of at least 94,394 blockchain addresses on the TRON blockchain—operating for the benefit of the Venture. Of these 94,394 addresses, 8,894 are addresses that are "hosted wallets," i.e., wallets held by a third-party service provider such as Binance on the user's behalf, 85,395 are unhosted wallets, and 105 are wallets that had been previously blacklisted by Tether.

172. There are 923 addresses that received funds directly from the 69 Core Intermediary Addresses on three or more separate occasions and that also transacted with three or more distinct addresses within the 69 Core Intermediary Addresses (the "First Hop Addresses").

173. There are 7,348 addresses that received funds directly from the First Hop Addresses or the 69 Core Intermediary Addresses on three or more separate occasions and that also transacted with three or more distinct addresses within the 69 Core Intermediary Addresses or the First Hop Addresses (the "Second Hop Addresses").

174. There are 86,054 addresses that received funds directly from the Second Hop Addresses, the First Hop Addresses, or the 69 Core Intermediary Addresses on three or more separate occasions and that also transacted with three or more distinct addresses within the 69 core intermediary addresses or the First Hop Addresses or the Second Hop Addresses (the "Third Hop Addresses").

175. The "Network" is the 69 Core Intermediary Addresses plus the First, Second, and Third Hop Addresses, for a total of 94,394 addresses.

176. A meaningful share of the funds transferred within the Network terminates at, or routes through, Defendant Huione Guarantee, as well as Defendant Xinbi Guarantee and related Telegram-based marketplaces such as Tudou Guarantee and FLL Guarantee, each of which operates in the same criminal ecosystem, and all of which are interconnected components of a single illicit financial ecosystem, rather than independent actors. The Network's repeated escrow interactions with these designated marketplaces—Huione Group having been designated by FinCEN as a primary money-laundering concern, and Xinbi having been sanctioned by OFAC—represent discrete, consummated illicit transactions rather than an incidental transfer of funds.

177. Huione acquired a 30% ownership stake in another marketplace called Tudou Guarantee in December 2024—shortly after public reporting on Huione's role in facilitating human trafficking—allowing Huione to maintain a market presence through an ostensibly separate platform. After Telegram banned Huione Guarantee's public channel in May 2025, vendors migrated from Huione Guarantee to Defendant Xinbi Guarantee and Tudou Guarantee and continued to offer the same trafficking- and laundering-related goods and services to the same criminal clientele, consistent with on-chain analytics from Elliptic and TRM Labs.

178. Blockchain tracing also shows that these marketplaces work together to launder proceeds in other crimes. For example, following the July 2024 hack of the Indian cryptocurrency exchange WazirX, attributed to the North Korean state hacking group known as the Lazarus Group, a portion of the approximately $235 million in stolen funds was consolidated through cross-chain bridges, passed through intermediary wallets, and then split between wallets associated with Defendant Xinbi Guarantee and Defendant Huione Guarantee.

179. Overall the Network contains 7,490 addresses attributed to the Huione Defendants. For example, the address TS8wmuQvwv2ZUfgpntoQa9Pa5UaQoKbjCA is a direct counterparty

(one hop) attributed to Defendant Huione as "Huione Background Investigative Service, @AnxinTianyan," a Telegram-channel service selling personal-data lookups for which Huione is listed as the TRON payment address, and the Network separately includes addresses attributed to "Huione Pay Deposit Wallet" and "Huione Merchant."

180. The Network's interactions with Huione Guarantee and the related guarantee marketplaces consist of hundreds of thousands of transactions involving hundreds of millions of dollars in assets.

181. Huione's infrastructure also connects the Network to an entity called Qbit, which has been tied to online investment. The deposit address THGTenLmvqWycGLGtgRvX4wURiHQeDvNps ("THGT"), which was attributed to Qbit in a public civil lawsuit, is a deposit wallet at the cryptocurrency exchange called "OKX" that forms part of Huione's financial infrastructure, and the majority of funds deposited to THGT originate from Huione wallets used to fund accounts at OKX, as well as from pig-butchering wallets.

182. THGT functions as a payment portal wallet—a sort of bank teller window—where different scam operators deposit their scam proceeds to launder. That portal received approximately $251 million worth of Tether between March 5 and June 6, 2024, from a cluster of roughly 350 addresses whose TRX "gas fees" were provisioned by a single funder address tied to at least seven other known scam addresses.

183. Huione has continued its money-laundering operations through the Network even after government enforcement. Even after FinCEN proposed and finalized a rule cutting Huione off from the U.S. financial system, certain Huione Defendants continued to launder money in support of the Trafficking Venture, processing more than $10 billion worth of Tether. FinCEN

characterized Huione's response as "superficial restructuring apparently intended to evade further scrutiny," while its "money laundering enterprise appears to operate just as before."

184. The Xinbi Defendants likewise participated in the Venture and transacted with the Network. Xinbi Guarantee is a Telegram-based escrow marketplace that operates in substantially the same manner as Huione Guarantee and provides financial infrastructure for transnational cybercrime, pig-butchering scams and money laundering. It functions as a continuation of the same criminal venture, given the shared intermediaries, deliberate and acknowledged rebranding, and seamless transfer of illicit vendors.

185. Like Huione, Xinbi participated directly in the trafficking phase of the Venture. It provides a marketplace to sell both persons and the implements used to restrain and torture them, and according to a DOJ public statement on September 9, 2026, Xinbi vendors "solicit[] trafficking victims to work in scam compounds in Southeast Asia."

186. Other services marketed on Xinbi's marketplace include the laundering of money obtained by scammers into "clean" funds and Chinese renminbi, the creation of custom fraudulent investment websites, the sale of stolen personal data, and the provision of AI face-swapping tools to facilitate scams. Public reporting has further documented that Xinbi vendors offer scammers bank accounts in the scam victim's country to receive payments before paying the scammer in Tether, as well as stolen data, SIM cards and Starlink terminals, and other illicit offerings.

187. Xinbi's primary merchant-directory channel on Telegram, @gqdh, had over 650,000 subscribers and served as the landing page for new users of the marketplace, with an identical backup channel, @xbdh. Even after Telegram banned Xinbi's original channels in approximately May 2025, Xinbi continued to operate, migrated to the SafeW messaging application, and launched its own proprietary payment application, XinbiPay.

188. As with the other Defendants, Plaintiffs' forensic tracing confirms that the Xinbi Defendants' cryptocurrency addresses are connected to the Compound Wallet and the Network addresses, and actively participate in the Network of wallets belonging to the Venture.

189. Addresses known to be under the Xinbi Defendants' control sit directly within the Network. In total, the Network contains 331 addresses attributed to Xinbi Guarantee. In addition, 30 of the Xinbi-associated cryptocurrency addresses identified by federal investigators in a seizure warrant affidavit appear directly within the Network. Examples include:

- **TPkcXsUxnFiBpoLjZvvcW75quMqGmatHHH** (first hop): sent $755,434.00 into the Network across 14 transactions and received $219,592.50 across 56 transactions. It interacted with 4 of the 69 Core Intermediary Addresses.
- **TYPkHp46fk3pDDiazv9aWH8NcDU9r15cvv** (second hop): sent $2,729,012.00 into the Network across 174 transactions and received $1,827,367.20 across 361 transactions.
- **TTRnMtus9N7yURav1atvEmqK4f8MXUqJc4** (third hop): sent $44,719,748.00 into the Network across 455 transactions and received $42,645,128.62 across 539 transactions, with 35 different Network addresses.

190. Because Xinbi Guarantee operates as an escrow marketplace for money laundering, scam tooling, and related illicit services, each of the Network's repeated interactions with Xinbi-attributed addresses reflects, upon information and belief, a completed transaction for illicit services rather than an incidental transfer of funds.

191. The Sea Dragon Defendants raised funds from online investment scams in the United States and then laundered at least a portion of those funds through the Network.

192. In *Hoffman v. Sea Dragon Trading, LLC*, No. 1:23-cv-03407 (N.D. Ill.), two Ethereum blockchain addresses known to belong to Sea Dragon Trading—0x4fA6A2BB1d228FbFC2Cf13C8C8B4cA13724F609f and 0xc94d18fB5867fe4da5887c3be1E7fA386d9B68F1—were identified as direct recipients of proceeds of online investment scams.

