**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
District Judge S. Kato Crews

Civil Action No. 1:26-cv-05425-SKC

MOHAMMED JUNAEID HOSSAN PARBAS *et al.*

Plaintiffs,

v.

HUIONE GLOBAL, LTD. *et al.*

Defendants.

---

# ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER, ORDER FREEZING ASSETS, AND OTHER ANCILLARY RELIEF

---

This matter is before the Court on Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order Freezing Assets and Other Ancillary Relief (Dkt. 3). The Court held a status conference on October 27, 2026, where it heard arguments of Plaintiffs' counsel in support of the Motion.

Plaintiffs seek an *ex parte* order: (1) temporarily freezing the cryptocurrency assets held in the network of cryptocurrency addresses (the "Network") that, according to the opinions set forth in the Declaration of Jason Trager ("Trager Decl."), is under the common control of the Defendants and the criminal venture that trafficked Plaintiffs (the "Venture"), including (a) the Tether (USDT) and USD Coin

(USDC) held in the wallet addresses identified in Exhibit 3[1] to the Trager Decl. and (b) all assets associated with or held by the holders of the cryptocurrency exchange deposit addresses identified in Exhibits 4 and 20 to the Trager Decl. (together, the "Identified Addresses"); (2) directing the cryptocurrency exchanges and stablecoin issuers capable of immobilizing those assets to freeze them; (3) allowing Plaintiffs to serve Defendants by alternative means; (4) permitting limited expedited discovery of cryptocurrency exchanges appearing to hold assets belonging to the Venture and of any person or entity claiming an interest in those assets; (5) setting the security required under Fed. R. Civ. P. 65(c); and (6) directing Defendants to show cause why a preliminary injunction continuing the asset freeze during the pendency of this litigation should not be entered. The Court, having reviewed the Motion, the accompanying declarations and exhibits, the Class Action Complaint, and having considered counsel's arguments, hereby **PARTIALLY GRANTS** and **PARTIALLY DENIES** the Motion and enters a Temporary Restraining Order.

## BACKGROUND

Plaintiffs Mohammed Junaeid Hossan Parbas ("Ariyan"), Francis Kamugisha ("Frank"), MD Abdus Salam ("Salam"), Mohammed Gias Uddin ("Joton"), and Nabuule Gift Elizabeth ("Elizabeth"), on behalf of themselves and those similarly situated (the "Class"), bring this action under the Trafficking Victims Protection Act ("TVPA"), as codified at 18 U.S.C. §§ 1581 et seq., and the Colorado Organized Crime

[1] Exhibits 3, 4, and 20 to the Trager Decl. are attached to this Order.

Control Act ("COCCA"), Colo. Rev. Stat. §§ 18-17-101 et seq., against 15 entity and individual Defendants. Plaintiffs allege that between 2021 and the present, they and a Class of human trafficking victims were lured under false pretenses to Southeast Asia where they were enslaved, tortured, and otherwise coerced into participating in their captors' online scamming activities. Dkt. 1, ¶2. After escaping from these "internet scam compounds" in Myanmar, Cambodia, and Laos, in which they were enslaved, Plaintiffs worked with cryptocurrency tracing experts who were able to identify those responsible for their enslavement. *Id.* ¶3. Through that forensic analysis, Plaintiffs also uncovered how Defendants laundered the ill-gotten gains of their criminal activities—including proceeds from investment scam victims, from marketplaces selling implements of torture and human trafficking, and from brokering the trafficking of humans, all while refusing to pay Plaintiffs for their labor—through a complex web of cryptocurrency accounts. *Id.*

Plaintiffs bring this action to stop Defendants' further dissipation of over $500 million in ill-gotten gains from harming Plaintiffs, currently held as cryptocurrencies. *Id.* ¶1. Plaintiffs allege Defendants obtained these funds illicitly, through a vast criminal venture that trafficked and enslaved Plaintiffs and the Class, and then forced them—through beatings, torture, and threats of violence—to assist Defendants' online investment scams and frauds targeting Americans. *Id.* Plaintiffs allege Defendants knowingly operated, participated in, and benefited from a venture that, among other things, lures human victims and moves them across international

borders, enslaves them, tortures them, and forcibly conscripts them into defrauding American victims through online scams, the proceeds of which Defendants then launder. *Id.* ¶5. According to Plaintiffs, Defendants' Venture involves three key and interrelated components, each of which was required for it to succeed: (1) human trafficking, enslavement, and forced labor; (2) theft or conversion of assets from individuals in the United States through online scams; and (3) money laundering the proceeds from the United States. *Id.* ¶6.

The Court has considered the entire record of this case, including: (1) the Class Action Complaint; (2) the Motion; (3) the declarations of proposed Lead Plaintiffs Ariyan, Frank, Salam, Joton, and Elizabeth; (4) the Declaration of Jason Trager ("Trager Decl.") (Dkt. 5), with attached exhibits; (5) the Declaration of Jason Trager in support of alternative service; and (6) the Declaration of Jorge G. Tenreiro ("Tenreiro Decl.") (Dkt. 4), with attached exhibits. The Court now finds and orders as follows:

## ANALYSIS AND FINDINGS

### A. Jurisdiction

The Court has jurisdiction over the subject matter of this action. There is original jurisdiction over Plaintiffs' claims arising under the TVPA, 18 U.S.C. § 1595. *See* 18 U.S.C. § 1331. There is supplemental jurisdiction over their claims arising under COCCA, Colo. Rev. Stat. §§ 18-17-101 et seq. *See* 28 U.S.C. § 1367(a).

There are 15 Defendants. Three of the Defendants—Huione Global, Ltd., Huione Pay, Inc., and Xinbi Co., Ltd.—are Colorado corporations. Dkt. 4, Exs. N, Q, W. The Court has personal jurisdiction over the Colorado Defendants.

Eight Defendants are either private Cambodian companies, unincorporated associations that operate online marketplaces, individual citizens of China, or a "Cambodia-based" individual. Dkt.1 ¶¶33-55. The Court has jurisdiction over these Defendants under Fed. R. Civ. P. 4(k)(2) because, a claim against them arises under federal law; based on the record here they appear not to be subject to jurisdiction in any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the United States Constitution and laws. *See A.A. v. Omnicom Grp., Inc.*, 834 F. Supp. 3d 419, 441–42 (S.D.N.Y. 2026). The Court also finds the exercise of jurisdiction over these Defendants is reasonable under the circumstances of this case—the exercise of jurisdiction over them will not impose an unusual burden; the United States has a strong interest in combating human trafficking and in protecting its victims; and bringing the action here will allow for an efficient resolution of Plaintiffs' claims in one proceeding. *See id.* at 443.

