**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-05425

MOHAMMED JUNAEID HOSSAN PARBAS *et al.*,

Plaintiffs,

v.

HUIONE GLOBAL, LTD. *et al.*,

Defendants.

**MOTION TO VACATE OR MODIFY TRO AS TO TETHER PURSUANT TO FED. R. CIV. P. 65(b)(4)**

---

## TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION .......... 1
II. FACTUAL AND PROCEDURAL BACKGROUND .......... 4
A. Tether Issues the USDt Stablecoin to Non-U.S. Customers Outside the United States .......... 4
B. Tether Works with Law Enforcement to Stop Schemes of the Sort Alleged by Plaintiffs .......... 6
C. The Complaint and *Ex Parte* TRO .......... 6
III. LEGAL ARGUMENT .......... 8
A. The Court Lacks Authority to Enjoin Nonparty Tether Pursuant to Rule 65(d)(2) .......... 8
B. The Court Cannot Exercise Personal Jurisdiction over Foreign Nonparty Tether to Enforce the TRO .......... 12
C. The TRO Is an Improper Pre-Judgment Injunction .......... 16
D. In the Alternative, the Court Should Narrow the TRO as to Tether .......... 18
IV. CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Cases** **Page(s)**


*ADT LLC v. Northstar Alarm Services, LLC*,
853 F.3d 1348 (11th Cir. 2017) .......... 11

*Alemite Manufacturing Corp. v. Staff*,
42 F.2d 832 (2d Cir. 1930) .......... 9

*Astrove v. Doe*,
2022 WL 2805345 (S. D. Fla. June 17, 2022) .......... 18

*Blockowicz v. Williams*,
630 F.3d 563 (7th Cir. 2010) .......... 10

*Chang v. Shen Yun Performing Arts, Inc.*,
2026 WL 2410052 (S.D.N.Y. Aug. 18, 2026) .......... 11, 17

*ClearOne Communications, Inc. v. Bowers*,
651 F.3d 1200 (10th Cir. 2011) .......... 14

*F. C. v. Jacobs Solutions Inc.*,
790 F. Supp. 3d 1158 (D. Colo. 2025) .......... 15

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
592 U.S. 351 (2021) .......... 13

*In re Government Seizure of ICX Tokens*,
2022 WL 292923 (D. Colo. Jan. 31, 2022) .......... 13

*Great-West Life & Annuity Insurance Co. v. Knudson*,
534 U.S. 204 (2002) .......... 18

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) .......... 16

*Gucci America, Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014) .......... 12, 13, 14, 15

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*,
935 F.3d 211 (4th Cir. 2019) .......... 14, 15

*Huggins v. Buchannan*,
2026 WL 171587 (D. Colo. Jan. 22, 2026) .......... 8

*Lake Shore Asset Management Ltd. v. CFTC*,
511 F.3d 762 (7th Cir. 2007) .......... 12

*Mills v. FCA US, LLC*,
2018 WL 11386606 (D. Colo. Nov. 29, 2018) .......... 16

*National Association for Gun Rights v. Polis*,
173 F.4th 1317 (10th Cir. 2026) .......... 18

*Niemi v. Lasshofer*,
728 F.3d 1252 (10th Cir. 2013) .......... 16

*Nike, Inc. v. Wu*,
2020 WL 257475 (S.D.N.Y. Jan. 17, 2020), *aff'd Next Investments, LLC v. Bank of China*, 12 F.4th 119 (2d Cir. 2021) .......... 9

*Old Republic Ins. Co. v. Continental Motors, Inc.*,
877 F.3d 895 (10th Cir. 2017) .......... 15

*Pillow Menu, LLC, v. Super Effective, LLC*,
2021 WL 3726205 (D. Colo. Aug. 19, 2021) .......... 16, 17

*Prosper, Inc. v. Innovative Software Technologies*,
188 F. App'x 703 (10th Cir. 2006) .......... 17

*In re Qwest Communications International, Inc. Securities Litigation*,
231 F. Supp. 2d 1066 (D. Colo. 2002) .......... 20

*Receiver v. Banca Comerciala Victoriabank SA*,
843 F. App'x 485 (4th Cir. Jan. 29, 2021) .......... 15

*Reebok Intern. Ltd. v. McLaughlin*,
49 F.3d 1387 (9th Cir. 1995) .......... 14

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945) .......... 9

*Reliance Insurance Co. v. Mast Construction Co.*,
84 F.3d 372 (10th Cir. 1996) .......... 9

*Rukthammachalern v. Tether Holdings S.A. de C.V.*,
No. 26-CV-07400 (S.D.N.Y.) .......... 6

*Rylee & Cru, Inc. v. Zhu*,
2023 WL 355945 (D. Colo. Jan. 23, 2023) .......... 10

*Tactic Franchising, LLC v. 100 Percent Chiropractic Ryan, LLC*,
2025 WL 1251260 (D. Colo. Jan. 15, 2025) .......... 8