193. From these addresses, the *Hoffman* plaintiff's funds were moved through intermediary addresses and then, through cross-chain bridgers, onto the TRON blockchain into TFJv4XLKf8BpuLQ55kjVu2iHefSH26M8V6, which sits directly within the Network and accounted for $2,468,215.00 as of September 9, 2026. The other two addresses, though outside the Network under the applicable parameters, have interacted with and transferred funds into other Network addresses, including, for example, transferring over 1,139,900 USD in November 2024 to one of the sixty-nine core addresses.

194. Defendants' Trafficking Venture has laundered billions of dollars in proceeds through the Network. So far, approximately $6.93 billion has been sent to or received by the Network's addresses.

195. As of August 7, 2026, the Network held $734,800,149.38 in cryptocurrencies.

196. As of September 9, 2026, the Network held $634,537,082.59 in cryptocurrencies.

197. As of October 19, 2026, the Network held $526,012,674.10 in cryptocurrencies in unhosted-wallet addresses. *See* Trager Decl., **Exhibit 3**: Unhosted Network Wallets. The deposit addresses identified in **Exhibit 4** of the Trager Decl. collectively hold approximately $117,786.8515 USDT, and the flagged wallets identified in **Exhibit 20** of the Trager Decl. collectively hold approximately $24,966,343.36 USDT. *See* Trager Decl., **Exhibit 4**: Hosted Network Wallets (Deposit Addresses); Trager Decl., **Exhibit 20**: Flagged Network Wallets.

198. The cumulative on-chain activity reflected within the Network is substantial. In total, hosted wallets have received $6,934,856,201.96 in cryptocurrency deposits, including at exchanges like Binance, Huobi, and OKX.

199. The transaction activity of the addresses identified in the Network demonstrates how rapidly assets can be and are dissipated. The addresses within the Network have engaged in no less than 9,314,756 transactions. In one example from early August 2026, a Network address transferred funds 945 times within 24 hours, then executed an additional 521 transactions the following day.

### C. Huione's Additional Human Trafficking and Money Laundering Activities on Behalf of Defendants' Trafficking Venture

200. The Huione Defendants are the heart of Defendants' Trafficking Venture, enabling it end-to-end—running compounds, procurement, escrow/settlement, cross-asset conversion, and off-ramp liquidity—and benefiting financially at every turn, as the above cryptocurrency tracing analysis independently confirms. The Huione Defendants' participation is critical to the success and profitability of Defendants' Trafficking Venture.

201. On October 16, 2025, FinCEN finalized its Huione Rule, 31 C.F.R. § 1010.664, which imposes a special measure on Huione Group under Section 311 of the USA PATRIOT Act and prohibits financial institutions from opening or maintaining a correspondent account for, or on behalf of, Huione, including Defendant Haowang Guarantee, Defendant Huione Pay, and other Huione subsidiaries. *See* FinCEN 2025 Huione Rule, 90 Fed. Reg. 48,295 (Oct. 16, 2025).

202. In its findings in support of the rule, FinCEN directly linked Huione to investment scams perpetrated by human traffickers and characterized Huione as a "significant node within the money laundering ecosystem that enables criminals to both obtain necessary items to carry out various crimes, and the services to launder the proceeds of those crimes."

203. FinCEN further characterized Huione as a single coordinated entity enabling scam networks, with Huione Group as the parent entity controlling three subsidiaries (all of which are Defendants in this case): (i) Haowang Guarantee; (ii) Huione Pay [Cambodia]; and (iii) Huione Crypto. As FinCEN concluded, the "Huione Group, as an individual entity, coordinates the Subsidiaries' activities by operating the customer service and public relations functions of the Huione Group. Huione Group does this by hosting Telegram channels to aid customers experiencing problems with the services that the Subsidiaries provide." Because the organizational structure of Huione Group necessitates close interaction between parent and subsidiaries, FinCEN concluded that Huione has "apparent control of the Subsidiaries" creating a "self-contained ecosystem of exchange, payment, and market services."

204. Despite the FinCEN 2025 Huione Rule and other steps taken to stop Huione's criminal activities, Huione has found ways to continue participating in the Venture to this day.

205. Defendant Huione's international money laundering operations on behalf of the Venture operate in part from within the United States through companies in Colorado and trademarks registered in the United States.

### 1. Huione Laundered Funds for a Scam Compound that Trafficked Plaintiff Ariyan

206. Tai Chang in Myanmar's Karen State, where Plaintiff Ariyan was held captive, is one of the Venture's scam compounds (or Class Compounds).

207. Scams originating from Tai Chang targeted Americans, including in Colorado. In a November 2025 release imposing sanctions on the DKBA, OFAC described Tai Chang as a "compound known to have housed cyber scam operations that have targeted and stolen money from Americans."

208. Seizure warrants obtained by the DOJ, including an FBI affidavit documenting conduct as recently as November 2025, identified that scammers in Tai Chang targeted Americans in Colorado, San Diego, and other states. One of the scam victims, R.R., is from Colorado and met a woman on Facebook who attempted to pursue a romantic relationship with R.R. This woman introduced R.R. to the cryptocurrency investment website Nasdaqweb.com, a fraudulent website controlled by the scammers. These warrants further show the scammers "have been using U.S. wires to commit these [cyber scam] schemes," along with services of U.S. companies like SpaceX and Meta.



***Figure 3: The Tai Chang Scam Compound, as seen from the Thailand Border***

209. Scams originating in Tai Chang laundered funds obtained from U.S. victims through Huione-provided services. According to the victim evidence summary of one victim, the IP address from which the scam that targeted her originated was the "Tai Chang Compound in

Burma" and a Brooklyn-based money laundering cell "managed the domestic reception" of scam proceeds "before laundering them through the Huione Group marketplace."

**2. Huione Constructed and Operates a Scam Compound**

210. Defendant Huione also helped to physically construct and operate scam compounds. The scam compound #8 Park—occasionally referred to as "Huione Park"—was constructed over the last two years in Cambodia, near the border with Vietnam. Public reporting has documented claims that Defendant Huione is an investor in #8 Park. #8 Park is believed to be Cambodia's largest scam compound, with capacity to accommodate 20,000 trafficked victims.

211. #8 Park appears in many posts on Telegram channels used by scam industry operators. According to the monitoring organization Cyber Scam Monitor, these posts reference people being forced to pay operators to be allowed to leave, brutal treatment for poor performance, and unpaid wages by companies operating in #8 Park. Cyber Scam Monitor also reported being aware of several cases of foreigners appealing for help to escape #8 Park.

212. *The Japan News* reported in July 2025 that Japanese police uncovered scam operations at the site after a man from the area was recruited to work there. A local driver told *The Japan News* reporters that individuals of various nationalities lived inside #8 Park, and that "everyone knows that this is a fraud base."

213. Cyber Scam Monitor found images of the exterior of #8 Park reading "Legend Innovation Co., Ltd." Legend Innovation Co., Ltd. is registered in Cambodia at the address of Huione Insurance PLC.

214. Another Huione-affiliated company, Huione Technology Co. Ltd., displayed an artist's impression of the completed compound on its website around April 30, 2025, while construction of the compound was still underway.




***Figure 4: Design Image of #8 Park included on Huione Technology website***

215. Defendant Huione Pay Cambodia operates a physical store within #8 Park for individuals to exchange cryptocurrencies and fiat currency. #8 Park compound managers even mandate the use of Defendant Huione Pay Cambodia and post notices stating "[i]f any merchants are found to continue refusing Huione payments or charging extra service fees, their business operations will be suspended immediately." Elliptic, *#8 Park: Prince and Huione's Role in a*

*Scam Compound Still Operating amid Crackdowns* (Feb. 4, 2026), at 6 (reproducing and translating Dec. 1, 2025, notice of the "No. 8 Property Administration Department").

216. Defendant Huione Pay Cambodia's physical footprint and offerings in high-risk areas and scam compounds themselves—including in Sihanoukville and #8 Park—include runner and document-processing services and even armed escort services intended to meet the logistical needs of scam compounds and human traffickers.

**3. Huione Knowingly Participates in Human Trafficking**

217. Huione knowingly participates in—and benefits from—the Venture by coordinating subsidiary activities to form a self-contained ecosystem of exchange, payment, and market services for human traffickers, scam compounds, and criminal organizations.