Two Defendants—Sea Dragon Trading, LLC, and Sea Dragon Remodel, Inc.—are California-registered entities. Dkt. 1, ¶¶48–50. Two other Defendants—Justin Walker and Joseph Wong—are United States citizens who resided in Los Angeles and whom each were indicted in the Central District of California. *Id.* ¶¶53–54. The Court does not find sufficient evidence in the current record to exercise personal jurisdiction

over these four Defendants for purposes of the temporary restraining order. It appears these four Defendants may be subject to jurisdiction in the California courts which would preclude application of Rule 4(k)(2) to these Defendants. And the record so far makes an insufficient prima facie showing of this Court's general or specific jurisdiction over them. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1979); *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988) (it is plaintiff's burden to establish personal jurisdiction of a defendant).

Based on the allegations in the Class Action Complaint, and the declarations of record, the Court finds the Colorado Defendants and the eight non-U.S. citizen Defendants purposefully directed conduct at the United States, to include this District. This conduct includes, without limitation, incorporating global, billion-dollar crypto fraud businesses focused on money laundering services in this District or otherwise making fraudulent business filings with the State of Colorado (*see generally* Dkts. 4-21, 4-22; *see also id.* 4-20); using online marketplaces and online scams to solicit, receive, transmit, and launder funds belonging to United States persons and persons in this District; and forming and laundering funds through United States-based financial institutions and cryptocurrency exchanges. In addition, each Defendant's contacts with the United States and this District may potentially be attributed to the other Defendants as co-conspirators based on the well-pleaded allegations in this case. *See, e.g.*, *Benedict v. Manfred*, No. 1:23-cv-01563-DDD-KAS,

2024 WL 6907070, at *6 (D. Colo. May 20, 2024) (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1265 (10th Cir. 2013)).

**B. The Request for a TRO**

Plaintiffs seek an *ex parte* TRO and other relief under the TVPA and COCCA. Plaintiffs filed their Motion seeking, among other things, an *ex parte* temporary restraining order freezing the Identified Assets—the cryptocurrency assets held in the wallet addresses identified in Exhibit 3 to the Trager Decl. and all assets associated with or held by the holders of the cryptocurrency exchange deposit addresses identified in Exhibits 4 and 20 to the Trager Decl.—pending a hearing on Plaintiffs' request for a preliminary injunction. Plaintiffs also seek ancillary relief, including an order directing asset-holding intermediaries to freeze those assets, limited expedited discovery, and authorization for alternative service.

Under Tenth Circuit law and concerning their TVPA claims, Plaintiffs may obtain a temporary order freezing assets to maintain the status quo upon showing: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *SEC v. Reven Holdings, Inc.*, No. 24-1235, 2026 WL 3070863, at **13–15 (10th Cir. Oct. 14, 2026) (confirming these factors govern even where a statute authorizes injunctive relief); *see also Rylee and Cru, Inc. v. Zhu*, No. 23-cv-00120-PAB, 2023 WL 355945, at *2

(D. Colo. Jan. 23, 2023) (citing *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009)); *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010)).

Regarding Plaintiffs' COCCA claims, and under Fed. R. Civ. P. 64, the Court "look[s] exclusively to state law" when "shaping injunctive relief which freezes assets for the purposes of securing satisfaction of any judgment ultimately obtained[.]" *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Kozeny*, 115 F. Supp. 2d 1231, 1239 (D. Colo. 2000), *aff'd*, 19 F. App'x 815 (10th Cir. 2001); *see also* Fed. R. Civ. P. 64(a). Under COCCA, aggrieved persons may institute a proceeding for injunctive relief barring future violations, and a temporary restraining order may be issued without any "showing of special or irreparable damage to the person." Colo. Rev. Stat. §§ 18-17-106(1)(b), (6). To obtain a temporary asset freeze under COCCA, Plaintiffs must show (1) a reasonable probability of success on the merits of the COCCA claims; (2) the absence of a plain, speedy, and adequate remedy at law; (3) that the granting of a preliminary injunction will not disserve the public interest; (4) that the balance of the equities favors the injunction; and (5) that the injunction will preserve the status quo pending a trial on the merits. *Kozeny*, 115 F. Supp. 2d at 1239; Colo. R. Civ. P. 65; Colo. Rev. Stat. § 18-17-106(6).

The Court has authority to issue orders freezing assets at early stages in the litigation under both the TVPA and COCCA. Under the TVPA, the relief sought must be equitable in nature. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 310, 333 (1999). Plaintiffs here seek equitable relief under the TVPA—

restitution measured by Defendants' gains from trafficking Plaintiffs and coercing them into labor. *See* 18 U.S.C. § 1593(a) ("the court shall order restitution for any offense under this chapter."). Because TVPA restitution is measured in part by the defendant's gain, it is equitable relief. *See Sripetch v. SEC*, 608 U.S. 555, 565 (2026) (Under traditional principles of equity, "when a victim has suffered an interference with protected interests, he may be entitled to restitution of [the defendant's] wrongful gain.") (internal quotations omitted).

Plaintiffs also seek a constructive trust under Colorado law and a permanent injunction against future violations under COCCA. An injunction freezing assets to preserve the prospect of meaningful equitable relief is therefore proper. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (District courts "maintain the equitable power to [issue a prejudgment asset freeze] where such relief *was* traditionally available: where the plaintiff is pursuing a claim for final equitable relief[.]").

### 1. Plaintiffs Are Likely to Succeed on the Merits of their TVPA and COCCA Claims Against Defendants[2],[3]

#### a. TVPA

Section 1595(a) of the TVPA provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)[.]" 18 U.S.C. § 1595(a). To establish § 1595(a) liability, Plaintiffs must show Defendants (1) "'knowingly benefit[ted] financially or by receiving anything of value" (2) from participation in a venture that was violating the TVPA as "the defendant knew or should have known." *Lundstrom v. Choice Hotels Int'l, Inc.*, No. 21-cv-00619-PAB-SKC, 2021 WL 5579117, at *3 (D. Colo. Nov. 30, 2021) (citing 18 U.S.C. § 1595(a)); *see also F.C. v. Jacobs Sols., Inc.*, 790 F. Supp. 3d 1158, 1184–86 (D. Colo. 2025).