*Teets v. Great-W. Life & Annuity Insurance Co.*,
921 F.3d 1200 (10th Cir. 2019) .......... 17

*Tiffany (NJ) LLC v. Qi Andrew*,
276 F.R.D. 143 (S.D.N.Y. 2011), a*ff'd sub nom. Tiffany (NJ) LLC v. Andrew*, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011) .......... 20

*Tumu v. Roycoin*,
2026 WL 2971821 (W.D. Tex. July 31, 2026) ........ 18

*Walden v. Fiore*,
571 U.S. 277 (2014) ........ 15

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ........ 11

*Zucchero v. Bizango*,
2026 WL 1918039 (E.D. Tex. June 6, 2026) ........ 18

**Statutes**

18 U.S.C. § 1595(a) ........ 17

18 U.S.C. § 1595A ........ 11

**Rules**

Fed. R. Civ. P. 4.1 ........ 12

Fed. R. Civ. P. 64(a) ........ 11

Fed. R. Civ. P. 65(b)(4) ........ 1

Fed. R. Civ. P. 65(d) ........ *passim*

**Treatises**

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 2956 (3d ed.) ........ 12, 13

Pursuant to Fed. R. Civ. P. 65(b)(4), foreign nonparty Tether International, S.A. de C.V. ("Tether") seeks to vacate or modify the Court's October 29, 2026, *ex parte* temporary restraining order, Dkt. No. 13 (the "TRO"), to the extent it directs Tether or its affiliates to implement a pre-judgment asset freeze or otherwise act.

## I. INTRODUCTION

The Court's jurisdiction over Defendants is insufficient to enforce the TRO against foreign nonparty Tether because Tether is not acting in active concert or participation with Defendants, and it is subject to neither general nor specific personal jurisdiction in Colorado. That means the TRO is unenforceable as to Tether—full stop. Plaintiffs fail to identify any conceivable basis for the TRO to be enforced against a foreign nonparty that is not an agent or aider and abettor of Defendants. The Court's *in personam* jurisdiction over Defendants—while sufficient to enjoin *Defendants* from dissipating their assets—does not grant the Court *in rem* jurisdiction over the property itself or permit the Court to enforce the TRO against Tether. Tether's sporadic contacts with the United States writ large also do not create jurisdiction in Colorado to enforce the TRO against Tether.

That does not mean Tether is doing nothing. On the contrary, Plaintiffs acknowledge that Tether has already frozen more than 100 wallets worth approximately $25 million captured by their analysis, and that Tether is working with the Department of Justice, FBI, and Secret Service to stop these types of schemes. But Tether faces untold legal risk if it were to freeze more than 85,000

wallets of uncertain ownership in jurisdictions across the world. This situation is precisely why the legal and constitutional limitations on orders against foreign nonparties exist. Tether respectfully requests that the Court modify the TRO to the extent it directs Tether to implement an asset freeze or otherwise directs it to act.

*First*, the TRO exceeds the scope of the Court's authority to enter preliminary relief under Rule 65. Plaintiffs do not plead that Tether is in active concert or participation with Defendants, as required by Rule 65. Nor can they: Defendants are not Tether customers, and Tether has no way of knowing whether Defendants even own the wallets that Plaintiffs have targeted in this case. Moreover, Tether is working with U.S. law enforcement to *stop* "pig-butchering" schemes like the ones alleged by Plaintiffs. Plaintiffs may try to rely on statutes authorizing injunctions against *Defendants*, but none of those statutes authorizes injunctions against nonparties without complying with the basic requirements of Rule 65(d)(2).

*Second*, even if the Court had authority through Rule 65, it still lacks personal jurisdiction over Tether. A court cannot issue an asset freeze without personal jurisdiction, and neither Plaintiffs nor the TRO identify any basis for personal jurisdiction over Tether. The Court's exercise of *in personam* jurisdiction over Defendants gives it authority to require *Defendants* to freeze their assets. But it does not give the Court jurisdiction over *Tether*. Rather, Plaintiffs must establish *in personam* jurisdiction over Tether, and they cannot do so. Tether is not subject to general jurisdiction in this Court—it has no operations in Colorado or the United

States. Specific jurisdiction is likewise unavailable: Tether has no relationship with Defendants or the forum, it is not helping Defendants to violate the order, it prohibits U.S. customers, and its sporadic contacts with the United States have no connection to Defendants' compliance with the TRO. Plaintiffs are not entitled to jurisdictional discovery given the lack of any bona fide jurisdictional allegations.

*Third*, while the Court need not reach this issue unless it concludes that Plaintiffs could satisfy Rule 65 and establish jurisdiction over Tether to enforce the TRO, Plaintiffs are mistaken that their damages claim against Defendants permits a pre-judgment freeze of assets in which they have no property interest. If Plaintiffs' allegations are right, the wallets subject to the TRO contain funds connected to investment fraud that do not belong to the putative class of human trafficking victims. While Plaintiffs may ultimately prove their damages claim against Defendants, merely seeking restitution or a constructive trust does not permit a pre-judgment freeze of assets in which Plaintiffs had no property interest.