218. As set forth above, *supra* ¶ 68, the Head of Cyber Threat Intelligence for the blockchain data platform Chainalysis testified on April 1, 2025, to Congress that "[w]e see many of our scams are using Huione as a common denominator, the common place to launder cashout funds, but also reinvest the proceeds of scams for additional materials used to target additional victims." Moreover, according to the testimony, "[t]he peer-to-peer marketplace, [Defendant] Huione Guarantee [] has become a one stop shop for the scam supply chain."

219. Transactions in Defendant Huione Guarantee Telegram channels are sometimes publicly visible, and show purchases of torture devices, spoofed trading platforms, SIM cards, payment services for moving and concealing illicit funds, deepfake technologies for tricking victims, and even "recovery services" for runaway trafficking victims.

220. Defendant Huione Guarantee advertised and provided detention implements—such as electronic shackles and electric batons—for the Venture via Telegram groups, which are

described as groups for "extreme products." These implements were provided to the scam compound operators to detain and force human trafficking victims into conducting the scams.

221. The following image shows a listing on Defendant Huione Guarantee published in July 2024 as a part of Elliptic's investigation for a taser and electric baton designed for use on "runaway dogs," a euphemism used by traffickers for human trafficking victims who attempt to escape. Plaintiffs Frank, Ariyan, Joton, and Salam were each subjected to electric shock during their captivity as a form of torture designed to instill fear and prevent escape.




*Figure 5: Listing on Haowang Guarantee for Detention Equipment*

222. Defendant Huione Guarantee mediates access to private "extreme product" Telegram groups through up-front deposit payments in Tether and official on-site bots providing step-by-step assistance on how to join them. The following screengrab shows a May 2025 conversation that Inca conducted with a Huione Guarantee bot as part of its investigation. The bot performs this intermediary gatekeeping function on a Defendant Huione Guarantee Telegram channel. An English translation accompanies the screengrab:




***Bot (white):*** *Ad – All Categories Open! Instant Sales!*
*Maximum 100% profit!*
*Fully stocked with electric shock devices, 50u units for 18u, 100u units for 32u. Huge profits await!*

***Bot (white):*** *Hello, this is the 24/7 customer support for Huione Guarantee. Please select the appropriate business option below to proceed.*

***Our account (green):*** *Open a group.*

***Bot:*** *Dear, what kind of business group would you like to open?*

***Our account:*** *I want a group for selling high-voltage electric batons and electronic shackles.*

*Can you help?*

***Bot:*** *Please describe the type of business or trade you plan to conduct. For example, is it weapons, drugs, or counterfeit items? You can also join the group* ***@zhuanqun*** *for detailed transaction guidelines and industry group links.*

***Our account:*** *I want a group for selling high-voltage electric batons and electronic shackles. Can you recommend a group for this?*

***Bot:*** *For high-risk items like electric batons and electronic shackles, contact* @hwtb33. This *account can guide you to specialized groups, including those for weapons, drugs, and other restricted items.*

***Bot:*** *To join these groups, first contact* ***@hwtb12*** *for initial verification. This step is necessary for accessing the directory. You may also need to review transaction rules and deposit requirements before accessing the groups.*

*Once verified, use* ***@hwtb34*** *to confirm deposit amounts, group rules, and specific trading conditions.*

***Figure 6: Inca's Telegram Messages with Huione Bot inquiring about detention equipment. Huione Bot directing Inca account to specialized groups.***

223. Instructions from official bots operated by Defendant Huione Guarantee permit access to Telegram channels used by human traffickers to buy money laundering and trafficking tools and discuss strategies for improving the scams. "If you need to launder illegal funds, please contact me and I will help you," reads one comment on channel https://t.me/c/2165850959/406, a Telegram channel to which a Defendant Huione Guarantee bot directs users. Bots operated by

Defendant Huione Guarantee direct users to at least eleven Telegram groups discussing money laundering and the "recruitment" of workers.

224. Defendant Huione Guarantee's Telegram channels also advertise the sale and resale of trafficking victims *between* compounds. These channels advertise that trafficking victims can provide "online customer service with restricted movement," "24/7 availability," and inform potential buyers on how to maintain control of these victims ("ransom negotiable if worker wants to quit"). Victims are listed by price and skills, and scammers frequently discuss issues such as how to discipline "disobedient workers."

225. Figure 7 below is a screengrab of an advertisement for the sale of trafficking victims, taken in May 2025 by Inca during the course of their investigation.




***Figure 7: Advertisement of trafficking victims in Telegram Group***

226. Branches of Defendant Huione Pay Cambodia operate in high-risk zones for human trafficking, including in Sihanoukville where forced labor compounds are clustered, and where Plaintiff Salam was held captive. In Sihanoukville, Huione Pay Cambodia offers services such as personal security, emergency response, "runner services," armed escort, luxury car rental, and "document processing." These services are also offered through the Huione Life app—available on the Apple App Store—which supports online and offline consumption, shopping, and payments within Cambodia.

### 4. Huione Knowingly Participates in Additional Investment Scam and Money Laundering Activities for the Venture

227. Defendant Huione Guarantee also offers services to facilitate the Trafficking Venture's investment scams—in addition to laundering funds for Tai Chang—including offering services to develop websites for fraudulent cryptocurrency investment sites, individuals' personal data for targeting by scammers, and AI face-changing software advertised for use in scams.

228. Figure 8 below, reproduced from a United Nations Office on Drugs and Crime April 2025 report, depicts "[l]istings of Huione Guarantee data vendor, Cambodia and U.S.-based 'motorcade' laundering service, and Huione Crypto mobile application, 2024."




***Figure 8: Listings on Haowang Guarantee for Personal Data Used in Scam Targeting (left); Cambodia and U.S.-based money laundering "motorcade" service (center); and the Huione Crypto Mobile Application on the Apple App Store (right).***

229. Defendant Huione Pay Cambodia and other Huione entities, such as Huione International Payments, also knowingly participate in and benefit from the Venture by laundering money for the Venture, acting as merchants and money exchangers to process scam proceeds into cryptocurrency and fiat currencies for money-laundering purposes.

230. Defendant Huione's money laundering is not limited to "receiving" tainted funds. Defendant Huione provides sophisticated "laundering-as-a-service" products like escrow services, cross-asset conversions, and physical money mules to move, obfuscate, and guarantee funds.

231. In a July 26, 2024, interview with ABC News, Jacob Sims, a transnational crime and modern slavery expert, said trafficking victims, scam victims, and activists have indicated that Defendant Huione Guarantee is a technology platform leveraged heavily by the syndicates, stating Huione Guarantee is "effectively an illicit marketplace for the goods and services needed to launder proceeds from scamming."

232. In an April 2025 report, the United Nations Office on Drugs and Crime described Defendant Huione Guarantee as operating a United States-based network of accounts used to launder scam proceeds outside of the United States.

233. In the FinCEN 2025 Huione Rule, FinCEN highlighted the role of Defendant Haowang Guarantee in advertising money laundering services and scam-enabling resources, while also describing Defendant Huione Pay Cambodia's ability to convert value across fiat and multiple blockchains.

234. As described by an April 1, 2026, article from *The New York Times*, Huione is "a mighty constellation of companies that sucked in money from criminals, washed it clean and moved it across borders at stunning speed."

235. Figure 9 below is a screengrab, taken in July 2024, of a chat log on Defendant Haowang Guarantee where a customer asks for help laundering $2 million from a "quick kill" (i.e., a scam), and a Huione Pay representative provides a price quote of 10.5% and confirms the service is run by Huione.




***Figure 9: Chat on Haowang Guarantee Offering Laundering "by Huione."***

236. Defendant Huione International Pay is one of the Huione entities more directly involved in laundering money. According to internal company documents reviewed by *The New York Times* and two people familiar with its operations, Huione International Pay acts as a matchmaker for money launderers and scam operators. The documents and insiders indicate that Defendant Huione International Pay operates with the efficiency of a legitimate, professional bank. One Huione International Pay department handles customer relations for scammers and other illicit actors. Another monitors Telegram channels. A third department tracks money mule accounts in at least a dozen countries.