Plaintiffs have shown they are substantially and reasonably likely to succeed

---

[2] The Court uses the following Defendant groupings: the "Huione Defendants" includes Huione Group; Huione Global Ltd, f/k/a Huione LTD, f/k/a Lotcoin LTD; Huione Pay Inc.; Huione Pay PLC; Huione Crypto; and Haowang Guarantee, f/k/a Huione Guarantee; the "Xinbi Defendants" includes Xinbi Co., Ltd. and Xinbi Guarantee; and the "Sea Dragon Defendants" includes Hailong Zhu; Lu Zhang; and Daren Li. The Huione Defendants, Xinbi Defendants, and Sea Dragon Defendants are referred to collectively as "Defendants."

[3] Unless otherwise indicated, in the remaining sections, citations to simply "Ex. [letter]" are to exhibits to the Tenreiro Decl. at Dkt. 4; citations to simply "Ex. [number]" are to exhibits to the Trager Decl. at Dkt. 5.

on the merits of their § 1595(a) claim because Defendants knowingly benefited financially from participation in the Trafficking Venture, which they knew or should have known was engaged in numerous violations of the TVPA. In some instances, Defendants themselves committed the underlying violations.

First, Plaintiffs are reasonably likely to succeed on the merits of their claims that Defendants' Venture constituted a "venture" under the TVPA, which means "any group of two or more individuals associated in fact, whether or not a legal entity." *Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (citing 18 U.S.C. § 1591(e)(6)). Here, Plaintiffs' expert has determined that the various groups of Defendants control certain cryptocurrency addresses that operate as part of the same Network of addresses used in furtherance of the Venture, demonstrating an association in fact between the Defendants and other traffickers. *See* Trager Decl. at 34–36. Law enforcement and others have further documented the associations between the various Defendants and other traffickers that are part of the Venture, including the Huione Defendants forcing their commercial services upon the operators of the Tai Chang Scam Compound, *see* Ex. L at 6; the Xinbi Defendants providing services to a Huione-run compound, *see* Ex. X; Ex. 8 at 4–5; Ex. 9 at 7; and the Sea Dragon Defendant, Daren Li, being a part of Huione's network of actors and laundering funds on its behalf. *See* Ex. G (Li Aff.) ¶¶36, 46; Ex. HH (Bloomberg Huione). The Defendants are also associated with other Venture participants, including by providing guarantee services (the Huione and Xinbi Defendants) and money

laundering services from the United States (the Sea Dragon Defendants), and these interactions are not incidental but are coordinated activity. *See* Trager Decl. at 37–38, 54.

Plaintiffs' evidence in support of the Motion also shows that Defendants participated in and knowingly benefited from the Venture. Forensic tracing by Inca shows that the Compound Wallet—the wallet used by the owners of the compound that violated the TVPA as to Plaintiff Ariyan—is part of a single Network of cryptocurrency addresses used by the Venture associated with Ariyan's trafficking and forced labor. *See* Trager Decl. § E.4. Thousands of addresses that are known to belong to the Huione Defendants, or the Xinbi Defendants, or the Sea Dragon Defendants, are part of the Network. *See id.* at 35–36. This Network of addresses has received approximately $6.93 billion in cryptocurrency deposits at hosted wallets alone, across no less than 9,314,756 transactions, and other blockchain activity demonstrates that these funds are illicit proceeds from the Venture. *Id.* at 36, 65. The Court finds this forensic tracing further shows Defendants participated in and knowingly benefited from the Venture.

Additional evidence shows the Network belonging to the Venture that trafficked Plaintiffs interacts frequently with Defendant Huione Guarantee's marketplace. *Id.* at 37. Defendant Huione benefited from these acts because it monetized its laundering-as-a-service offerings as well as its services relating to the sale of implements to traffic individuals by charging commissions and fees for the

transactions it guaranteed from funds that can be traced to the Venture's proceeds. Exs. 11, 12. Huione Defendants are also linked to at least one physical scam compound, known as "#8 Park" and colloquially as "Huione Park." Ex. 8 at 4–5; Ex. 9 at 7. That compound uses trafficked labor and Huione Pay Cambodia operated a physical exchange store at the site. *Id.*

The Xinbi Defendants also participated in and benefited from the Venture. They ran a guarantee marketplace, Xinbi Guarantee, which also participated in the Venture—from trafficking to laundering—and from which it financially benefited through fees and commissions (approximately 3% of each transaction), all of which can be traced to the Venture's proceeds. Trager Decl. at 38; Ex. 26 (Xinbi Warrant Aff.), ¶¶55, 64. Xinbi-affiliated entities have also established a physical presence for its services inside scam compounds, including Yatai New City and one run by the Huione Defendants, and is connected to the Long Bay compound where Plaintiff Salam was held. Trager Decl. at 38; Ex. X.

The Sea Dragon Defendants participated in the Venture too by laundering money for "international cryptocurrency investment frauds" that "give criminal syndicates the means to traffic humans and run scam compounds," as individual Sea Dragon Defendants admitted in their guilty pleas. Ex. F (Gov't Sent'g Position Regarding Zhang), p.18; Ex. AA (Zhang Plea Agreement). Defendant Li pleaded guilty to a conspiracy to launder at least $73.6 million in scam proceeds through certain Sea Dragon pass-through companies and was "directly involved in the ultimate receipt of

victim funds in the Kingdom of Cambodia," and these funds gave "criminal syndicates the means to traffic humans and run scam compounds." Ex. FF (Gov't Sent'g Position Regarding Li), pp.3, 14. Defendant Li further participated in the Venture by building the offshore channel through which the wires sent by other Sea Dragon Defendants left the United States and was identified in court filings as the "boss" who directed other Sea Dragon Defendants or affiliated persons or entities. Ex. F (Gov't Sent'g Position Regarding (Zhang), pp.10–13; Ex. FF (Gov't Sent'g Position Regarding Li), p.5; Ex. GG (Somarriba Plea Agreement) at Ex. A, ¶¶2, 8, 10; Ex. G (Li Aff.), ¶¶8, 27–28, 33–34, 45–46. Internal Huione International Pay bookkeeping logs indicate Defendant Li earned a commission of approximately 9% for laundering work facilitated through Huione International Pay. Ex. HH, p.10 (Bloomberg Huione); *see also* Ex. KK (N.Y. Times Huione). Moreover, Defendants Sea Dragon Trading and Sea Dragon Remodel received at least $36,905,259 in victim funds in the United States and laundered them, eventually to Defendant Li and others in Cambodia. Ex. LL (Plea Agreement at Ex. A, *United States v. He*, No. 2:25-cr-00175-RGK (C.D. Cal. Mar. 17, 2025), ECF No. 35) ("He Plea"), ¶¶ 2, 8, 10; Ex. GG (Somarriba Plea Agreement), ¶¶2, 8, 10; *see also* Ex. FF (Gov't Sent'g Position Regarding Li), p.5.