*Finally*, even if the Court finds (i) Rule 65 satisfied, (ii) jurisdiction over Tether to enforce the TRO, and (iii) that the TRO is a valid pre-judgment asset freeze, the Court should modify and limit the scope of the TRO as to Tether because it presents significant risk to Tether's business based on a flawed and incomplete analysis. As Tether's expert Puneet Kakkar—a former federal prosecutor specializing in cybercrime—explains, Plaintiffs' methodology is unreliable. It fails to ensure that innocent third-party wallets and service providers are not captured in the freeze; in

fact, there is evidence that hosted wallets controlled by major cryptocurrency exchanges *were* inadvertently included in his analysis, and that wallets belonging to their legitimate customers may have been too. In his opinion, Plaintiffs' request to freeze 85,395 wallets is unprecedented and a product of their failure to conduct the type of robust analysis used by law enforcement. Additionally, as Tether's Chief Compliance Officer Leonardo Real explains, freezing wallets is a manual process by Tether's senior personnel, and freezing 85,000 wallets has no precedent and would present significant operational challenges. If the Court determines that the TRO is enforceable as to Tether (it should not), it still should modify the TRO as to Tether. Plaintiffs' flawed methodology is simply inadequate to risk harm to the property rights of innocent nonparties, and thereby expose Tether to claims across the world from the holders of more than 85,000 cryptocurrency wallets.

The Court should modify the TRO to remove foreign nonparty Tether.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Tether Issues the USDt Stablecoin to Non-U.S. Customers Outside the United States

Tether is a foreign corporation incorporated in El Salvador and headquartered in San Salvador.[1] Declaration of Leonardo Real ("Real Decl.") ¶ 5. It is licensed by El Salvador's National Commission of Digital Assets as a stablecoin issuer. *Id.* Tether has no operations in Colorado or the United States. *Id.* ¶ 6.

[1] Prior to January 27, 2025, Tether Limited, a Hong Kong company, also issued USDt. Real Decl. Ex. A at 2 (Notice of Assignment).

Tether issues USDt, a stablecoin cryptocurrency pegged one-to-one to the U.S. dollar. Dkt. No. 5 ("Trager Decl.") ¶ 24. Tether issues USDt only to customers who have passed Tether's Know-Your-Customer and Anti-Money-Laundering verification process. Real Decl. ¶ 10. As of February 2026, Tether had 819 customers. *Id.* No Defendant in this action is a Tether customer. *Id.* ¶ 4. Tether's Terms of Service prohibit U.S. residents and entities from "holding" or "owning" USDt "in any way." Real Decl. Ex. A § 3.3; *see id.* § 1.1.30. Every purchase and redemption of USDt takes place in El Salvador. *Id.* § 4.6.

Unlike primary market participants who buy USDt from Tether, secondary market participants "do[] not require permission from Tether" to buy and sell USDt. *Id.* § 3.2. Tether does not have a contractual relationship with third-party holders of USDt who are not Tether customers. Real Decl. ¶ 13. The TRO orders Tether to freeze wallet addresses that are purportedly "unhosted" whose ownership is unknown to Tether. TRO at 32; *see* Trager Decl. ¶¶ 22, 28, 91; Real Decl. ¶ 13.

Tether cannot control USDt transactions or transfer USDt from one cryptocurrency wallet to another. Real Decl. ¶ 13. But it does retain the limited ability to "freeze" USDt by blacklisting specific wallet addresses on the TRON blockchain. *Id.* ¶ 14. This is a manual process that entails blacklisting specific wallet addresses on the relevant USDt smart contract, preventing outflows of USDt. *Id.* ¶¶ 14, 25. The process requires entry of the administrative private keys—one of the most closely guarded secrets in any cryptocurrency company—for the USDt smart

contract, which are only known to select senior Tether personnel. *Id.* ¶ 25.

### B. Tether Works with Law Enforcement to Stop Schemes of the Sort Alleged by Plaintiffs

Tether actively collaborates with over 340 law enforcement agencies in 65 countries, including the Department of Justice, Federal Bureau of Investigation, and U.S. Secret Service, in investigating unlawful uses of USDt, such as "pig butchering" scams. Real Decl. ¶ 16. For example:

- In June 2025, the U.S. Attorney's Office for the District of Columbia announced the "largest cryptocurrency seizure in U.S. Secret Service history" in connection with "crypto[currency] confidence scams." "The Department of Justice thank[ed] Tether for its proactive assistance in this investigation." *Id.* Ex. B.

- In February 2026, the U.S. Attorney's Office for the Eastern District of North Carolina announced the seizure of $61 million of cryptocurrency from a "pig butchering scheme." "The Department of Justice and [Homeland Security Investigations] acknowledge[d] Tether for its assistance in transferring these assets." *Id.* Ex. D.[2]

- In September 2026, the Department of Justice's Scam Center Strike Force took action against Defendant Xinbi Guarantee, restraining more than $52 million. "The Strike Force thank[ed] Tether for its proactive assistance in this investigation." *Id.* Ex. C.