237. Defendant Huione International Pay was so intimately involved in operations that it extended large lines of credit to high-performing teams of money launderers, according to reporting in *Bloomberg* on August 1, 2025, and documents *Bloomberg* reviewed.

238. One such document—a multi-page manual authored by Defendant Huione International Pay's transaction department—lays out policies for filling out logs for scam victims, referred to as "customers," in the U.S., Europe and Australia. The report, dating from 2022, describes how to handle risks "from mild to severe," including when scam victims reach out to the police or when mules are detained by the authorities. The manual, for instance, instructs Huione International Pay employees to change one field in the logs to "person arrested" and to "report immediately to manager or regional leader."

239. Defendant Huione Pay Cambodia operates eight Cambodian branches located in Battambang, Phnom Penh, Poipet, Siem Reap, and Sihanoukville and operates the website Huione.me, which functions as a cryptocurrency exchange with an integrated wallet system that provides a simplified user interface geared toward promoting easy trading of cryptocurrencies.

240. Many of Defendant Huione Pay Cambodia's services, such as the cryptocurrency known as USDH, were created to frustrate anti-money laundering initiatives. As FinCEN assessed, Huione, through Defendant Huione Crypto, launched USDH likely "to hamper compliance with applicable anti-money laundering laws. Huione Group's intentional launching of this 'unfreezable' stablecoin differs from other stablecoin issuers that generally respond to law enforcement requests to freeze CVC [convertible virtual currencies, another term for cryptocurrencies] tied to illicit activity."

241. FinCEN's analysis identified that, in the aggregate, Defendant Huione Group has received at least $4 *billion* worth of illicit proceeds, between August 2021 and January 2025.

242. Large amounts of Tether have moved from Huione-associated wallets to major cryptocurrency exchanges. The International Consortium of Investigative Journalists reported that at least $408 million in Tether was sent from Huione addresses to Binance deposit accounts between July 2024 and July 2025, and at least $226 million in Tether was sent to deposit accounts at the cryptocurrency exchange OKX between February 24 and July 22, 2025.

243. Moreover, as set forth above, the Venture's cryptocurrency Network confirms Huione's central role in laundering scam proceeds. A meaningful share of the funds transferring through the Network terminates at, or routes through, Defendant Huione Guarantee, as well as Defendant Xinbi Guarantee and related Telegram-based marketplaces Tudou Guarantee and FLL Guarantee. These marketplaces operate as interconnected components of a single illicit financial ecosystem rather than independent actors: Huione's 30% stake in Tudou Guarantee, the migration of Huione vendors to Xinbi and Tudou after Telegram's May 2025 ban, and the split of the WazirX hack proceeds between Xinbi- and Huione-affiliated wallets (*see, e.g.*, *supra* ¶ 176; *infra* ¶ 256) all confirm that these marketplaces act as a single laundering pipeline.

244. The Network confirms that specific blockchain addresses attributed to Huione and its affiliated services, including "Huione Background Investigative Service," "Huione Pay Deposit Wallet," and "Huione Merchant," interact with the above marketplaces over hundreds of thousands of transactions involving hundreds of millions of dollars in assets.

245. In November 2025, the DOJ filed a verified forfeiture complaint against approximately $11.8 million in USDT. The FBI traced those funds to a cryptocurrency investment-fraud scheme in which criminals, believed to be located abroad, defrauded at least 15 U.S. victims. One victim lost more than $730,000 after a man she met on eHarmony steered her to a fake trading platform. According to the complaint, funds from two wallets holding

commingled victim funds were transferred, directly or indirectly, to Huione Pay, "which is part of the Huione Group."

246. Similarly, in a January 2026 verified forfeiture complaint, the FBI traced the proceeds of scams against 20 U.S. victims to a single cryptocurrency address. That address also held 991,000 USDT from Huione Pay, which investigators believed "are derived from cryptocurrency investment fraud schemes." Tracing "did not identify any legitimate sources of income" for the address.

247. Figure 10 below is a screengrab, taken in May 2025, showing the services that Huione Guarantee provided as of May 2025 and the various fees and commissions it charged.

- **1. USD/USDT Exchange Fee**
  - **Fee: 0.2% of transaction value**, with a **minimum charge of 20 USDT or $20**
  - Fee is negotiated between the buyer and seller
- **2. Payment Proxy Services ("代付" = acting as a payment middleman)**
  - Fee: **0.1% of transaction volume**
  - Daily parking (escrow) fee of **10 USDT/day per transaction**, minimum of 20 USDT per week
  - Minimum transaction deposit: **800 USDT**
- **3. General Goods Transactions**
  - Fee: **3% of transaction value**, minimum 20 USDT
  - Again, fees negotiated by buyer/seller
- **4. "拉粉" or "拉群" Tasks (User Recruitment or Group Operations)**
  - When used for recruiting group members or handling bulk tasks, fees are treated as normal goods trades: **3% per day**
  - Option: flat rate **1500 USDT/month**
- **5. Game-Type Transactions (for laundering through online games or gambling platforms)**
  - Fee tiers:
    - **50 USDT/day** for transactions <10,000 RMB
    - **100 USDT/day** for 10,000–100,000 RMB
    - **200 USDT/day** for 100,000+ RMB

***Figure 10: Services provided, and commissions earned, by Huione Guarantee***

### 5. Huione Has Continued Participating in and Benefiting from the Venture Despite Efforts to Stop It

248. After Elliptic's July 2024 reporting tying Defendant Huione Guarantee to human trafficking, Huione Pay Cambodia removed a section of its website describing Huione Guarantee as a subsidiary.

249. On October 19, 2024, Defendant Huione Guarantee rebranded as Haowang Guarantee. The Haowang Guarantee site is an almost exact copy of the original Defendant Huione Guarantee site, containing links to the same Telegram groups that continue to sell goods and services for the Trafficking Venture.

250. The below image, Figure 11, is a since-deleted page on the website of Defendant Huione Pay Cambodia titled, "About 'Haowang Guarantee'" that describes "Huione Group's Haowang Guarantee Platform [as] a professional e-commerce platform providing virtual digital product trading services to users. It is committed to serving the vast number of internet professionals, striving to make online transactions safer and more efficient, and providing comprehensive transaction protection for both buyers and sellers."




***Figure 11: Huione webpage describing Haowang Guarantee Platform***

251. Despite the increased scrutiny and enforcement actions against it, Defendant Huione Group has continued its activities on behalf of the Venture. While Telegram removed Haowang Guarantee channels in May 2025, Defendant Huione continued operating channels for its "VIP" vendors on Telegram. Moreover, Defendant Huione's crypto exchange platform re-emerged as huione.me and Defendant Huione continued to promote its cryptocurrency USDH.

252. In addition, the Huione Defendants are using other related entities such as Tudou Guarantee or Defendant Xinbi Guarantee to continue to sell trafficking and money-laundering services.

253. On May 13, 2025, *Wired* reported in an article called "An $8.4 Billion Chinese Hub for Crypto Crime Is Incorporated in Colorado," that Xinbi advertises on its website in Mandarin that it is registered in Colorado. The article reports that Xinbi has offered an online marketplace for laundering funds from crypto scams since at least 2022. Andy Greenberg, *An $8.4 Billion*

*Chinese Hub for Crypto Crime Is Incorporated in Colorado*, Wired (May 13, 2025), https://www.wired.com/story/xinbi-guarantee-crypto-scam-hub/. As reported by *Wired*, Xinbi's central use is as a cash-out point for crypto scammers, and its vendors, like Huione Guarantee's, offer two principal types of cash-out services. First, vendors offer bank accounts in the same country as the victim of the crypto scam, so that they can receive whatever payments the victim is scammed into making, and then pay the scammer in Tether. Second, vendors offer to receive cryptocurrency payments and cash them out in the scammer's local currency, such as Chinese renminbi.

254. As set forth above, blockchain addresses known to belong to Xinbi Guarantee have received criminal proceeds from the same Network of money laundering entities that Huione did, showing that they operate in the same money laundering pipeline.

255. Moreover, Haowang Guarantee and Xinbi Guarantee received and moved criminal proceeds through overlapping vendor networks and wallet infrastructures, as further confirmed by blockchain analytics from the private companies Elliptic and TRM Labs, which show vendors using both Huione Pay/Haowang and Xinbi shared counterparty flows and rapid cross-platform migration when channels were banned.