The above shows that, "[i]n each case, the venture participant provided personalized, particular services for the venture[,]" meaning there is a substantial and reasonable likelihood of success on the merits on this element of the TVPA. *Jacobs Sols.*, 790 F. Supp. 3d at 1188–89 (collecting cases).

Plaintiffs may establish a violation of the TVPA in various ways. Pertinent here, the TVPA prohibits peonage (18 U.S.C. § 1581), enticement into slavery (§ 1583), sale into involuntary servitude (§ 1584), forced labor (§ 1589), trafficking with respect to peonage, slavery, involuntary servitude, or forced labor (§ 1590), sex trafficking by force, fraud, or coercion (§ 1591), and unlawful conduct with respect to documents in furtherance of trafficking (§ 1592). To establish liability under § 1595(a), Plaintiffs don't have to show that Defendants committed the acts that violated these provisions; it is sufficient to show that Defendants "knowingly receive[d] a financial benefit." *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 936 (D. Or. 2020). Plaintiffs must also show that Defendants knew or should have known they were receiving the financial benefit from a venture violating the TVPA. Again, no overt act by the Defendants is required. *See Lundstrom*, 2021 WL 5579117, at *6 (collecting cases). The knowledge requirement under § 1595 is "negligence." *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1076 (D. Colo. 2021). No knowledge or conspiracy between the Defendants and the person who violated the TVPA is required. *Id.*

Plaintiffs are reasonably likely to succeed on the merits of their claim that the Venture's acts against them violated the TVPA, including:

Debt bondage and peonage (§ 1581): Nearly all the Plaintiffs were held captive and obligated to generate money for the Venture under peonage or debt bondage—Ariyan was forced at gunpoint into signing a work contract obligating him to generate

hundreds of thousands of dollars for the Venture; Frank was forced to work to repay his travel expenses; Joton's pay was often garnished, and he was told he would need to reimburse the Venture for his travel expenses; and Elizabeth was told to repay the costs of her visa and travel or she would be sold to another company. Ex. A, ¶¶7–8; Ex. B, ¶¶8–9; Ex. D, ¶8; Ex. E, ¶¶17, 20.

Enticement into slavery (§ 1583): Each Plaintiff was recruited through fraudulent job offers promising legitimate service positions. But none of the Plaintiffs were given those positions and were instead forced to engage in coerced labor. Ex. A, ¶¶2–4, 9; Ex. B, ¶¶2–3, 8–9; Ex. C, ¶¶2, 7, 11; Ex. D, ¶¶2–3, 6; Ex. E ¶¶3, 13, 16.

Sale into involuntary servitude (§ 1584): Frank was sold among three compounds and told that he was "owned" by the Venture's operators; Salam was sold between compounds twice; Elizabeth was sold across multiple compounds in Cambodia, Myanmar, and Laos. Ex. B, ¶18; Ex. C, ¶¶15, 20; Ex. E, ¶¶17, 21.

Forced labor (§ 1589): Each Plaintiff was compelled to work 12-18 hours daily under threat of violence. Ariyan was locked in a cupboard, beaten, electrocuted, and burned with frying pans; Frank was beaten with batons, roused by tasers, and starved; Salam was physically punished for failing to meet quotas; Joton was slapped, kicked, and forced to work overtime past 18 hours a day; and Elizabeth was punished for refusing to work with sexual violence and denial of food. Ex. A, ¶¶7, 8, 13; Ex. B, ¶¶10, 17; Ex. C, ¶¶9, 12, 17, 19; Ex. D, ¶¶7, 9; Ex. E, ¶¶19, 21, 22.

Sex trafficking (§ 1591): Elizabeth was raped and became pregnant. Ex. E,

¶¶21, 22.

Document confiscation (§ 1592): Every Plaintiff had their passport confiscated upon arrival and their phone either confiscated or restricted. Ex. A, ¶6; Ex. B, ¶¶8, 21; Ex. C, ¶¶7, 9, 21; Ex. D, ¶¶5, 12; Ex. E, ¶¶4, 9, 10, 19.

The above facts show Defendants knew or should have known that the Venture was violating the TVPA—Defendants themselves were active participants in it. Their knowledge is corroborated by other evidence in the record, satisfying the TVPA claim's final element.

To be sure, the Huione Defendants knew or should have known the Venture they participated in was violating the TVPA because the record evidence shows they ran a crime-as-a-service business, which supplied scam compounds and traffickers with physical goods and services through Huione Guarantee's marketplace, operated Huione Pay Cambodia branches in high-risk trafficking zones, and converted value across fiat and blockchains, marketing "unfreezable" USDH to defeat compliance. Exs. 11, 12; Exs. 8, 9; Ex. M (FinCEN 2025 Huione Proposed Rule) at 18,936–38, 18,940–41; Ex. 10 (FinCEN 2025 Huione Rule) at 48,303. Huione Guarantee openly advertised detention implements such as electronic shackles and electric batons for use on "runaway" victims and brokered the sale and resale of trafficking victims. Trager Decl. at 19–20; Exs. 11, 12.

The U.S. government has further documented the Huione Defendants' knowledge. For example, in the FinCEN 2025 Huione Rule, FinCEN directly linked

Huione to cryptocurrency investment scams perpetrated by human traffickers and characterized Huione as a significant node within the money laundering ecosystem that enables criminals to obtain items to carry out crimes and launder the proceeds. FinCEN noted that "much of the illicit revenue laundered through Huione Group originates from well-documented criminal activity" and that "numerous publicly available reports describe the failings of Huione Group's anti-money laundering/know your customer (AML/KYC) program." Ex. 10 (FinCEN 2025 Huione Rule) at 48,296.