These are just a few illustrative examples of Tether's active collaboration with U.S. law enforcement to stop schemes like the ones alleged by Plaintiffs.

### C. The Complaint and *Ex Parte* TRO

Plaintiffs assert claims against Defendants under the Trafficking Victims

---

[2] Even Tether's freezes for law enforcement are not without risk: Tether was sued by two Thai nationals for facilitating this seizure. *See Rukthammachalern v. Tether Holdings S.A. de C.V.*, No. 26-CV-07400 (S.D.N.Y. filed Aug. 31, 2026).

Protection Reauthorization Act ("TVPRA") and the Colorado Organized Crime Control Act ("COCCA"), alleging that they were participants in a "venture" involving a combination of human trafficking and investment fraud. *See* Dkt. No. 1 ("Compl.") at 81–83. Plaintiffs assert no claims against Tether, and Tether is not a party to the action. Simultaneously with their complaint, Plaintiffs filed a motion for an *ex parte* TRO. *See* Dkt. No. 3 ("Mot.") at 1. As relevant to this motion, Plaintiffs proposed that the Court "direct[] certain cryptocurrency intermediaries to freeze or immobilize certain of Defendants' assets," including digital assets in more than 85,000 unhosted wallets that Mr. Trager claims belong to the "venture." *Id.*; Trager Decl. ¶ 148. Plaintiffs' motion did not explain the basis for the Court's authority or jurisdiction to enjoin these nonparty "intermediaries." *See* Mot. at 49–55. The Court granted Plaintiffs' motion and ordered Tether to freeze Defendants' purported assets, but it made no jurisdictional findings regarding Tether. *See* TRO at 32.

Plaintiffs rely on the Trager Declaration as evidence purportedly demonstrating that the more than 85,000 wallets identified by Plaintiffs belong to Defendants. *See* Mot. at 49–50. But as Tether's expert Puneet Kakkar, a former cybercrime prosecutor, explains, Mr. Trager's methodology is unreliable and skips important analysis used by law enforcement to determine ownership—the enormous volume of wallets Plaintiffs seek to freeze is a product of the failure to do that work. Kakkar Decl. ¶ 8. Additionally, Mr. Kakkar's analysis casts doubt on Plaintiffs' theory of common ownership, showing that Plaintiffs' analysis is likely tainted by the

inadvertent inclusion of legitimate exchange service wallets, thereby potentially drawing in exchange customers and other legitimate services as well. *Id.* ¶ 12.

On November 2, 2026, Plaintiffs filed an emergency motion for a hearing to assess "whether Tether ha[d] complied or [was] taking the steps necessary to fully comply with" the TRO. *See* Emergency Mot. at 1. Following letter submissions and a status conference, instead of granting Plaintiffs' hearing motion, the Court instead ordered that Tether file its motion by November 12, 2026. *See* Dkt. No. 19. The Court subsequently stayed the TRO as to Tether pending briefing. *See* Dkt. No. 24.

## III. LEGAL ARGUMENT

The TRO should be modified to remove Tether. First, the Court cannot enjoin Tether as a nonparty pursuant to Rule 65(d)(2) because Tether is not in "active concert or participation" with Defendants. Second, the Court cannot enjoin Tether for lack of personal jurisdiction. Third, though the Court need not reach this issue, it lacks authority to issue *any* pre-judgment asset freeze here. Finally, in the alternative, the TRO should be modified to mitigate the legal and operational risk to Tether.

### A. The Court Lacks Authority to Enjoin Nonparty Tether Pursuant to Rule 65(d)(2)

"Federal Rule of Procedure 65 permits courts to enter TROs and preliminary injunctions." *See Tactic Franchising, LLC v. 100 Percent Chiropractic Ryan, LLC*, 2025 WL 1251260, at *1 (D. Colo. Jan. 15, 2025). Rule 65, however, "does not typically extend to non-parties." *See, e.g.*, *Huggins v. Buchannan*, 2026 WL 171587, at *3 (D.

Colo. Jan. 22, 2026). There are two exceptions: Rule 65(d)(2)(B) permits an injunction of "the parties' officers, agents, servants, employees, and attorneys," and Rule 65(d)(2)(C) permits a court to enjoin "persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. P. 65(d). This is based on the common law principle that "no court can make a decree which will bind any one but a party . . . . [I]t cannot lawfully enjoin the world at large, no matter how broadly it words its decree." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (Hand, *J.*); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945) ("The courts, nevertheless, may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently.").