256. The below chart from Elliptic depicts a segment of tracing done after $235 million was stolen from the Indian crypto exchange called WazirX in July 2024 by state hackers. The chart below shows, from left to right: two cross-chain bridges consolidated approximately USD $515,000 in funds into a single wallet and then sent approximately USD $460,000 to another single wallet, which subsequently split the funds between wallets associated with Xinbi Guarantee and Haowang Guarantee. As Elliptic describes it, "[t]his indicates that vendors operating on Xinbi Guarantee were employed to help launder proceeds of the WazirX heist."




***Figure 22: Simplified Network Analysis Showing Proceeds of WazirX Heist Sent to Addresses Controlled by Xinbi Guarantee and Haowang Guarantee in November 2024***

257. Moreover, even after FinCEN first announced in early 2025 it would adopt the FinCEN 2025 Huione Rule, according to FinCEN "Huione Group's money laundering enterprise appears to operate just as before." This prompted FinCEN, in June of 2026, to propose a modification of its FinCEN 2025 Huione Rule to cover any potential rebrand of the Huione entities, which was already occurring in response to the original.

### 2. <u>Huione Operates in Part from the United States</u>

258. Defendant Huione conducted its business and directed business activity in the United States, and specifically in Colorado, to further facilitate the Venture.

259. On August 4, 2024, Huione Pay U.S. filed articles of incorporation in Colorado, listing its principal office and registered agent address as 1312 17th Street, Suite 1402, Denver, CO 80202.

260. The next day, Huione Pay U.S. registered with FinCEN as a Money Services Business ("MSB"), using the same Colorado address. The Huione Pay U.S. MSB registration covers check cashing, dealing in foreign exchange, issuing money orders and traveler's checks, money transmission, and selling money orders, prepaid access, and traveler's checks, with activities flagged for all U.S. states and territories.

261. On February 18, 2025, Lotcoin LTD filed Colorado Articles of Incorporation, listing 1312 17th Street, Suite 600, Denver, CO 80202 as the principal office and registered agent address. On February 18, 2025, Lotcoin LTD changed its name to Huione and, on March 17, 2025, changed its name to Huione Global.

262. The next day, March 18, 2025, Huione Global registered with FinCEN as an MSB at 1312 17th Street, Suite 600, Denver, CO 80202, listing its activities as including being a dealer in foreign exchange, money transmitter, and seller of money orders, with all U.S. states and territories flagged.

263. Between March 1, 2018, and July 12, 2019, Healthmac Analytics, Inc. ("Healthmac"), a Florida corporation, filed 13 trademark applications with the U.S. Patent and Trademark Office ("USPTO"). Upon information and belief, Healthmac filed these applications on behalf of Defendant Huione. Healthmac's listed address is Suite 224, 601 Heritage Drive, Jupiter, Florida, the same suite as The Curran Law Firm, whose attorney, Maura S. Curran, filed the applications. U.S. Trademark Application Serial No. 87,815,927 (filed Mar. 1, 2018).

264. Five of the applications became registrations (USPTO Trademark Search). All five registrations were later cancelled after Healthmac failed to file the required Section 8 declarations of use.

265. The HUIONE wordmark was registered on the USPTO's Principal Register on March 5, 2019, as U.S. Reg. No. 5,688,960, in International Class 36 (U.S. Reg. No. 5,688,960). Class 36 covers financial services. The mark was registered for "[f]inancial services, namely, providing electronic transfer of a virtual currency for use by members of an on-line community via a global computer network." The application claimed first use of the mark in commerce at least as early as August 1, 2014. The specimen filed with the application was a page from Defendant Huione's website, located at huione.com/html/about.jsp. The page refers to "Huione Group" and "HUIONE MONEY EXCHANGE (KAMPUCHEA) CO., LTD.," and includes a "HUIONE HISTORY" entry dated August 2014. "Kampuchea" is the Khmer name for Cambodia. The specimen is reproduced below in Figure 13.




***Figure 13: Huione Wordmark Specimen***

266. The wordmark HUIONE COIN was registered in the United States on November 13, 2018, as U.S. Reg. No. 5,605,749, in a trademark registration class covering financial services, specifically "financial services, namely, providing a virtual currency for use by members of an on-line community via a global computer network." The application states that the first use in commerce was at least as early as March 8, 2018.

267. HUIONE COIN (stylized/design) was registered in the United States on March 5, 2019, as U.S. Reg. No. 5,689,342, depicting "HUIONE" in black and "COIN" in green next to a green octagon with an opening at the top and bottom and a green negative sign inside.

268. The HUIONE COIN specimens at ico.huione.com state that Huione Coin is "based on the well-established cross-border capital settlement system of Huione Group" and assert Huione Group's objective "to become Southeast Asia's most mainstream currency trading center."

269. The wordmark HUIONE PAY was registered in the United States on November 6, 2018, as U.S. Reg. No. 5,599,604, in a trademark registration class covering financial services, specifically "financial services, namely, providing a virtual currency for use by members of an on-line community via a global computer network." The application states that the first use in commerce was at least as early as August 1, 2014. The HUIONE PAY specimen is a company website at huionepay.7572.com, describing the platform as "based in Southeast Asia," detailing since-2014 expansion to "6 physical stores covering the main big cities in Cambodia," and touting cross-border currency exchange across Southeast Asia and Greater China.

### D. The Xinbi Defendants' Additional Money Laundering and Scam Services for the Trafficking Venture

270. As set forth above, Defendant Xinbi Co. incorporated in Colorado in August of 2022, and is a subsidiary of, or is otherwise affiliated with, Defendant Xinbi Guarantee. *See supra* ¶¶ 45–46.

271. On September 9, 2026, OFAC sanctioned Xinbi Guarantee and added it to its Specially Designated Nationals List for being a foreign person that constitutes a significant transnational criminal organization, pursuant to E.O. 13581 ("Blocking Property of Transnational Criminal Organizations"), as amended by E.O. 13863.

272. As set forth in part above, Xinbi is a Telegram-based marketplace functioning as part of the same illicit financial ecosystem as Defendant Huione Guarantee, with overlapping vendor networks and shared wallet infrastructure. Xinbi Guarantee operates in substantially the same manner as Huione Guarantee, and when Telegram banned Huione Guarantee's public

channel in May 2025, Huione's criminal vendors migrated to other marketplaces, including Xinbi Guarantee.

273. Xinbi's business model monetizes the Venture's demand for money laundering and scam services. Merchants register with Xinbi and post collateral, after which Xinbi advertises their services on its Telegram channels, holds buyers' funds in escrow, and releases those funds once services are performed.

274. Xinbi profits at every step: it charges merchants group-opening fees, recurring monthly fees, and per-post advertising fees, and typically retains a commission of approximately 3% of each transaction it guarantees. A set of just 58 deposit addresses advertised on Xinbi Guarantee have received more than $11 billion since July 2022.

275. According to federal investigators, Xinbi merchants "are utilizing the marketplace to advertise their illicit services in furtherance of scam compounds targeting U.S. victims" and "utiliz[e] these channels and financial structure built and controlled by Xinbi to traffic funds received from and commit wire fraud against U.S. victims." According to DOJ, vendors on Xinbi's Telegram marketplace sell scam-center operators custom fraudulent investment websites and money-laundering services and solicit "trafficking victims to work in scam compounds in Southeast Asia." Xinbi Strike Force Press Release.

276. The largest category of Xinbi's vendors is its "Payment Receipt and Release" vendors, whose offerings relate to receiving funds directly, or nearly directly, from fraud victims, including "first-tier" merchants willing to receive a victim's money directly.

277. Other categories advertise: the conversion of fraud proceeds into "white fund[s]" or "white capital," i.e., funds that will not draw law-enforcement attention or be subject to seizure, the recruitment of chat operators "commonly used in scam centers to contact victims," including

"sex scam" operators, AI face-swapping and voice-cloning tools for "detailed chat" (i.e., pig-butchering) scams, infrastructure services, including scam-platform and domain registrations, cryptocurrency services, including coin-mixing services used to "frustrat[e] law enforcements efforts to effective[ly] trace and seize funds," marketed to users concerned about "freezing" (Tether freezes) or "marking" (addresses being flagged by blockchain-analytics tools), and lead generation for scams.