DOJ materials further identify the Tai Chang Scam Compound as targeting Americans and document U.S. law-enforcement actions linking those operations and their laundering flows to Huione, further corroborating that Huione knew or should have known it was participating in a Venture that was committing the acts that violate the TVPA. *See* Ex. K (FBI Aff. in *Two Domain Names*) ¶¶8–9, 53(a) (scams operating out of Tai Chang targeted victims in Colorado and other states); Ex. L at 6 (victim evidence summary verified by U.S. Secret Service Special Agent identifying scam as linked to "the physical location of the Tai Chang Compound in Burma" and that scam proceeds were laundered "through the Huione Group marketplace").

More evidence of the Xinbi Defendants' knowledge includes that its staff moderates merchant groups and adjudicates disputes between merchants and their clients on Xinbi Guarantee—which would be "impossible" without "knowing the details of each specific interaction, including the origin of the funds in question." Ex. 26 (Xinbi Warrant Aff.), ¶101. Xinbi also has a physical presence inside scam

compounds, which "directly contradicts Xinbi's operating terms associated with avoiding human trafficking." *Id.* ¶57.

The Sea Dragon Defendants also knew they were participating in a Venture that violated the TVPA. Three Sea Dragon individual Defendants admitted in federal plea proceedings that they conspired to launder at least $20 million in scam proceeds, knowing the funds were the proceeds of unlawful activity. *See* Ex. AA (Zhang) at 7–8; Ex. BB (Walker) at 6–8; Ex. CC (Wong) at 7–8. Defendant Li also knew, as he was the "boss" of the other Sea Dragon Defendants (Ex. G, ¶¶45–46) and was the one who "determin[ed] where victim funds" obtained by Defendants Zhang, Walker, Wong, and Zhu "should be sent." *Id.* ¶8. The DOJ also obtained admissions from two co-conspirators in related Sea Dragon cases that they traveled to at least one scam compound in Cambodia to discuss the money-laundering activities carried out by the Sea Dragon Defendants with Defendant Li. Ex. LL (He Plea) at Ex. A, ¶¶6–7; Ex. GG (Somarriba Plea) at Ex. A, ¶¶6–7; *see* Ex. NN (Gov't Sent'g Position Regarding He, *United States v. He*, No. 2:25-cr-00175-RGK, ECF No. 54) at 8; Ex. OO (Gov't Sent'g Position Regarding Somarriba, *United States v. Somarriba*, No. 2:25-cr-00181-RGK, ECF No. 35) at 9 (identifying Li).

This plethora of evidence corroborated by the declarations of record in support of the Motion shows Plaintiffs are reasonably likely to succeed on their TVPA claim.

**b. COCCA Claim(s)**

COCCA provides that "[i]t is unlawful for any person employed by, or

associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity[.]" Colo. Rev. Stat. § 18-17-104(3). As for the first element, COCCA defines "enterprise" as "any individual, sole proprietorship, partnership, corporation, trust, or other legal entity or any chartered union, association, or group of individuals, associated in fact although not a legal entity, and shall include illicit as well as licit enterprises and governmental as well as other entities." *Id.* § 18-17-103(2).

Concerning the second element, COCCA defines a "pattern of racketeering activity" as knowingly engaging in at least two acts of racketeering related to the conduct of the enterprise. *Id.* § 18-17-103(3). "Racketeering activity" encompasses: (a) conduct defined as racketeering under the federal RICO statute codified at 18 U.S.C. § 1961(1)(A)–(D); and (b) violations of certain enumerated Colorado statutes. *Id.* § 18-17-103(5)(a)–(b). The federal RICO statute in turn includes the following acts as racketeering activity: (i) acts prohibited by the TVPA under 18 U.S.C. §§ 1581–1592, "relating to peonage, slavery, and trafficking in persons"; (ii) wire fraud under 18 U.S.C. § 1343; and (iii) money laundering under 18 U.S.C. §§ 1956, 1957. In other words, the federal trafficking offenses under the TVPA are themselves COCCA predicates, along with the wire fraud and money laundering offenses mentioned. Further, COCCA's enumerated Colorado statutes include: (i) conduct constituting human trafficking for involuntary servitude under Colo. Rev. Stat. § 18-3-503; (ii) money laundering under Colo. Rev. Stat. § 18-5-309; and (iii) criminal possession of

an identification document under Colo. Rev. Stat. § 18-5-903.5.

The evidence of record plausibly establishes the Venture is an "enterprise" under COCCA. The Colorado Supreme Court has held that "COCCA requires an associated-in-fact enterprise to have (1) a minimum amount of structure—namely, a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose—and (2) an ongoing organization of associates, functioning as a continuing unit, that exists separate and apart from the pattern of racketeering activity in which it engages." *McDonald v. People*, 494 P.3d 1123, 1126 (Colo. 2021); *see also Boyle v. United States*, 556 U.S. 938, 946, 948 (2009) (no formal hierarchy required; "decisions may be made on an ad hoc basis").

Plaintiff has shown a reasonable likelihood that the Venture satisfies this test. The record contains evidence of its purpose: to generate illicit proceeds through human trafficking, cyber scams targeting Americans, and money laundering. It further contains evidence of the relationships among Defendants, each of which played critical and at times overlapping roles in the Venture's operations, while operating with various connections between and among each other. There is also sufficient evidence in the record of the Venture's longevity: it has operated continuously since at least August 2021. Trager Decl. at 36, 54. And it operates as an ongoing organization with associates functioning as a continuing unit, as demonstrated by the Huione Defendants', the Xinbi Defendants', and Sea Dragon

Defendant Daren Li's ongoing activities, including those aimed at skirting law enforcement attempts to disrupt the Venture, and the ongoing transfers of funds out of the cryptocurrency addresses in the Network. *See generally* Trager Decl. The enterprise thus exists "separate and apart" from the individual predicate acts. *McDonald*, 494 P.3d at 1131.

The record also supports a finding that Defendants are engaged in a pattern of racketeering activity because they have committed more than two acts that constitute such activity under COCCA. First, Defendants have engaged in multiple acts in violation of the TVPA and of the Colorado human trafficking statute (Colo. Rev. Stat. §§ 18-3-502, -503) (prohibiting trafficking for involuntary servitude through "coercion," including the use or threat of force, abduction, serious harm, physical restraint, destruction or taking of identification documents, and debt bondage) as discussed at various points above.