Neither Rule 65(d)(2) exception applies to Tether. Tether is clearly not any Defendant's agent. Nor is it in "active concert or participation" with any Defendant. Rule 65(d)(2)(C)'s "active concert or participation" language encompasses arrangements "akin to alter ego, collusion, or identity of interest between a party and a nonparty,'" as well as "where a nonparty with actual notice aids or abets a named defendant or his privy in violating the order." *Reliance Ins. Co. v. Mast Constr. Co.*, 84 F.3d 372, 377 (10th Cir. 1996). That showing is not satisfied when, for instance, a foreign bank merely continues to provide ordinary course financial services to defendants while an asset freeze is in place. *See Nike, Inc. v. Wu*, 2020 WL 257475, at *19 (S.D.N.Y. Jan. 17, 2020) (denying motion for contempt against nonparty foreign bank for allegedly violating asset freeze, noting that "routine banking

activities to an enjoined party" do not satisfy Rule 65(d)(2), which requires "something more than account management in the ordinary course"), *aff'd Next Investments, LLC v. Bank of China*, 12 F.4th 119 (2d Cir. 2021).

But unlike a bank or cryptocurrency exchange, Plaintiffs do not and cannot allege any relationship between Tether and the Defendants, making an "active concert or participation" claim even more implausible against Tether. Defendants are not Tether customers, and they do not need Tether's assistance to transact in USDt. Real Decl. ¶¶ 4, 13. Tether has no non-public information regarding the ownership of the wallets, nor any role in any transactions involving the USDt held in the wallets. *Id.* ¶ 13. And as courts in this District have held, a nonparty's mere inactivity relative to a defendant's activities is insufficient for Rule 65(d) to reach the nonparty. *See Rylee & Cru, Inc. v. Zhu*, 2023 WL 355945, at *5 n.3, *6 (D. Colo. Jan. 23, 2023) (holding Rule 65(d)(2)(C) did not empower Court to bind nonparty domain name registrar to terms of TRO requiring website removal where plaintiffs "alleged only inactivity" by nonparty, drawing contrast to "nonparties [who] were actively involved in defendants' unlawful activities"); *see also Blockowicz v. Williams*, 630 F.3d 563, 568 (7th Cir. 2010) (holding Rule 65(d) did not permit nonparty injunction because "fact that [nonparty] is technologically capable of removing the postings does not render its failure to do so aiding and abetting. [Nonparties'] mere inactivity is simply inadequate to render them aiders and abettors in violating the injunction.").[3]

[3] Plaintiffs attempt to identify crypto-asset freezes ordered by other courts against

In fact, far from acting in concert with Defendants, the Trager Declaration shows that Tether is working *against* them: Tether has frozen more than 100 wallets worth approximately $25 million that Plaintiffs' own expert attributes to Defendants. Real Decl. ¶ 22; Trager Decl. ¶ 91. And Tether has frozen hundreds of millions of additional USDt tied to "pig-butchering" schemes, including USDt directly connected to Defendant Xinbi Guarantee, in conjunction with U.S. federal law enforcement.

Plaintiffs may point to various state or federal statutory authority as a purported basis for injunctive relief here, but regardless of whether the Court has authority under the TVPRA, COCCA, or some other law to issue an injunction as to *Defendants,* it still must satisfy Rule 65(d)(2)'s basic requirements to bind nonparties.[4] *See e.g.*, *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 112 (1969) (holding it was error to enjoin nonparty in antitrust case under Rule 65(d) because "a nonparty with notice cannot be held in contempt until shown to be in concert or participation"); *ADT LLC v. Northstar Alarm Servs., LLC*, 853 F.3d 1348, 1354 (11th Cir. 2017) ("'[T]he question of the extent to which a federal injunction

---

nonparties but, unlike here, those orders (1) satisfied Rule 65(d)(2), or (2) were issued *ex parte* without an opposition raising the application of Rule 65. Mot. at 6, 8, 45, 50.

[4] Notably, the TVPRA does not permit private plaintiffs to seek injunctive relief. *See* 18 U.S.C. § 1595A; *Chang v. Shen Yun Performing Arts, Inc.*, 2026 WL 2410052, at *6 (S.D.N.Y. Aug. 18, 2026) ("[O]nly the 'Attorney General,' not 'any individual who is a victim,' *i.e.*, Plaintiffs, may properly request injunctive relief under these provisions of the TVPRA."). For COCCA, when state injunctive remedies are sought in federal court by operation of Rule 64, they are subject to the express limitation that "a federal statute governs to the extent it applies." Fed. R. Civ. P. 64(a).

applies to non-parties is governed by Federal Rule of Civil Procedure 65(d), not by state law.'" (alteration in original)). Plaintiffs rely on cases where government agencies sought to freeze a defendant's assets, Mot. at 6, 31, but not only are the statutes in those cases not at issue here, even in those cases, the regulators were limited by Rule 65(d)'s requirements for enjoining nonparties. *See e.g., Lake Shore Asset Mgmt. Ltd. v. CFTC*, 511 F.3d 762, 767 (7th Cir. 2007) (Easterbrook, J.) (vacating CFTC injunction as to nonparty entities for lack of notice and opportunity to be heard regarding whether Rule 65(d)(2)(C) was satisfied).[5]

Federal courts cannot enjoin nonparties unless they are agents or acting in concert with defendants. Tether is neither, so the TRO is unenforceable as to it.