278. Xinbi knew or should have known that its marketplace serves the Venture. Xinbi staff actively moderate merchant groups, and adjudicate disputes between merchants and their clients—something federal investigators concluded would be "impossible" without "knowing the details of each specific interaction, including the origin of the funds in question." In one example, Xinbi staff resolved a dispute in which a scammer had purchased a bank account from a Xinbi merchant to launder a victim's funds, only for the bank to close the account because of the volume of fraud-traceable funds. Xinbi also sees its merchants' cryptocurrency addresses when it receives their collateral and settles escrow and is therefore "reasonably aware of the nature of the activity surrounding the merchants' cryptocurrency addresses" according to federal investigators.

279. Federal investigators also traced funds from a scam victim residing in France—defrauded through lavishlocs[.]com, the website of registered Colorado corporation LavishLocs Inc.—to a Xinbi merchant. Moreover, as federal investigators noted, "[e]ven in cases when non-U.S. persons are scammed, scammers depositing funds into the Xinbi network utilize U.S. infrastructure to commit their [fraud] schemes."

280. Another scam victim reported that the scammer communicating with her said he was being physically beaten by his supervisors, which, according to investigators, suggests the scam originated from a scam compound in Southeast Asia.

281. Xinbi has also established a physical presence inside scam compounds. Xinbi advertised the launch of a physical Xinbi storefront within Yatai New City, a large compound of scam centers in Shwe Kokko, Myanmar; a photograph posted by Xinbi staff shows the storefront, bearing xinbi.com signage, between scam-center towers. As federal investigators observed, the storefront "directly contradicts Xinbi's operating terms associated with avoiding human trafficking and US scam funds."

282. Xinbi is also connected to the Long Bay compound—where Plaintiff Salam was trafficked, *see supra* ¶¶ 107–111—through the business network of She Zhijiang, a key developer of Yatai New City.

283. Yatai New City was developed as a joint venture between a Karen border militia company and Yatai International Holdings Group, whose former chairman, She Zhijiang, was the largest shareholder of its Myanmar subsidiary.

284. In November 2018, Zhijiang appeared onstage with the owners of the main real estate company developing the Dara Sakor zone, at the launch of the Long Bay compound. They were pictured "pouring sand onto a placard with the Long Bay logo," according to online sources.

285. Hong Kong corporate records, obtained by the Organized Crime and Corruption Reporting Project, also show that Zhijiang has owned Cosmos Rise Investment Limited together with Wu Jianfeng since 2020, and that Deng Pibing is Cosmos Rise Investment Limited's director.

286. On March 26, 2026, the United Kingdom sanctioned Xinbi, stating that Xinbi "provides cryptocurrency-based services to scam centres[,] including #8 Park"—the same Cambodian scam compound built and operated by the Huione Defendants—which according to the official release by the United Kingdom is "believed to be Cambodia's largest scam compound, with capacity to accommodate 20,000 trafficked workers."

287. Xinbi operates in part from the United States through its Colorado corporation. In August 2022, Defendant Xinbi Co. incorporated as a Colorado profit corporation in Aurora, Colorado, and Xinbi advertised that registration on its Chinese-language website at least as late as February 16, 2025. The Colorado Attorney General has alleged that, through its fraudulent filings, "Xinbi has been able to unlawfully profit from the veneer of legitimacy that comes with being a Colorado registered entity," and that this conduct "began in August 2022 and continues through the present."

288. Importantly, the Xinbi Defendants have engineered and marketed methods to avoid or defeat asset freezes. Xinbi's merchants openly market coin-mixing services to users with "concerns about freezing/marking" and promise compensation to clients whose funds are frozen by law enforcement. Because Xinbi addresses are often active for only two weeks and funds move through them rapidly, federal investigators found it "unviable for law enforcement to fully attribute the funds held in Xinbi controlled cryptocurrency addresses" before Xinbi turns to new addresses.

### E. The Sea Dragon Defendants' Investment Scam and Money Laundering Services for the Trafficking Venture

289. The Sea Dragon Defendants participated in, and benefited from, investment scams and money laundering used to further the Trafficking Venture. In furtherance of Defendants' Trafficking Venture, the Sea Dragon Defendants created entities, opened business accounts, and executed wire transfers in the United States. Cryptocurrency addresses associated with or attributed to the Sea Dragon Defendants also interacted with or are a part of Defendants' Network of cryptocurrency addresses.

290. Many of the facts of the Sea Dragon Defendants' involvement in the Venture come from two groups of criminal indictments: the December 2023 indictment of Sea Dragon Defendants Zhang, Wong, Walker, and Zhu, *see United States v. Lu Zhang, Joseph Wong, Justin*

*Walker, and Hailong Zhu*, No. 2:23-cr-00596-RGK (C.D. Cal. Dec. 6, 2023) ("*U.S. v. Zhang*"), and the related cases against their co-conspirators: *United States v. Daren Li et al.*, No. 2:24-cr-00311-RGK (C.D. Cal.) (indictment of Defendant Daren Li and Yicheng Zhang).

291. Between September 2022 and March 2023, the Sea Dragon Defendants Zhang, Wong, Zhu, Walker, and Li conspired together and with others to launder funds from investment scam victims in the United States.

292. In September and October 2022, Defendant Zhu registered Defendants Sea Dragon Trading, LLC and Sea Dragon Remodel, Inc. with the California Secretary of State, listing himself as the sole registered agent and Chief Executive Officer of each. The Sea Dragon entities are two of the pass-through companies used by a money-laundering cell operating in Los Angeles County and elsewhere.

293. Defendant Zhang was the leader of this domestic money laundering cell, which laundered at least $20,083,987. Defendant Zhang directed co-defendants, including Defendants Wong and Walker, to go to U.S.-based banks and make the wire transfers, and to record themselves when doing so. Defendant Zhang also told her co-defendants how to unfreeze bank accounts that had been frozen because of fraud concerns.

294. Defendant Wong managed a network of launderers within Los Angeles County, coordinated acts through encrypted communications, and arranged for the transfer of fraud proceeds using company accounts. He also called financial institutions, misrepresented himself as an account holder, and attempted to unfreeze restricted accounts. Defendant Wong pleaded guilty on April 14, 2025, and admitted that at least $20 million in scam funds were laundered, with more than $2.2 million flowing through United States-based accounts linked to Sea Dragon Trading and Sea Dragon Remodel.

295. Defendant Zhu received over a million dollars from scam victims across the United States, funds that were then transferred abroad in furtherance of the Trafficking Venture.

296. Between approximately June 2022 and March 2023, 74 pass-through companies (including the Sea Dragon Defendant entities) transferred approximately $58,465,480 to a custody account in the name of Deltec Bank & Trust. Law enforcement identified 157 scam victim complaints, reflecting 208 wire transactions, tied to 63 of those companies.

297. Scam victims who sent money to these companies were numerous U.S. states. According to *in rem* proceedings relating to these cases, the total seized from the custody account (herein, "the MUFJ 0328 account") across June 2023, was $44,828,369.38.

298. The domestic cell involving the Sea Dragon Defendants Zhang, Zhu, Wong, and Walker laundered over $20 million through 25 of the companies, including Defendant Sea Dragon Trading and Defendant Sea Dragon Remodel.

299. These funds were then sent via "for further credit" wire instructions (to avoid regulatory scrutiny and requirements for international transfers) through the MUFJ 0328 account in New York to Deltec Bank & Trust in the Bahamas and then forwarded to an account in the name of Axis Digital Limited, a Bahamas company incorporated November 30, 2021. Axis Digital received at least $36,905,259 from U.S. pass-through company accounts between June 2022 and July 2023 through this method.

300. At that point, Deltec converted the U.S. dollar deposits into Tether and transmitted the Tether to a cryptocurrency wallet address beginning on the Tron blockchain with the letters "TRteo," controlled by co-conspirators overseas. From that wallet, scam victim funds reached the scam operations themselves. As DOJ has explained, after U.S. dollars were converted and transferred to the Cambodia-controlled wallet, "co-conspirators in Cambodia transferred the

USDT to the leaders of scam centers throughout the region including in Sihanoukville, Cambodia," where Plaintiff Salam was trafficked.