Second, Defendants committed wire fraud because they used a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, transmitted by wire communication in interstate commerce. *See* 18 U.S.C. § 1343. The Huione Defendants have received $347.5 million from scams targeting Americans originating at the Tai Chang Scam Compound (Ex. 10 (FinCEN 2025 Huione Rule) at n.93; Ex. L at 6) and the Xinbi Defendants' infrastructure "received from and commit wire fraud against U.S. victims" in violation of the federal wire fraud statute (Ex. 26 (Xinbi Warrant Aff.) ¶164(a)). Several of the Sea Dragon

Defendants pleaded guilty to wire fraud in connection with the Venture's activities. *E.g.*, Ex. AA (Zhang) at 7–8; Ex. BB (Walker) at 7–8; Ex. CC (Wong) at 7–8.

Third, record evidence supports finding the Defendants committed money laundering in violation of federal and Colorado law. Defendants conducted countless financial transactions to further the Venture's unlawful activities knowing that the funds involved in the transactions were proceeds of unlawful activity (investment scams and facilitating human trafficking) and conducted these transactions to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *See* 18 U.S.C. § 1956; Colo. Rev. Stat. § 18-5-309. These transactions include hundreds of thousands of transfers of cryptocurrencies by and among addresses in the Network, as well as the Sea Dragon Defendants' money laundering schemes, which certain Sea Dragon Defendants admitted they knew were criminal proceeds and that the transactions were designed to conceal their nature, source, and ownership. See generally Trager Decl; *see also* Ex. AA (Zhang) at 7–8; Ex. BB (Walker) at 7–8; Ex. CC (Wong) at 7–8; Ex. EE (Li Plea), Ex. GG (Somarriba Plea). Moreover, law enforcement has determined that the Huione Defendants engaged in money laundering, Ex. 10 (FinCEN 2025 Huione Rule) at 48,302, as did Xinbi when it trafficked "funds received from . . . U.S. victims." Ex. 26 (Xinbi Warrant Aff.), ¶164(a).

Fourth, the Venture had in its possession certain of the Plaintiffs' identification documents without lawful authority, another violation of Colorado law that is a predicate under COCCA. *See* Colo. Rev. Stat. § 18-5-903.5; *see also* Ex. A, ¶6; Ex. B,

¶8; Ex. C, ¶7; Ex. D, ¶5; Ex. E, ¶¶4, 9.

This plethora of evidence corroborated by the declarations of record in support of the Motion shows Plaintiffs are reasonably likely to succeed on their COCCA claim.

**2. Irreparable Harm**

While COCCA does not require Plaintiffs to show irreparable injury to obtain a temporary asset freeze (but such showing is required to obtain a temporary freeze under the TVPA), without a temporary asset freeze, Plaintiffs face the substantial certainty of irreparable harm through asset dissipation. Defendants are still extracting the Trafficking Venture's funds held in the Network. *See generally* Trager Decl. The funds are currently held in forms or locations where third-party actors have some ability to restrict their movement and that will typically abide by court orders to freeze assets. *See id.* But Defendants can quickly transfer and irreversibly dissipate the cryptocurrencies to other forms of cryptocurrencies not subject to third-party intervention, essentially moving the assets outside the court's jurisdiction or authority. *Id.*; *see also Jacobo v. Doe*, No. 1:22-cv-00672-DAD-BAL (BAM), 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022) (collecting cases); *see also Gaponyuk v. Alferov*, No. 2:23-cv-01317-KJM-JDP, 2023 WL 4670043, at *3 (E.D. Cal. July 20, 2023) (granting *ex parte* TRO freezing cryptocurrency due to "risk of anonymous and speedy asset dissipation").

The Huione Defendants have already actively employed methods to evade law enforcement—launching an "unfreezable" cryptocurrency, Ex. 10 (FinCEN 2025

Huione Rule) at 48,303—and otherwise shown an aversion to complying with the law, including by having its "money laundering enterprise" continue "to operate just as before" FinCEN actions against it, *id.* at n.107, and by simply attempting to rebrand in response to regulatory action. The Xinbi Defendants have likewise engineered and marketed methods to avoid or defeat asset freezes. According to federal investigators, Xinbi addresses are often active for only two weeks and funds move through them rapidly, so it is "unviable for law enforcement to fully attribute the funds held in Xinbi controlled cryptocurrency addresses" before Xinbi turns to new addresses. Ex. 26 (Xinbi Warrant Aff.), ¶129. Xinbi's merchants openly market coin-mixing services to users with "concerns about freezing/marking" and promise compensation to clients whose funds are frozen by law enforcement. *Id.* ¶¶98, 121, 125, Fig. 39.

Thus, there is good cause to believe Defendants would dispose of, dissipate, or remove assets from the jurisdiction of the Court absent a freeze. And there is irreparable harm to Plaintiffs in the absence of injunctive relief as a result.

**3. There is No Plain, Speedy or Adequate Remedy at Law**

Plaintiffs do not have a plain, speedy, or adequate remedy at law absent a freeze, because the assets at issue "would be beyond the reach of the Court" such that "any judgment ultimately obtained by Plaintiffs would be of questionable value." *Kozeny*, 115 F. Supp. 2d at 1241. As shown, Defendants have wired millions from the U.S. to known human traffickers abroad, they are continuing to dissipate their assets, and they have persistently refused to abide by the law. Absent a freeze, any remedy

Plaintiffs obtain is likely to be of little to no value. In such circumstances, "the typical remedy is the subject requested injunctive relief to freeze and disgorge to Plaintiff the" assets at issue. *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *5 (S.D. Fla. June 17, 2022).

**4. Balance of Equities and Public Interest**

A temporary freeze is both within the public interest and favored by the balance of equities. First, by ensuring judgments can be satisfied, asset preservation serves the judicial process in providing meaningful remedies to injured plaintiffs and has been expressly recognized as an effective tool available under COCCA. *See Silverstein v. Wolf*, No. 22-cv-01817-PAB-NRN, 2025 WL 2418495, at *8 (D. Colo. Aug. 21, 2025) ("[T]he public interest weighs in favor of injunctive relief because it would be inequitable and against the public interest to allow a defendant to dissipate its assets." (quoting *Kozeny*, 115 F. Supp. 2d at 1242)). Second, an order preventing asset dissipation furthers the public interest against human trafficking and organized crime reflected in the TVPA and in COCCA. Congress reauthorized and expanded the TVPRA "to address the problem of human trafficking throughout the world" such that, "[v]iewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Jacobs Sols.*, 790 F. Supp. 3d at 1181. Similarly, the Colorado General Assembly has determined that organized crime "is a highly sophisticated, diversified, and

widespread activity" operating "in the state of Colorado, as well as nationwide," that it derives its "power through money procured from … social exploitation," and that "enhanced sanctions and … remedies" are needed to combat it. Colo. Rev. Stat. § 18-17-102. Together, those provisions reflect a clear public policy that those who profit from human-trafficked and forced labor may not keep the proceeds.