### B. The Court Cannot Exercise Personal Jurisdiction over Foreign Nonparty Tether to Enforce the TRO

Even if the Court concluded that it had authority to enjoin Tether here, the Court would need—but lacks—personal jurisdiction over Tether to do so.

A court cannot order a nonparty to freeze assets without personal jurisdiction. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) ("A district court can enforce an injunction against a nonparty . . . only if it has personal jurisdiction over that nonparty"); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice

[5] Even if Plaintiffs could invoke authority other than Rule 65 to enjoin a nonparty, then they would need to serve Tether under Rule 4.1—which they have failed to and cannot do—rather than rely on Rule 65's actual notice provision. Fed. R. Civ. P. 4.1 (service other than summons or a subpoena must be done by the U.S. Marshals Service "within the territorial limits of the state where the district court is located and, if authorized by a federal statute, beyond those limits").

and Procedure § 2956 (3d ed.) ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction."). Plaintiffs have not asserted *in rem* jurisdiction over the wallets here.[6] So Plaintiffs must establish that the Court has *in personam* jurisdiction—general or specific jurisdiction—over Tether. It has neither.

The Court clearly lacks general jurisdiction over Tether. Tether is not "at home" in Colorado because it is incorporated and headquartered in El Salvador and has no operations in Colorado (or the United States). *See* Real Decl. ¶¶ 5, 6; *see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (corporation "at home" in "its place of incorporation and principal place of business").

The Court also lacks specific jurisdiction over Tether. In applying specific jurisdiction to a nonparty's compliance with a court order, the Second Circuit in *Gucci*, cited by Plaintiffs, November 3, 2026, Tr. at 12, explained that the relevant analysis is "the connection between the nonparty's contacts with the forum *and the order at issue*." *Gucci*, 768 F.3d at 137 (emphasis added). In asset freeze cases involving domestic nonparties, this test turns on whether the nonparty intentionally aided the defendants in violating the court's order, thereby purposefully availing

[6] Nor could they: The Court cannot exercise *in rem* jurisdiction over extraterritorial assets. *See In re Gov't Seizure of ICX Tokens*, 2022 WL 292923, at *3 (D. Colo. Jan. 31, 2022) ("One of the essentials of in rem jurisdiction is that the property be within the court's jurisdiction at the time of the suit."); *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2956 (3d ed.) ("The application of in rem jurisdiction principles to injunction decrees seems dubious" and "should be viewed with great suspicion.").

itself of the forum. *See ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1215 (10th Cir. 2011) (analyzing purposeful violation of court order rather than general forum contacts to assess specific jurisdiction); *Gucci*, 768 F.3d at 137.

But for a *foreign* nonparty, the test requires even more than intentional aid to defendants—it requires that the forum be the "focal point" of the nonparty's acts. *See Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 230-31 (4th Cir. 2019) ("[T]he mere act of aiding and abetting is not always enough to provide minimum contacts"); *Reebok Intern. Ltd. v. McLaughlin*, 49 F.3d 1387, 1391–92 (9th Cir. 1995).

*Gucci* is instructive. There, a nonparty foreign bank holding alleged trademark infringer defendants' assets appealed an order requiring the bank to comply with the court's pre-judgment asset freeze against defendants. *Gucci*, 768 F.3d at 125. The Second Circuit contrasted the case before it with those involving domestic nonparties, concluding that in "no case" had a court exercised personal jurisdiction over a *foreign* nonparty based solely on the "intentionally aid[ing]" theory, and suggesting the foreign bank's "presence and activity in the forum" was also required to establish specific personal jurisdiction. *Id.* at 137–38. The Fourth Circuit in *Hawkins* agreed, holding that even a foreign nonparty's knowing participation in a defendant's violation of an order does not itself give rise to personal jurisdiction. *Hawkins*, 935 F.3d at 228–29. The court reasoned that a foreign nonparty "cannot be haled into the forum simply because he knew that his conduct would have incidental effects there; he must have 'expressly aimed' his conduct at the forum." *Id.* (quoting

*Walden v. Fiore*, 571 U.S. 277, 288 n.7 (2014)).