301. Victim funds sent to the Bahamas and converted to cryptocurrency were sent to addresses controlled by Defendant Daren Li. Li "had a leadership role in determining where victim funds should be sent," according to an affidavit from a U.S. Secret Service Special Agent. DOJ was unable to freeze, seize, or recover "any of the direct victim proceeds," which were "dispersed to dozens of unhosted virtual wallets."

302. In December 2023, a grand jury in the Central District of California charged Zhu, Zhang, Wong, and Walker with money laundering conspiracy and international money laundering, alleging that they opened shell companies and bank accounts in the United States to launder more than $80 million in cyber scam losses across at least 284 transactions, including more than $2.2 million deposited into accounts associated with the Sea Dragon Defendants.

303. The Sea Dragon Defendants Zhang, Zhu, Wong, and Walker each earned tens of thousands of dollars from their money laundering activities for Defendants' Trafficking Venture.

304. According to their plea agreements, Defendant Zhang (who pleaded guilty on or around May 13, 2024), Defendant Walker (who pleaded guilty on or around August 13, 2024), and Defendant Wong (who pleaded guilty on or around April 14, 2025) each admitted that they and their co-conspirators registered pass-through companies with the California Secretary of State, including Sea Dragon Trading and Sea Dragon Remodel, and opened bank accounts in those companies' names with U.S. financial institutions. Those accounts were held at Bank of America, Wells Fargo, JPMorgan Chase, and East West Bank.

305. In their plea agreements, Defendants Zhang, Wong and Walker admitted that they knew the property involved was the proceeds of unlawful activity; that the transactions were

designed to conceal or disguise the nature, location, source, ownership, and control of the proceeds; and that the scheme involved at least $20 million in fraudulently obtained funds.

306. DOJ's sentencing memoranda in *U.S. v. Zhang* confirm that the underlying scams were run from scam centers overseas, including in Cambodia, and that the laundered funds flowed to those operations. As those memoranda describe, the conspiracy "involved an international network of co-conspirators who scammed U.S. victims and laundered victim money through U.S. companies, international bank accounts, and cryptocurrency wallets." After the funds were converted to USDT, foreign-based co-conspirators "would distribute the USDT to foreign criminals running the scam centers overseas, including in the Kingdom of Cambodia." In DOJ's words, money laundering schemes "like the one involved in this case are the lifeline for international cryptocurrency investment frauds," and "[t]he funds transferred overseas and converted to cryptocurrency give criminal syndicates the means to traffic humans and run scam compounds."

307. The sentencing memorandum submitted by Defendant Wong himself states that he "was not a leader of the overall criminal enterprise, but rather a participant whose conduct facilitated the transfer of funds within the United States," and that "[his domestic laundering] actions, though not at the level of the overseas operators who executed the scams themselves, played a role in enabling the larger scheme to function."

308. The DOJ also charged five additional individuals in related cases before the same court, each of whom played a role in receiving and converting the victim funds that flowed from the Sea Dragon entities and other U.S. companies: Defendant Daren Li and Yicheng Zhang with conspiracy to commit money laundering and international money laundering in May 2024;

and Shengsheng He, Jose Somarriba, and Jingliang Su, each with conspiracy to operate an unlicensed money transmitting business in November 2024.

309. Government sentencing filings in the case against Li explicitly describe that "Defendants in the related case, [*U.S. v. Zhang*] fit within [the] category of co-conspirators" who "worked together to register shell companies with the California Secretary of State and/or open bank accounts in the names of those shell companies," and that "virtually all of the victim funds flowed from U.S. bank accounts to two bank accounts at the Bahamian financial institution Deltec Bank & Trust."

310. Defendant Li pleaded guilty in November 2024, admitting that the laundering scheme involved at least $73.6 million in fraudulently obtained funds, including at least $59.8 million from U.S. shell companies. Li built and funded the offshore channel through which the wires sent by the other Sea Dragon Defendants left the United States, and was identified in court filings as the "boss" who directed the other Sea Dragon Defendants. As DOJ explained in its sentencing position, Li was "directly involved in the ultimate receipt of victim funds in the Kingdom of Cambodia," and "[c]onspiracies like the one involved in this case are the lifeline for international cryptocurrency investment frauds," because "[t]he funds transferred overseas and converted to cryptocurrency give criminal syndicates the means to traffic humans and run scam compounds."

311. When federal agents searched the phone of one of the *U.S. v. Zhang* defendants (identified only as "Defendant 1"), they found Telegram chats "showing Li's involvement in the laundering of pig-butchering proceeds conducted by" the other Sea Dragon Defendants. Investigators concluded that Li was the "boss" or "master" to whom money launderers reported

bank transaction updates, and that Li was "a high-level member" of the Sea Dragon laundering syndicate.

312. Public reporting has also connected Defendant Li directly to Huione. According to internal Huione International Pay records reviewed by *Bloomberg*, Huione's laundering division logged entries for the Telegram username "KG71777," as well as a WhatsApp handle associated with Li.

313. In chats reviewed by U.S. Secret Service agents, Li used the handle "KG71777," saved as "KK" with a Cambodian telephone number ending in 1777.

314. *Bloomberg*'s reporting found that Li earned a commission of approximately 9% for laundering facilitated through Huione International Pay. *The New York Times* separately confirmed that "Mr. Li worked with Huione International Pay to launder money, according to records we reviewed." Selam Gebrekidan & Joy Dong, *How Scammers Launder Money and Get Away With It*, N.Y. Times (Mar. 23, 2025), https://www.nytimes.com/2025/03/23/world/asia/cambodia-money-laundering-huione.html.

315. Both Defendants Li and Zhu remain fugitives as of October 2026. After signing a plea agreement with DOJ but before he could be sentenced, Li cut off his court-ordered ankle monitor and fled the United States for China, later stating, according to law enforcement, that he "may have to stay in China for the rest of [his] life." Zhu is the only charged member of the domestic cell who has not pleaded guilty.

316. The defendants in the related cases *United States v. Shengsheng He*; *United States v. Jose Somarriba*; and *United States v. Jingliang Su* connect the Sea Dragon Defendants directly to scam compounds in Cambodia.

317. Shengsheng He, Jose Somarriba, and Jingliang Su ran the Bahamian business that received funds from Sea Dragon and other companies, converted those funds to cryptocurrency, and sent them to wallets controlled by co-conspirators in Cambodia, including Defendant Li. As described by DOJ sentencing memoranda, "[a]fter personally traveling to Cambodia to meet with the recipients of [laundered] funds and visit a scam compound," the Bahamian bank account established by He, Somarriba, and Su "received millions of dollars from U.S. shell companies," including Defendants Sea Dragon Trading and Sea Dragon Remodel. These funds were then dissipated across unhosted virtual wallets controlled by individuals overseas, primarily in Southeast Asia.

318. In November 2021, Somarriba incorporated Axis Digital Limited ("Axis Digital") in the Bahamas. Somarriba and He then met with Deltec Bank & Trust ("Deltec") employees in the Bahamas to open a bank account for Axis Digital, identified by DOJ as "Bahamas Account #1."

319. Money from Defendants Sea Dragon Trading and Sea Dragon Remodel was wired to this Axis Digital account at Deltec. As company wires arrived, He, Somarriba, and Su directed Deltec employees to convert the funds to USDT and send them to a cryptocurrency wallet controlled by Defendant Li and co-conspirators in Cambodia ("TRteo wallet"). In total, more than $36 million in Bahamas Account #1 was converted and sent to the TRteo wallet.

320. From the TRteo wallet, the USDT went to co-conspirators in Cambodia, including Defendant Li, who "would distribute the USDT to foreign criminals running the scam centers overseas, including in the Kingdom of Cambodia."

321. In July 2022, He, Somarriba, and Su traveled to Phnom Penh, Cambodia, to meet with co-conspirators, including Defendant Li. Gov't Sent'g Position (Somarriba) at 10. There,

they discussed sending scam funds from Bahamas Account #1 to the TRteo wallet. Each of He, Su, and Somarriba received commissions for the transfer of scam victim funds.

322. He and Somarriba each admitted that, during that trip, they and co-conspirators "traveled within the greater Phnom Penh region to at least one compound wherein co-conspirators conducted cryptocurrency investment scams, also known as 'pig butchering scams.'" Su did not admit to visiting a compound.