For similar reasons, the balance of equities favors the freeze Plaintiffs seek. As explained in their declarations, Plaintiffs, and thousands like them, have suffered as victims of human trafficking. They have no recourse against these acts but the hope of recovering restitution for their forced labor. Plaintiffs would be further harmed if the Venture and Defendants move assets beyond this Court's reach. By contrast, any inconvenience Defendants face from temporarily frozen assets they obtained through illegal means is minimal compared to Plaintiffs' total losses. The evidence shows that Defendants have withdrawn hundreds of millions, if not billions, of dollars' worth of assets from the cryptocurrency addresses that comprise the Network and that only a few hundred million dollars in cryptocurrency remain in those addresses. Thus, the requested freeze does not reach a significant portion of Defendants' overall assets based on the billions of dollars in assets that have moved through the Network. *See generally* Trager Decl. And as discussed above, denying a freeze here would reward Defendants for their crimes by permitting them to dissipate the funds in short order. *See Reven Holdings*, 2026 WL 3070863, at **23–27 (affirming asset freeze as properly balancing the equities even though defendants

argued it was eroding the value of their intellectual property); *Jacobo*, 2022 WL 2052637, at *6 ("[a] delay in defendant's ability to transfer the assets only minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice plaintiff"); *Gaponyuk*, 2023 WL 4670043, at *3 (finding "a short-term freeze is unlikely to present any great harms" to defendants).

**5. The Status Quo**

"In essence, a TRO 'is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction and may be issued with or without notice to the adverse party.'" *Bikinvention 2 CC v. Squirt, LLC*, No. 14-cv-01178-CMA-MEH, 2014 WL 1758142, at *2 (D. Colo. May 2, 2014) (quoting Charles Alan Wright, *et al.*, 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed. Apr. 2014 update)). Courts determining the status quo "are directed to look at the last peaceable uncontested status existing between the parties before the dispute developed." *Archer v. Griswold*, 638 F. Supp. 3d 1246, 1255 (D. Colo. 2022) (citing *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005)).

Here, that last peaceable uncontested status had approximately $526,012,674.10 held across USDT and USDC available to Plaintiffs as restitution. *See generally* Trager Decl. The purpose of the temporary freeze is to ensure these assets do not move and are available pending this Court's consideration of preliminary injunctive relief. In that regard, Defendants are not being asked to do

anything to afford this relief.[4] *Home Shopping Club, Inc. v. Roberts Broad. Co. of Denv.*, 961 P.2d 558, 560 (Colo. App. 1998); *accord Reven Holdings*, 2026 WL 3070863, at **14, 25 (upholding asset freeze "designed to preserve the status quo"). And in that sense, a freeze maintains the status quo by leaving in place assets that exist and are currently available to accord relief in this lawsuit.

**6. Bond**

The Court has broad discretion in determining the proper amount of the bond, if any. *E.g.*, *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003); *Nat'l Oilwell Varco, LP v. Nygard*, 2023 WL 12052506, at *8 (Colo. App. 2023). "[A] bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'" *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987); *Kaiser v. Mkt. Square Disc. Liquors*, 992 P.2d 636, 643 (Colo. App. 1999) (nominal $1 bond proper after finding defendants "would not suffer any compensable loss if it were later determined that the TRO was wrongfully issued.").

The Court finds that no bond is required under the circumstances alleged and shown here. Based on the allegations and sworn declarations in support of the Motion, Defendants have no cognizable right to the stolen and laundered proceeds at

[4] In this regard, the injunction sought also is not of the "disfavored" variety because it neither mandates action by Defendants; changes the status quo; nor grants all the relief the moving party could expect from a successful trial. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019).

issue, and the brief duration of the TRO, even if extended, suggests no Defendant faces a risk of compensable loss. And requiring bond from Plaintiffs as victims of human trafficking with limited means to post any sizeable bond would only serve inequity.

*   *   *

For the reasons shared above, and having found that Plaintiffs have met their burden to demonstrate their entitlement to an *ex parte* restraining order. **IT IS ORDERED** that the Motion is **GRANTED IN PART** insofar as it requests a temporary restraining order freezing assets, expedited discovery, and alternative service. The Court finds good cause for ordering the limited expedited discovery which is necessary to support the ordered relief.

**IT IS FURTHER ORDERED** that the Motion is **DENIED IN PART** insofar as it sought relief against those Defendants over whom there is currently an insufficient showing of this Court's personal jurisdiction—those Sea Dragon Trading, LLC, Sea Dragon Remodel, Inc., Justin Walker, and Joseph Wong.

[*remainder of page left blank intentionally*]

## TEMPORARY RESTRAINING ORDER

For the reasons shared above, and having found Plaintiffs have met their burden to establish their entitlement to a temporary restraining order and related relief, the Court **ORDERS** as follows:

**1.** Under Fed. R. Civ. P. 65(b)(1) and (2), the Court finds and ORDERS that this Temporary Restraining Order shall issue without notice to Defendants because: (a) the specific facts set forth in the sworn declarations and exhibits show that immediate and irreparable injury, loss, or damage will result to Plaintiffs if notice is provided to Defendants before they can be heard in opposition. That injury is the dissipation of the assets held in the Identified Addresses, which is irreparable because, considering the speed with which cryptocurrency transactions are made and the anonymous nature of those transactions, assets moved out of the Identified Addresses can be transferred instantly and irreversibly across borders and become difficult to freeze, leaving Plaintiffs unable to recover on their equitable claims; (b) advance notice was not provided because it would likely prompt Defendants, who are continuing to expend their assets abroad and have demonstrated a willingness to dissipate assets and evade legal proceedings, to move the assets beyond the reach of this Court, rendering the requested relief meaningless; and (c) Plaintiffs have certified, under Fed. R. Civ. P. 65(b)(1)(B) and D. Colo. L. Civ. R. 65.1(a), that no notice was provided to Defendants and have set forth the reasons why notice should not be required.