Here, Tether has done nothing whatsoever, let alone knowingly or intentionally, to aid the Defendants—it is not helping them. Thus, Plaintiffs cannot satisfy the jurisdictional test even for domestic nonparties, let alone the more demanding one applied to foreign nonparties. Plaintiffs cannot identify any contacts between Tether and Colorado, let alone a "connection between the nonparty's contacts with the forum and the order at issue." *Gucci*, 768 F.3d at 137; *see F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1175 (D. Colo. 2025) ("[T]he TVPRA does not provide for nationwide service of process," and therefore treating Colorado as the relevant forum).[7] For instance, Plaintiffs point to the fact that USDt is sold by U.S. cryptocurrency exchanges, but that just shows that Tether does not sell USDt directly in the U.S. And as in *Hawkins*, the USDt at issue here is allegedly held and transacted by Defendants outside the United States—and certainly not in Colorado—making the connection to the forum "incidental" at best. *Hawkins*, 935 F.3d at 231. Colorado thus can hardly be considered the "focal point" of Tether's conduct; any connections between Colorado and Tether are "random, fortuitous, or attenuated," or due to "the unilateral activity of another party or a third person" and therefore insufficient to establish jurisdiction. *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877

[7] Fed. R. Civ. P. 4(k)(2) does not apply to Tether, a nonparty. *See Receiver v. Banca Comerciala Victoriabank SA*, 843 F. App'x 485, 492 (4th Cir. Jan. 29, 2021). But to the extent that Tether's nationwide contacts matter, Plaintiffs cannot explain how Tether's purported contacts with the United States "connect" to the disputed TRO.

F.3d 895, 905 (10th Cir. 2017).

Accordingly, Plaintiffs have failed to make even a *prima facie* case for personal jurisdiction over foreign nonparty Tether. Plaintiffs are not entitled to jurisdictional discovery in a futile attempt to remedy that failure. "Absent a substantial probability that jurisdictional discovery would produce evidence sufficient to support the conclusion that specific personal jurisdiction would be appropriate, a party is not entitled to conduct such discovery." *Mills v. FCA US, LLC*, 2018 WL 11386606, at *6 (D. Colo. Nov. 29, 2018) (citation omitted).

### C. The TRO Is an Improper Pre-Judgment Injunction

While the Court need not reach the validity of the TRO if it lacks authority to bind or jurisdiction over Tether, the TRO is an improper pre-judgment asset freeze.

An asset freeze must comport with "traditional principles of equity jurisdiction." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). "[F]ederal district courts do not possess the inherent equitable power to issue preliminary injunctions preventing the transfer of assets [in which] the plaintiffs claim no pre-existing lien or equitable interest." *Niemi v. Lasshofer*, 728 F.3d 1252, 1257 (10th Cir. 2013). Instead, to justify an asset freeze, plaintiffs must "seek[] cognizable equitable relief" and show "a sufficient nexus between the assets sought to be frozen and the equitable relief plaintiffs request." *Pillow Menu, LLC, v. Super Effective, LLC*, 2021 WL 3726205, at *18 (D. Colo. Aug. 19, 2021).

Plaintiffs cannot seek a pre-judgment asset freeze under the TVPRA because

the statute provides private plaintiffs with the right to seek damages only, not injunctive relief. *See* 18 U.S.C. § 1595(a); *Chang*, 2026 WL 2410052, at *6. And *Grupo Mexicano* holds that district courts have "no authority to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication" of a "claim for money damages." 527 U.S. at 333.

Plaintiffs also seek "restitution" under the TVPRA and a constructive trust under Colorado law, Compl. at 84, but that changes nothing. The mere incantation of equitable relief "does not render *Grupo Mexicano* immaterial." *See Prosper, Inc. v. Innovative Software Techs.*, 188 F. App'x 703, 705 (10th Cir. 2006). Plaintiffs cannot show here "a sufficient nexus between the assets sought to be frozen and the equitable relief plaintiffs request." *Pillow Menu, LLC*, 2021 WL 3726205, at *18. Plaintiffs seek TVPRA restitution in the amount of their losses or Defendants' gain; they do not seek the return of the specific assets they seek to restrain. Compl. ¶ 338. And Plaintiffs do not have a "cognizable" equitable trust claim against these assets under COCCA either because, if Plaintiffs' allegations are correct, the assets never belonged to them. *See In re Estate of Feldman*, 443 P.3d 66, 70 (Colo. 2019) (constructive trust "is an equitable device used to compel one who unfairly holds a property interest to convey that interest to another to *whom it justly belong*s." (emphasis added)); *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1224 (10th Cir. 2019) (equitable restitution "ordinarily [comes] in the form of a constructive trust or an equitable lien, where money or property identified as *belonging in good conscience to the plaintiff*

could clearly be traced to particular funds or property in the defendant's possession." (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)) (emphasis added)). Because Plaintiffs are not seeking the return of their own property, the narrow exception for pre-judgment asset freezes is unavailable.

### D. In the Alternative, the Court Should Narrow the TRO as to Tether

Even if this Court finds that it has the authority and jurisdiction to enforce the TRO against Tether, and that the TRO itself is valid, it should modify the TRO in light of the legal and operational burdens on Tether as a foreign nonparty.