323. In addition, as set forth above, the Sea Dragon Defendants' blockchain addresses are connected to Defendants' Network, including in November 2024 transferring 1,113,900 USDT in a single transaction into TNyKo2VW77R8SAz7CpRj3XUZgHm7uRqHdh, one of the sixty-nine (69) core addresses. The Sea Dragon Defendants' funds thus flowed into the same Network of wallets that also received funds from the Compound Wallet.

## VII. CLASS ACTION ALLEGATIONS

324. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of a Class consisting of human trafficking victims who were or are trafficked and forced to work the Class Compounds, defined to include the Tai Chang Scam Compound, the V9 International Hotel Compound, the Long Bay Century Hotel Compound, the Thaiyang Chheng Casino (f/k/a Helory Estate), #8 Park, the Golden Casino (f/k/a White Sands 2), and as-yet-unnamed compounds in the Golden Triangle Special Economic Zone, Laos; Ton Pheung, Laos; Myanmar; and Tachileik, Myanmar, from August 2021 to the present, and who were damaged thereby (the "Class").

325. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and

can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least 18,000 members of the proposed Class based on estimates by NGOs and public sources.

326. Class members may be identified and notified of this action through NGOs with contacts with trafficking victims in scam compounds in Southeast Asia.

327. Plaintiffs' claims are typical of Class members' claims, as all members of the Class assert the same claims against Defendants.

328. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions.

329. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a) Whether Defendants' Trafficking Venture engaged in peonage, enticement into slavery, sale into involuntary servitude, forced labor, trafficking for labor/services, sex trafficking by force, fraud, or coercion, and unlawful conduct with respect to documents, in violation of 18 U.S.C. §§ 1581, 1583, 1584, 1589, 1590, 1591 and 1592;

b) Whether Defendants benefited from and participated in the Trafficking Venture by providing it with money laundering and trafficking-related goods and services in exchange for fees and commissions;

c) Whether Defendants profited from their provision of money laundering and trafficking-related goods and services;

d) Whether Defendants knew or should have known that the venture in which they participated engaged in human trafficking; and

e) The scope of the injunctive relief and damages to which the Plaintiffs and members of the Class are entitled.

330. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. There will be no difficulty in the management of this action as a class action.

## VIII. CLAIMS FOR RELIEF

### COUNT I

### TVPA BENEFICIARY LIABILITY (18 U.S.C. § 1595) (AGAINST ALL DEFENDANTS)

331. Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

332. All Defendants benefited from and participated in the vertically integrated Trafficking Venture using (1) human trafficking, enslavement, torture, and forced labor; (2) cyberscams; and (3) money laundering via the conversion of cryptocurrency and fiat currencies sent by individuals in the United States.

333. During the Class Period, the Venture engaged in violations of the TVPA, including peonage (18 U.S.C. § 1581), enticement into slavery (18 U.S.C. § 1583), sale into involuntary servitude (18 U.S.C. § 1584), forced labor (18 U.S.C. § 1589), trafficking for labor/services (18 U.S.C. § 1590), sex trafficking by force, fraud, or coercion (18 U.S.C. § 1591) and unlawful conduct with respect to documents (18 U.S.C. § 1592).

334. All Defendants knew that the Trafficking Venture was engaged in human trafficking, forced labor, involuntary servitude, peonage, and unlawful conduct with respect to documents.

335. Defendants knowingly benefited, financially and otherwise, from their participation in the Trafficking Venture that they knew or should have known was engaged in trafficking, enslavement, torture, and forced labor, including commissions on money laundering transactions.

336. By virtue of the conduct set forth herein, Defendants benefited, attempted, and conspired to benefit, financially and by receiving things of value from participating in the Venture, which Defendants knew or should have known was engaged in acts in violation of the TVPA.

337. Defendants' participation in the Trafficking Venture directly caused Plaintiffs' injuries, including economic loss, and physical and psychological harm.

338. Plaintiffs seek restitution in an amount equal to the larger of Defendants' illicit gains or Plaintiffs' and the Class's lost wages, recruitment fees, and ransoms paid for release from scam compounds; attorneys' fees and reasonable costs; and other damages to be determined at trial.

## COUNT II

## COLORADO ORGANIZED CRIME CONTROL ACT (C.R.S. § 18-17-104) (AGAINST ALL DEFENDANTS)

339. Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

340. Defendants violated the COCCA by violating C.R.S. § 18-17-104.

341. Defendants' Trafficking Venture is an "enterprise" under Colorado law, and includes Defendants, and Doe criminal organizations and individuals who recruited, transported, confined, and exploited Plaintiffs ("Doe Criminal Organizations"), and Doe affiliates or agents that processed, brokered, or facilitated payments, laundering, or marketplace transactions conducted by Plaintiffs, Defendants, and Doe Criminal Organizations ("Doe Criminal Service Providers").

342. Defendants and the Venture operate a continuing unit with a common purpose to obtain illicit proceeds via trafficking-linked cyber-scams and money laundering.

343. Defendants and the Venture engaged in a pattern of racketeering activity including wire fraud, money laundering, and trafficking predicates.

344. By conducting the Venture through a pattern of racketeering, Defendants caused injury to the property and business interests of Plaintiffs and Class members through coerced labor without compensation, forced-labor deprivation, ransom-style confinement, and uncompensated overtime within compounds, lost wages from the opportunity cost of confinement, and derivative harms such as emotional distress flowing from the Venture's operations.

345. Defendants knowingly received proceeds, directly or indirectly, from a pattern of racketeering activity by earning substantial profits from the coerced labor, trafficking, and derivative harms suffered by Plaintiffs.

346. Defendants used or invested, directly or indirectly, at least part of the proceeds to maintain, operate and expand the Venture, including by using USDT and USDC proceeds from trafficking victims' forced labor.

347. As a result, Plaintiffs and those similarly situated suffered damages, including emotional damages, and are entitled to a constructive trusts over Defendants' assets, treble damages, a money judgment of forfeiture for the amount of Defendants' proceeds derived from the pattern of racketeering activity, fees, costs, and injunctive relief as set forth by law.

348. Unless permanently enjoined, Defendants will continue to violate C.R.S. § 18-17-104. Plaintiffs and the Class are therefore entitled to a permanent injunction, pursuant to C.R.S. § 18-17-106(1), (6), and (7), prohibiting Defendants from committing further violations of COCCA.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for relief and judgment, as follows:

a) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b) restitution under the TVPRA, including in an amount equal to the greater of Defendants' gains or Plaintiffs' and the Class's lost wages, recruiting fees, and ransoms paid, with interest thereon;

c) a constructive trust over the specified cryptocurrency accounts and wallets transacting through the Trafficking Venture, including wallets identified in Exhibits 3, 4, and 20 to the Trager Decl.;

d) treble damages and forfeiture under COCCA, C.R.S. § 18-17-106;

e) a permanent injunction pursuant to C.R.S. § 18-17-106(1), (6), and (7) prohibiting Defendants from committing further violations of COCCA;

f) injunctive relief freezing specified cryptocurrency accounts and wallets transacting through the Trafficking Venture, including wallets in Exhibits 3, 4, and 20 to the Trager Decl.;

g) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

h) such other and further relief as the Court may deem just and proper.

## X. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

*[SIGNATURES ON NEXT PAGE]*

Dated: October 20, 2026

Respectfully submitted,

*/s/ Jorge G. Tenreiro*

Avi Josefson
Michael Blatchley
Jorge G. Tenreiro
Rashelle R. James
Carolina Yu
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
T: (212) 754-1400
F: (212) 754-1444

avi@blbglaw.com
michael.blatchley@blbglaw.com
jorge.tenreiro@blbglaw.com
rashelle.james@blbglaw.com
carolina.yu@blbglaw.com

*/s/ Mark. L. Williams*
Mark L. Williams
**WILLIAMS & SERIO LLC**
1401 Lawrence St., Suite 1600
Denver, CO 80202
T: (303) 505-8000
MLW@WilliamsSerio.com

-and-

Frank Partnoy *(admission forthcoming)*
**BISHOP PARTNOY LLP**
1717 K Street, NW Suite 900
Washington, DC 20006
T: (202) 787-5769
frank@bishoppartnoy.com

*Counsel for Plaintiffs*