**2.** Pending the determination of Plaintiffs' request for a preliminary injunction and in order to preserve the status quo, Defendants[5] and their officers, agents, servants, employees, attorneys, partners, successors, assigns, and all other persons or entities through which they act or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, are hereby restrained and enjoined from directly or indirectly transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any cryptocurrency or other assets, including but not limited to the Tether (USDT) and USD Coin (USDC) held in the Identified Addresses.

[5] *See supra* n.2 regarding definition of Defendants.

**3.** Any cryptocurrency exchange, virtual asset service provider, stablecoin issuer, or other person or entity holding, controlling, or having the technical ability to restrict any of the assets held in the Identified Addresses shall, upon receiving actual notice of this Order, immediately freeze, or assist in or facilitate the freezing of, the assets held in the Identified Addresses, and shall hold and retain such assets within its control and prohibit the withdrawal, removal, transfer, conversion, burning, reissuance, or other disposal of any such assets. Without limiting the foregoing: (a) Tether, the issuer of USDT, and Circle, the issuer of USDC, shall freeze, blacklist, or otherwise render non-transferable the USDT and USDC held at the unhosted wallet addresses identified in Exhibit 3 to the Trager Declaration; and (b) OKX and Binance shall immediately freeze each account associated with the deposit addresses identified in Exhibits 4 and 20 to the Trager Declaration.

**4.** Plaintiffs' application for expedited discovery is granted and that, commencing with the time and date of this Order, in lieu of the time periods, notice provisions, and other requirements of Rules 26, 30, 33, 34, 36, and 45 of the Federal Rules of Civil Procedure, limited expedited discovery shall proceed as follows:

**5.** Plaintiffs are authorized to serve subpoenas under Fed. R. Civ. P. 45 on the cryptocurrency exchanges identified in Exhibits 4 and 20 to the Trager Declaration, including the issuers of the cryptocurrencies USDT and USDC, and the cryptocurrency exchanges OKX and Binance, and Fed. R. Civ. P. 30, 31, 33, and 45 subpoenas or interrogatories on any person or entity claiming an interest in the assets held in the Identified Addresses, requesting that each such exchange, person, or entity: (i) identify all beneficial owners of any accounts associated with the Identified Addresses; (ii) provide account opening information, including related bank accounts; (iii) identify any other accounts held by the same persons or entities; (iv) provide information sufficient to identify all transactions involving those accounts; (v) provide information concerning the source of the funds deposited into those accounts or held in the Identified Addresses, including the originating addresses, accounts, and counterparties from which those funds were received; and (vi) as to any person or entity claiming an interest in the Identified Addresses, state the nature and basis of that claim, including the source of the funds in which that interest is claimed. Any such exchange, person, or entity shall respond to such subpoenas or interrogatories within **five (5) days** of service.

**6.** Plaintiffs shall serve this Order, the Class Action Complaint, the Motion, and all papers upon which they are based on any Defendant organized under the law of a U.S. state or a citizen of a U.S. state (Defendants Huione Pay Inc., Huione Global, Ltd., Xinbi Co., Ltd., Sea Dragon Trading, LLC, Sea Dragon Remodel, Inc.,

Justin Walker, and Joseph Wong) by any means authorized under Fed. R. Civ. P. 4; Plaintiffs are further authorized to effect service of this Order, the Class Action Complaint, the Motion, and all papers upon which they are based: (i) via email, overnight delivery, or personal delivery to the counsel of record who appeared on behalf of the Huione Defendants in connection with FinCEN's rulemaking against Huione and counsel of record for the Sea Dragon Defendants in *Hoffman v. Sea Dragon Trading, LLC*, No. 1:23-cv-03407 (N.D. Ill.); (ii) by making a one-time transmission of a crypto token on the TRON blockchain, with the characteristics set forth in the Motion, to any Identified Address with a balance greater than $1 as of the date of this Order; (iii) by publication on a dedicated website maintained by Plaintiffs' counsel, which website shall be updated in real time with any additional filing in this matter; and (iv) via email, overnight delivery, or personal delivery upon the entities that have possession or control of certain of the Identified Addresses, specifically Tether, Circle, OKX, and Binance. Service by any of these means shall constitute effective service under Fed. R. Civ. P. 4(f)(3) and 4(h)(2).

**7.** Following initial service by the above means, Plaintiffs may serve all subsequent papers, notices, orders, discovery, and filings by posting them to the dedicated website. Service shall be deemed complete upon posting, provided Plaintiffs file a declaration identifying the document posted, the date and time of posting, and the URL where the document is available. Plaintiffs need not transmit a separate on-chain transaction for each subsequent filing unless otherwise ordered by the Court.

**8.** This Temporary Restraining Order shall expire on November 12, 2026 (fourteen (14) days from its entry) at 8:21 p.m. MT, in accordance with Fed. R. Civ. P. 65(b)(2), unless, for good cause shown, this Order is extended or the affected Defendant consents to a longer extension. Any Defendant or other affected person may move to dissolve or modify this Order on two (2) days' notice to Plaintiffs' counsel pursuant to Fed. R. Civ. P. 65(b)(4), and the Court may, upon a demonstration of good cause by any party-of interest, shorten or lift this Order.

**9.** The Motion is also deemed to be a motion for a preliminary injunction, and Plaintiffs are not required to file or serve a separate motion for a preliminary injunction in order to seek the entry of a preliminary injunction under Fed. R. Civ. P. 65. An evidentiary hearing on the motion for preliminary injunction is set before this Court at 8:30 a.m. MT on November 12, 2026, in Courtroom A601 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado 80294. The Court will consider all materials filed by Plaintiffs in connection with the Motion to have been filed in connection with Plaintiffs' request for a preliminary injunction. Plaintiffs shall be permitted, but are not required, to file a supplemental brief and supporting exhibits in advance of the preliminary injunction hearing.

**10.** Any Defendant wishing to oppose the entry of a preliminary injunction shall file a Response by November 9, 2026. Plaintiffs shall not file a Reply without leave of Court. Defendants are hereby on notice that failure to timely file an opposition, or failure to appear at the hearing, may result in the imposition of a preliminary injunction against them pursuant to Fed. R. Civ. P. 65.

DATED: 10/29/2026 8:21 PM

BY THE COURT:

S. Kato Crews
United States District Judge