Plaintiffs' methodology for identifying the more than 85,000 wallets it attributes to Defendants is insufficiently reliable to establish ownership. "Preliminary injunctions are 'extraordinary' remedies, so plaintiffs must show their right to relief is 'clear and unequivocal.'" *Nat'l Ass'n for Gun Rts. v. Polis*, 173 F.4th 1317, 1331 (10th Cir. 2026). The quantity of wallets Plaintiffs seek to freeze is many times the total number Tether has frozen in coordination with U.S. law enforcement in the company's entire history. *See* Real Decl. ¶ 23. Indeed, cases cited by Plaintiffs involve a dozen or fewer wallets. *See Astrove v. Doe*, 2022 WL 2805345, at *3–4 (S. D. Fla. June 17, 2022) (twelve wallets); *Zucchero v. Bizango*, 2026 WL 1918039, at *3 (E.D. Tex. June 6, 2026) (three wallets); *Tumu v. Roycoin*, 2026 WL 2971821, at *6 (W.D. Tex. July 31, 2026) (one wallet that "almost certainly belongs to one of the alleged perpetrators," so burden on Binance "minimal").

The reason for the disparity between the number of wallets at issue in this action and the typical law enforcement request is Plaintiffs' failure to engage in a robust tracing and attribution analysis. Puneet Kakkar, a former federal prosecutor specializing in cybercrime, opines in his declaration that Mr. Trager's analysis is unreliable, and the unusual and unprecedented volume of wallets Plaintiffs seek to freeze is a result of Mr. Trager's failure to conduct a full tracing and joint ownership analysis to establish attribution. Kakkar Decl. ¶¶ 8, 28. More importantly, Mr. Trager's analysis appears to have misidentified multiple service wallets at major cryptocurrency exchanges as "unhosted wallets," tainting his analysis by potentially capturing innocent exchange customers. Kakkar Decl. ¶¶ 11, 12.

If forced to implement the TRO, Tether will likely freeze at least some assets belonging to innocent third parties or even cryptocurrency exchanges located all over the world, who it lacks a contractual relationship with and are not in the United States, let alone Colorado. These people will either be deprived of their assets or seek recourse against Tether in courts across the world. There are also uncertain operational challenges with freezing 85,000 wallets. Senior company personnel controlling private keys facilitate the freeze of each wallet individually and manually. Real Decl. ¶ 25. Tether has never frozen wallets at this scale before—because no law enforcement agency or court has ever asked Tether to freeze more than a few dozen wallets at one time. *Id.* ¶¶ 23–24.

Ultimately, Plaintiffs fail to show that "the threatened injury they face outweighs the injury [Tether] likely would face" from the TRO. *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 231 F. Supp. 2d 1066, 1070 (D. Colo. 2002); *see also Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 158–59 (S.D.N.Y. 2011) (noting hardship to nonparty banks of complying with order with more than speculative likelihood of exposure to civil and criminal liability in foreign court), a*ff'd sub nom. Tiffany (NJ) LLC v. Andrew*, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011).

Accordingly, even should the Court find it has authority to enjoin Tether, jurisdiction to enforce the TRO against Tether, and that the TRO is valid, Tether requests that the Court modify the TRO as to Tether. This is necessary to ensure that Tether's compliance, if even technically and operationally feasible, would not encroach upon the rights of innocent nonparties because of the flaws in Mr. Trager's analysis, exposing Tether to legal peril in jurisdictions far from Colorado.

## IV. CONCLUSION

For the foregoing reasons, Tether respectfully asks this Court to modify the TRO as to Tether.

Dated: November 12, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

/s/ *Monica Loseman*
Monica Loseman
mloseman@gibsondunn.com
1900 Lawrence St. Suite 3000
Denver, CO 80202
Phone: (303) 408-1847

Dani James
djames@gibsondunn.com
Daniel Ketani
dketani@gibsondunn.com
200 Park Avenue
New York, NY 10166
Phone: (212) 351-3880

*Attorneys for Nonparty*
*Tether International S.A. de C.V.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2026, I caused the foregoing Motion to be transmitted by email to the Clerk of the Court for filing, and that on November 13, 2026, hard copies will be delivered to the Clerk of the Court. I further certify that on November 12, 2026, I caused true and correct copies of the foregoing to be served by email on counsel for Plaintiffs at the following addresses:

Jorge.Tenreiro@blbglaw.com

Avi@blbglaw.com

mlw@williamsserio.com

*/s/ Lynette Apodaca*
Lynette Apodaca

## CERTIFICATION REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to Section C.2 of the Court's Standing Order for Civil Cases, the undersigned certifies that any language drafted by AI (even if later edited by a human) was personally reviewed by the filer or another human for accuracy and all legal citations are to actual, non-fictitious cases or cited authority.

Dated: November 12, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

/s/ *Monica Loseman*


Monica Loseman
mloseman@gibsondunn.com
1900 Lawrence St. Suite 3000
Denver CO 80202-2211
Telephone: (303) 408-1847

Dani James
djames@gibsondunn.com
Daniel M. Ketani
dketani@gibsondunn.com
200 Park Avenue
New York New York 10166-0193
Telephone: (212) 351-3880


*Attorneys for Nonparty*
*Tether International S.A. de C.V.*